# EXHIBIT C

**FOOD AND DRUG ADMINISTRATION (FDA)**
Center for Drug Evaluation and Research (CDER)

***Peripheral and Central Nervous System Drugs Advisory Committee Meeting***

# Alemtuzumab (BLA 103948\5139) Background Package

**November 13, 2013**

# DISCLAIMER STATEMENT

The attached package contains background information prepared by the Food and Drug Administration (FDA) for the panel members of the advisory committee. The FDA background package often contains assessments and/or conclusions and recommendations written by individual FDA reviewers. Such conclusions and recommendations do not necessarily represent the final position of the individual reviewers, nor do they necessarily represent the final position of the Review Division or Office. We have brought these issues to this Advisory Committee in order to gain the Committee's insights and opinions, and the background package may not include all issues relevant to the final regulatory recommendation and instead is intended to focus on issues identified by the Agency for discussion by the advisory committee. The FDA will not issue a final determination on the issues at hand until input from the advisory committee process has been considered and all reviews have been finalized. The final determination may be affected by issues not discussed at the advisory committee meeting.

# Table of Contents

1. Deputy Division Director Memo

2. Draft Points to Consider

3. Clinical Safety

4. Clinical Efficacy

5. Statistics

# CLINICAL REVIEW

| | |
|---|---|
| Application Type | BLA Labeling Supplement |
| Application Number(s) | sBLA-103948-5139 |
| Priority or Standard | Standard |
| | |
| Submit Date(s) | November 27, 2012 |
| Received Date(s) | November 27, 2012 |
| PDUFA Goal Date | December 27, 2013 |
| Division / Office | Division of Neurology Products |
| Reviewer Name(s) | John R. Marler, M.D. |
| Review Completion Date | October 1, 2013 |
| | |
| Established Name | Alemtuzumab |
| (Proposed) Trade Name | Lemtrada |
| Therapeutic Class | Monoclonal antibody |
| Applicant | Genzyme Corporation |
| | |
| Formulation(s) | 10 mg/ml concentrate for dilution |
| Dosing Regimen | Month 0: 12 mg/day for 5 days<br>Month 12: 12 mg/day for 3 days |
| Indication(s) | Multiple sclerosis |
| Intended Population(s) | Adults |

(Blank – Back of Cover Page)

# Table of Contents

**1. RECOMMENDATIONS/RISK BENEFIT ASSESSMENT ........ 8**

1.1 Recommendation on Regulatory Action ........ 8
1.2 Risk Benefit Assessment ........ 9
1.3 Recommendations for Post-market Risk Evaluation and Mitigation Strategies .. 9
1.4 Recommendations for Post-marketing Requirements and Commitments ........ 10

**2. INTRODUCTION AND REGULATORY BACKGROUND ........ 10**

2.1 Product Information ........ 10
2.2 Tables of Currently Available Treatments for Proposed Indications ........ 11
2.3 Availability of Proposed Active Ingredient in the United States ........ 11
2.4 Important Safety Issues with Consideration to Related Drugs ........ 12
2.5 Summary of Presubmission Regulatory Activity Related to Submission ........ 12
2.5.1 BLA Submission for B-Cell Chronic Lymphocytic Leukemia (CLL) ........ 12
2.5.2 IND 10717 Alemtuzumab for Multiple Sclerosis ........ 13
2.6 Other Relevant Background Information ........ 19

**3. ETHICS AND GOOD CLINICAL PRACTICES ........ 20**

3.1 Submission Quality and Integrity ........ 20
3.1.1 Quality ........ 20
3.1.2 Integrity ........ 20
3.2 Compliance with Good Clinical Practices ........ 20
3.3 Financial Disclosures ........ 20

**4. SIGNIFICANT EFFICACY/SAFETY ISSUES RELATED TO OTHER REVIEW DISCIPLINES ........ 21**

4.1 Chemistry Manufacturing and Controls ........ 21
4.2 Clinical Microbiology ........ 22
4.3 Nonclinical Pharmacology/Toxicology ........ 22
4.4 Clinical Pharmacology ........ 23
4.4.1 Mechanism of Action ........ 24
4.4.2 Pharmacodynamics ........ 24
4.4.3 Pharmacokinetics ........ 25

**5. SOURCES OF CLINICAL DATA FOR EFFICACY ANALYSIS ........ 25**

5.1 Tables of Studies/Clinical Trials ........ 26
5.2 Review Strategy ........ 29
5.3 Design of Individual Clinical Studies and Clinical Trials ........ 29

5.3.1 Trial 323: Design ........ 29
5.3.2 Trial 324 Design: Differences from Trial 323. ........ 50
5.3.3 Trial 223 Design ........ 52
5.3.4 The CAMMS3409 Extension Trial (EXT) ........ 58

**6. REVIEW OF EFFICACY ........ 59**

6.1 Indication ........ 60
6.2 Methods ........ 60
6.3 Demographics and Baseline Clinical Characteristics ........ 60
6.4 Subject Disposition ........ 62
6.4.1 Dropout and Discontinuation ........ 64
6.5 Analysis of Primary Endpoints ........ 68
6.6 Analysis of Secondary Endpoints ........ 71
6.7 Tertiary and Exploratory Endpoints ........ 72
6.8 Subpopulations ........ 74
6.9 Analysis of Clinical Information Relevant to Dosing Recommendations ........ 75
6.10 Discussion of Persistence of Efficacy and/or Tolerance Effects ........ 76
6.11 Antibody formation and effectiveness ........ 76
6.11.1 Alemtuzumab antibodies ........ 76
6.11.2 Interferon antibodies. ........ 77
6.12 Compliance with Criteria for Well-controlled Trials in CFR §314.126(b) ........ 77
6.13 The significance of the extremely low relapse rates ........ 80
6.14 Consistency of the outcomes between and within the 323 and 324 trials. ........ 82
6.15 Efficacy Summary ........ 83

**7. REVIEW OF SAFETY ........ 84**

Safety Summary ........ 84

**8. POST-MARKETING INFORMATION ........ 85**

**9. APPENDICES ........ 86**

9.1 Complete List of Selection Criteria for CAMMS323 Trial ........ 86
9.2 The McDonald Criteria from the CAMMS323 protocol ........ 89
9.3 Tertiary Outcome Measures for 323 and 324 Trials ........ 89
9.4 Advisory Committee Meeting ........ 90
9.5 EDSS Scale Components ........ 90

alemtuzumab 30mg IV three times per week for 4 to 12 weeks.[3] The response rate was 33%. Two other open-label one-arm trials with 32 and 24 patients showed response rates of 21% and 29%. The median duration of the response was 7, 7, and 11 months in the three trials. The original label had three black-box warnings for (1) hematological toxicity, including pancytopenia, marrow hypoplasia, autoimmune idiopathic thrombocytopenia, and autoimmune hemolytic anemia; (2) infusion reactions; (3) serious opportunistic infections. The label listed hyperthyroidism as a serious endocrine adverse event.

FDA approved an addition to the label on 5/19/2004: "The following serious adverse events were identified in post-marketing reports: tumor lysis syndrome, Goodpasture's syndrome, Graves disease, Guillain-Barre syndrome, optic neuropathy, and serum sickness."

FDA granted the original approval contingent on performance of a post-marketing unblinded randomized controlled clinical trial to compare alemtuzumab to chlorambucil in B-cell CLL. That trial showed an increase in progression-free survival when alemtuzumab was used as first-line therapy. The label was changed to reflect this finding on 9/19/2007.

### 2.5.2 IND 10717 Alemtuzumab for Multiple Sclerosis

Ilex Oncology submitted an IND to develop alemtuzumab for MS on October 8, 2002. The first trial proposed was the CAMMS223 trial. After acquiring Ilex Oncology, Genzyme submitted the protocols for the CAMMS323 and CAMMS324 trials.

On **November 7, 2002**, FDA archived minutes of a teleconference with Genzyme. Clinical comments relevant to issues of this review included the following:

> "The Agency views the proposed study as an open-label Phase II trial with numerous secondary endpoints. Due to the clinical trial design, the results of this study will not provide substantial support for a BLA. T<u>he sponsor acknowledged that this study will not provide substantial support for a BLA.</u>"
>
> "The sponsor agreed to revise the trial to improve the reliability and objectivity of the ascertainment of relapse occurrence."
>
> "In an open-label study, variations in the use of steroids could have an impact on the occurrence of relapses. Therefore, the protocol should specify and standardize the treatment that investigators will use to treat a clinically significant relapse."

---

[3] For MS the dose of alemtuzumab is two one-week cycles separated by a year. Each cycle consists of 12mg IV three times per week.

> "However, the sponsors acknowledged that variation in the treatment of relapses may confound the interpretation of the study results. The sponsor expressed their commitment to obtain complete data regarding the treatment of relapses during the course of the study"

On **August 13, 2004**, FDA archived minutes of a teleconference with Genzyme. Clinical comments relevant to issues of this review included the following:

> "The sponsor requested this telephone conference to discuss the possibility of submitting an sBLA based on the results of a 1-year analysis of the ongoing trial."
>
> "Because of study design issues (open-label, small sample size), the [CAMMS223 trial] is unlikely to provide substantial support for an sBLA."

On **August 24, 2004**, FDA called Genzyme to discuss a change in the statistical analysis plan for CAMMS223 to add relapse rate as a co-primary endpoint.

> FDA noted that the details of the analysis, such as the method for calculating relapse rate and the allocation of alpha to the two co-primary endpoints, are important. FDA also noted that it is permissible to change the statistical analysis plan as long as the data remains blinded.

On **April 1, 2005**, FDA called Genzyme to discuss amendment #60,[4] a change in the statistical analysis plan for the CAMMS223 trial.

> FDA stated that FDA views the ongoing clinical trial as a Phase 2 study. The trial is moderately sized and open-label. Therefore, the trial will not be a pivotal study to support a license application. However, if the trial is conducted rigorously, the trial may provide evidence to support a subsequent Phase 3 study.
>
> "FDA is uncertain about the clinical meaningfulness of an effect on relapse rate at one year. In order to support a license application, an effect on relapse rate at two years (or longer) is necessary"

On **July 19, 2005**, FDA called Genzyme to discuss amendment #60, a change in the statistical analysis plan for the CAMMS223 trial.

> "The sponsor plans to revise the statistical analysis plan to specify that the study statistician will provide the interim results to the Steering Committee, who will then make decisions about the design of the Phase 3 study. With this revised plan, the DSMB will not serve as an intermediary between the statistician and the Steering Committee."
>
> "FDA expressed concern that the Steering Committee that receives the results of the interim analysis should have no impact or effect on the ongoing clinical trial. FDA also

[4] There is no corresponding amendment described in the sBLA submission. Amendment 3 had the date December 27, 2005. Amendment 2 had the date November 13, 2003.

> stated that FDA had no new comment after reviewing the analysis plan submitted in Amendment 65."

**On September 13, 2005**, FDA archived minutes of a teleconference with Genzyme after Genzyme had notified FDA that the DSMB had reviewed safety and efficacy data from the study in MS, and recommended suspending dosing of alemtuzumab due to the occurrence of 3 cases of severe ITP in alemtuzumab patients and none in interferon beta patients. A plan to monitor for ITP was discussed. CDER placed the IND on clinical hold:

> "The sponsor may not administer additional dosing of Alemtuzumab under this IND, pending submission and CDER review of a revised protocol and consent form that adequately address CDER concerns regarding the risk of ITP."

In addition, during the same teleconference, the sponsor and CDER discussed the design of a future Phase 3 study. Clinical comments in the minutes regarding trial design included the following:

> "Sponsor and CDER agreed that a Phase 3 trial is necessary to confirm these preliminary results."
>
> "Sponsor and CDER agreed that the public disclosure [of the CAMMS223 results] should be worded such that it does not undermine subject and/or investigator participation in a subsequent, randomized Phase 3 study."
>
> "Sponsor and CDER agreed that off-label use of Alemtuzumab would be a problem and should not be encouraged by any public disclosure."
>
> "A lower dose Alemtuzumab group may be necessary to provide strong double-blind evidence of a treatment effect."
>
> [The sponsor is proposing that] "the trial will include a single-blind active control group, with blinded assessors."
>
> "Considering the unblinding (of the sponsor and FDA) that has occurred, minimizing the changes to the analysis plan is essential to preserve the integrity of [CAMMS223]."

On **February 2, 2006,** Genzyme submitted a complete response to the full clinical hold placed because of concerns about ITP. FDA found the response inadequate and continued the clinical hold on March 17, 2006. On **March 17, 2006**, DNP continued the clinical hold.

**On May 18, 2006**, Genzyme submitted a second complete response. On **July 7, 2006**, DNP continued the clinical hold.

**On October 13, 2006**, Genzyme submitted a third complete response. FDA continued the clinical hold on November 9, 2006.

> FDA clarified that "the clinical hold is a partial hold, in which new exposure to alemtuzumab is not allowed, but clinical follow-up of patients already treated may otherwise continue, as has been the case up to this date."

On **November 21, 2006**, FDA met with Genzyme to discuss current and future development plans for alemtuzumab. Clinical comments in the minutes regarding trial design included the following:

> "FDA cannot agree at this time that the study [CAMMS223] was successfully completed based on the 2 year interim analysis. We note that the original plan was for two co-primary endpoints (relapse rate and time to sustained accumulation of disability) based on 3 years, and that using the two year interim analysis as the primary analysis is a deviation from the prospective analysis plan. Also, the study had an open-label design, which raises possible issues of bias. We are, however, willing to consider that the study could serve as one source of substantial evidence of effectiveness, but our final decision will depend upon our detailed review of the data."
>
> "[CAMM223] provides encouraging results regarding the efficacy of alemtuzumab for MS, but also raises serious concerns regarding its safety (see above). If efficacy is showed in a well designed, and well controlled randomized study, with very robust evidence, then the completed study has the potential to provide data contributing to the establishment of substantial evidence of efficacy."
>
> "Genzyme, through press releases, has already shared a lot of information regarding the safety and efficacy of alemtuzumab. Considering the open-label design, and the information already disseminated, FDA has no objection."
>
> "FDA responded that a rater blinded (but patient not blinded) study may be adequate if the effect is large. However, a totally blinded study is more likely to be found persuasive if the treatment effect is relatively small."
>
> "The FDA noted that using a low dose active comparator would assist with the blinding. However, the sponsor was hesitant to have a treatment arm with ineffective therapy, such as placebo or very low dose alemtuzumab. The FDA again noted that they prefer double-blinded, controlled studies, especially for the pivotal trials."
>
> "In the absence of a valid justification for the proposed study, we believe that any further investigation of alemtuzumab for multiple sclerosis should be carried out under a well designed randomized controlled trial that will provide useful efficacy data as well as adequate safety monitoring. The current trial (CAMMS223) does not meet these criteria."
>
> The clinical hold may be lifted after positive review of a well designed and well controlled randomized study.

**March 16, 2007** and **March 21, 2007** Genzyme submitted two protocols for SPA. June 29, 2007, FDA responded with a No Agreement letter. The letter contained the following FDA comments regarding the trial designs for CAMMS323 and CAMMS324:

"The FDA would not allow an indication for "…relapsing forms of MS…" unless you are able to provide the required substantial evidence of effectiveness, including replication, in all relapsing forms of MS."

"You must show that efficacy is sustained throughout the second year, and you should also randomize patients by site."

"FDA strongly recommends that you use a double-dummy placebo control in your pivotal trials. The acceptability of your rater-blinded study will be a matter of review. If your study results reveal an extremely large effect, then FDA may potentially accept this rater-blinded design for the pivotal trials. Also, you should carefully assess the effectiveness of your blinding during the trial and at its conclusion to determine if the rater blind was maintained."

"The secondary efficacy endpoint of proportion of patients with no MS disease activity is based on relapse, SAD, as well as MRI results. In both phase III studies, MRI will be measured once a year. Since Gd-enhancing lesions could markedly increase in number in a short period such as one month, we believe that MRI needs to be measured more frequently (for example every 3 months), in order to adequately capture disease activity."

"No, you must show replication of the outcome(s). For example, if one study were positive for relapse rate, but not SAD, and the second study was positive for SAD, but not relapse rate, then we would not accept this as adequate evidence for efficacy of these outcomes. Likewise, if both trials are positive for relapse rate, but only one is positive for SAD, then FDA would consider the indication for relapse rate, but not SAD."

"If an interim analysis is planned, you need to take all necessary precautions to ensure the integrity of the study and to avoid unauthorized access for the interim data. All personnel who have access to the unblinded interim data and all contacts with those personnel need to be documented for all occasions. The complete details of the interim analysis and charter documents need to be submitted."

**May 3, 2007**, FDA removed the clinical hold.

**April 23, 2009**, Genzyme submitted the statistical analysis plan for CAMMS323. On August 20, 2009, FDA responded with comments regarding that plan.

The FDA statisticians agreed with the definition of the full analysis set, the use of the proportional hazards model for the analysis of time to SAD but disagreed with the use of the proportional means model for the relapse endpoint.

"Relapse also causes the censoring of time to SAD due to alternative medications the patient receives, if the patient has not experienced SAD yet. Sensitivity analyses, including a worst-case scenario analysis, of time to SAD for patients who are censored due to relapses should be added to the protocol."

"SAD and relapse rate are co-primary endpoints. The study will be considered positive if both endpoints achieve statistical significance at the 0.05 significance level."

> "The co-primary endpoint of relapse rate as defined is problematic. A subject who has a relapse is likely to take alternative medication. The treating physician is unblinded in this study. As described in the protocol, the treating physician will treat the patient who has relapses based on the treatment assignment of the patient. Therefore, subsequent relapses may be dependent on the treatment of the first relapse, causing bias in efficacy evaluations. We recommend you use time to first relapse instead of relapse rate as the co-primary endpoint. The relapse rate estimated as proposed is not acceptable."

**March 17, 2010**, FDA met with Genzyme to discuss key design elements and the analysis plan for the alemtuzumab development program. FDA comments in the meeting minutes relevant to this review included the following:

> FDA agreed "with the use of relapse rate as an endpoint. However, the proposed analysis (in particular with the elimination of censoring of patients who initiate an alternate therapy) would be very difficult to interpret, because of the open-label design of the study. Any relapse, EDSS assessment and time in study taking place after the initiation of an alternative MS therapy should be excluded from the primary analysis."
>
> "The Division continues to have concerns about group differences in the treatment of relapses by unblinded physicians and the reporting of relapses by unblinded patients."
>
> FDA was "concerned by the potential bias introduced by the absence of blinding of patients, the possibility of unblinding of EDSS raters, the initiation of alternative MS therapies after the first relapse, and the elimination of censoring. The interpretation of the results from the statistical analysis will be challenging, and extremely robust findings will be necessary to overcome these issues."
>
> "Blinding procedures were discussed in detail. For EDSS and relapse reporting, the bias introduced by unblinding of physicians and patients remains a significant problem which will cause serious difficulties in interpreting the results of the trial. Trial procedures leave doubt about the extent of any unblinding of EDSS raters."
>
> "Analysis of secondary outcomes will not be done unless the differences in both primary outcomes are statistically significant. Labeling of any secondary outcome is ultimately a question of review. However, FDA continues to believe that the secondary clinical outcomes of CAMMS323 overlap many of the same domains covered by the primary outcomes."
>
> "The adjudicated relapses will form the basis for the analysis of the primary relapse rate outcome. The detection of a relapse still depends entirely on subjective observations by the unblinded patient or an unblinded physician."

**June 11, 2010,** FDA granted Fast Track Designation.

**January 24, 2011**, FDA met with Genzyme at a pre-BLA meeting. Clinical comments regarding the planned BLA application included the following:

"Beginning with our initial review of the CAMMS323 and CAMMS324 protocols, the lack of double-blinding has consistently concerned us. The lack of blinding remains a major concern. We [FDA] note that, despite these previous concerns that have been communicated to you, there was little discussion of the unblinded design of the trials in the meeting material. We emphasize the importance of presenting a full discussion and analysis of the impact of having the patients and treating physicians unblinded. You need to present data and analyses that evaluate the objectivity of the EDSS and MRI outcomes as well as the relapses. To do so requires full descriptions of the procedures for ensuring the blind and data to support compliance with the different blinding procedures in the protocols. You need to include efficacy data from the ongoing extension study CAMMS03409 because it can provide important information about clinical outcomes after subjects left the CAMMS223, CAMMS323, and CAMMS324 trials."

**August 7, 2012**, FDA refused to file the initial sBLA submission because of problems with data formatting. Subsequent to this meeting DNP clinical reviewers and the DBI statistician communicated with Genzyme by email and teleconference, and at meetings to explain the data formatting problems.

**November 29, 2012,** Genzyme resubmitted supplement sBLA 103948-5139. FDA filed the application—the subject of this review.

## 2.6 Other Relevant Background Information

On May 02, 2007, the website Drugs.com reported that Genzyme Corporation and Bayer HealthCare Pharmaceutical had announced detailed interim two-year results from the CAMMS223 Phase 2 study which had been presented by Alasdair J. Coles, Ph.D., at the 59th Annual Meeting of the American Academy of Neurology (AAN) in Boston.[5] This announcement came 4 or more months prior to randomization of the first subject in the unblinded CAMMS323 and CAMMS324 phase 3 trials.

[5] http://www.drugs.com/clinical_trials/genzyme-bayer-healthcare-announce-detailed-interim-two-year-alemtuzumab-multiple-sclerosis-data-774.html. The 59th Annual Meeting of the American Academy of Neurology, Boston, Massachusetts occurred from April 28 to May 5, 2007.

# 3. Ethics and Good Clinical Practices

## 3.1 Submission Quality and Integrity

### 3.1.1 Quality

The submission was complete and there is no reason to believe it did not accurately portray the conduct and results of the clinical trials. The dataset documentation did not clearly delineate the derivations of analysis variables from fields on the case report forms. In general, the application did not convey objectivity and did not explore alternative explanations for the results that were reported. The submission did not explain unusual features of the trial such as the determination of baseline EDSS scores after randomization in many subjects. The discussion of the blinding was incomplete and did not adequately address FDA concerns about the extent of bias introduced by unblinded subjects and treating physicians or estimate the possible effects of unblinding patients and treating physicians on the interpretation of the results.

The quality of the design and conduct of the trials is the subject of sections 5 and 6, below.

### 3.1.2 Integrity

The sponsor reported problems with data quality at one of the clinical sites. The sponsor asserts that none of the problems could have had a significant impact on the evidence for effectiveness.

## 3.2 Compliance with Good Clinical Practices

The sponsor has provided statements asserting compliance with Good Clinical Practice.

## 3.3 Financial Disclosures

In the sBLA application Genzyme certifies that it has financial disclosure statements from all but 34 clinical investigators that demonstrate no proprietary interest in the product or significant equity in Genzyme. 13 sub-investigators in the CAMMS223 trial, 18 in the CAMMS324 trial, and 3 in the CAMMS323 trial did not provide financial disclosure information to the sponsor. The sponsor reports multiple attempts to obtain the information without success. The chief financial officer submitted a statement that Genzyme made no payments to the sub-investigators that did not complete disclosures.

Genzyme paid the 6 members of the adjudication panel. Genzyme states that the amount of compensation did not depend on the outcome of the trials.

Trial sponsorship by Bayer Schering Pharma was not mentioned in the submission but did appear in the published reports of the clinical trials.[6] In response to a request for information, Genzyme explained that Bayer Schering Pharma collaborated with Genzyme and supported one-third of clinical development costs. In 2009, Genzyme acquired the rights to Campath (alemtuzumab) from Bayer; however, Bayer retained rights to co-promote the drug if approved for use in MS and may receive payments on any annual revenues in MS. Genzyme claims that they were directly responsible for the "design, conduct, monitoring, analysis, oversight, regulatory reporting and decision making relative to the Phase 2, Phase 3 and Extension studies of alemtuzumab per 21 CFR 312." The financial disclosures for investigators involved in the 223, 323, and 324 trials did not include any financial interests or arrangements with Bayer. FDA requested financial disclosures regarding Bayer from investigators. Genzyme had not provided those disclosures by the time this review was completed.

# 4. Significant Efficacy/Safety Issues Related to Other Review Disciplines

## 4.1 Chemistry Manufacturing and Controls

The material in this section summarizes information in the July 19, 2011, version of Genzyme's Investigator Brochure.

Molecular Structure and Chemical Name

Alemtuzumab is a Y-shaped molecule consisting of two polypeptide chains linked by disulfide bridges.

Drug Molecular Structure

[6] The CAMMS223 Trial Investigators, *N Engl J Med* 359;17. October 23, 2008; Jeffrey Cohen, CAMMS323, *Lancet*, November 1, 2012; Alastair Coles, CAMMS324, Lancet, November 1, 2012.