**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

UMB BANK., N.A, *as Trustee*,

                                    Plaintiff,

          -against-

SANOFI,

                                    Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: SEP 08 2016

<u>MEMORANDUM DECISION</u>
<u>AND ORDER</u>

15 Civ. 8725 (GBD)

GEORGE B. DANIELS, United States District Judge:

   Plaintiff UMB Bank, N.A.[1] brings this action against Defendant Sanofi for breach of contract and breach of the implied covenant of good faith and fair dealing. (*See* Complaint, ECF No. 5.) As to Count I Plaintiff asserts that Defendant, successor in interest of Genzyme, the developer of the multiple sclerosis ("MS") drug Lemtrada, has breached the Contingent Value Rights Agreement ("CVR Agreement") between the parties through its failure to use diligent efforts to meet a milestone in connection with the drug's regulatory approval. (Compl. ¶¶ 1, 3-4, 123.) Count II is another breach of contract claim as to milestones associated with drug sale thresholds. (*Id.* ¶¶ 127-130.) Plaintiff alleges that meeting those milestones would have resulted in payments to Plaintiff, the Trustee for holders of contingent value rights ("CVRs") in the drug. (*See id.* ¶¶ 1, 5.) Plaintiff also asserts in Count III that Defendant breached the implied covenant of good faith and fair dealing because it has purposely kept drug sales low in an effort to avoid making milestone payments. (*Id.* ¶¶ 132-34.) Plaintiff seeks declaratory and injunctive relief,

---

[1] American Stock Transfer & Trust Company ("AST"), the former Trustee, initiated this action on November 9, 2015. AST resigned as Trustee on May 13, 2016, and UMB Bank was appointed as the new Trustee on June 30, 2016. (*See* Pl.'s Mem. in Supp. of Mot. to Substitute Party, ECF No. 57, at 1.) On July 8, 2016, AST filed a motion to substitute UMB Bank, N.A. as Plaintiff. (Pl.'s Mot. to Substitute Party, ECF No. 56.) The motion was unopposed, and this Court granted the motion to substitute on July 19, 2016. (*See* ECF No. 66.)

compensatory and liquidated damages plus prejudgment interest, expert and attorney's fees, as well as any other "just and proper" relief.  (*Id.* at 36-37.)

Defendant moves to dismiss Counts II and III of the Complaint for failure to state a claim upon which relief can be granted pursuant to Federal Rule of Civil Procedure 12(b)(6).  (Def.'s Mot. to Dismiss, ECF No. 19; Def.'s Mem. in Supp. of Mot. to Dismiss ("MTD Mem."), ECF No. 20, at 1.)[2]  As to Count II, Defendant argues that Plaintiff has failed to sufficiently allege facts that support its contention that Defendants did not make a diligent effort to achieve the approval and product sales milestones, resulting in economic damage to Plaintiff.  (August 17, 2016 Oral Arg. Tr., at 7:9-18.)  Defendant also argues that under New York law, Count III, Plaintiff's separate cause of action for breach of the implied covenant of good faith and fair dealing, cannot lie when a breach of contract claim based on the same facts is already pleaded. (Mem. at 17.)

Plaintiff moves for summary judgment on its claim for attorneys fees against Defendant. (*See* Pl.'s Mot. for Summ. J., ECF No. 60; Pl.'s Mem. in Supp. of Mot. for Summ. J. ("MSJ Mem."), ECF No. 61.)[3]  Plaintiff seeks a declaratory judgment stating that the CVR Agreement obligates Defendant to pay up front, and upon request, Plaintiff's reasonable attorneys' fees, disbursements, and expenses incurred in investigating and prosecuting the claims brought in this action, costs of distribution of notices pursuant to the CVR Agreement, and any other Trustee's Expenses.  (Suppl. Compl., ECF No. 52, ¶¶ 45-59, Prayer for Relief.)

---

[2] The motion was fully submitted following the filing of Plaintiff's Opposition brief, ("MTD Opp'n," (ECF No. 26)), and Defendants' Reply brief ("MTD Reply," (ECF No. 31)).

[3] The motion was fully submitted on an expedited basis following the filing of Defendants' Opposition brief, ("MSJ Opp'n," (ECF No. 69)), and Plaintiff's Reply brief ("MSJ Reply," (ECF No. 74)). This Court held oral argument on both motions on August 17, 2016.

Defendant's motion to dismiss Count II is DENIED.  Plaintiff has sufficiently alleged a breach of contract claim based on Defendant's failure to use diligent efforts to meet the agreed-upon Product Sales Milestone (PSM) #1, which resulted in missing PSM #1.

Defendant's motion to dismiss Count III is GRANTED.  Plaintiff has failed to sufficiently allege a separate claim for breach of the covenant of good faith and fair dealing.

Plaintiff's motion for summary judgment seeking immediate payment of attorney's fees and other expenses is DENIED.  However, Plaintiff may seek later payment of attorney's fees and other expenses as provided by the CRV Agreement.

## I.   FACTUAL BACKGROUND

Plaintiff alleges that Defendant entered into a merger agreement with biotechnology company Genzyme Corporation in February 2011. (Compl. ¶ 2.)  According to Plaintiff, prior to and at the time of the merger, Genzyme had been conducting clinical trials on Lemtrada (generic name "alemtuzumab").  (*Id*. ¶¶ 2, 20.)  Plaintiff further alleges that to effectuate the merger, the parties entered into the CVR Agreement under which Defendant issued a contingent value right, and $74 for each Genzyme share, to Genzyme's stock holders as consideration for more than 90% of Genzyme's stock. (*Id*. ¶¶ 3-4.)  According to a March 7, 2011 SEC filing, "Genzyme estimated the value of a CVR at $5.58." (*Id*. ¶ 22.)

As outlined in the CVR Agreement, to achieve the approval milestone, Defendant must have obtained Federal Drug Administration (FDA) approval of Lemtrada for MS treatment by March 31, 2014. (*Id*. ¶ 23a.)   The CVR Agreement further provides that achieving PSM #1 required the sum of Lemtrada sales for certain major markets and certain non-major markets to surpass $400 million by June 30, 2016.[4] (*See* Compl., Ex. A, at 11.)  PSM #2 would be achieved

---

[4] The June 30, 2016 date became the operative deadline for PSM #1 because the contractual measuring period was four quarters from the date of the first commercial sale in the last qualifying major market. (*See*

when the global sales of Lemtrada hit $1.8 billion during any four consecutive quarters (including the quarters used to compute PSM #1). (*See* Compl. ¶ 23c; *id.*, Ex. A at 11.) PSM #3 would be achieved when global sales hit or exceeded $2.3 billion during any four consecutive quarters, exclusive of any quarters used to achieve PSMs #1 and #2. (*Id.* at ¶ 23d.) PSM #4 would similarly be achieved when global sales hit or exceeded $2.8 billion during any four consecutive quarters, exclusive of any quarters used to achieve any previous milestone. (*Id.* at ¶ 23e.) The deadline to meet PSMs #2, #3, and #4 is December 31, 2020. (*See* Compl., Ex. A, at 15.)

Plaintiff alleges that under the CVR Agreement, (Ex. A to Compl., ECF No. 5), Defendant promised to use diligent efforts to achieve milestones relating to the regulatory approval and sales of Lemtrada. (Compl. ¶¶ 4-5; Compl., Ex. A, at 4, 43 ("Section 7.10").) The CVR Agreement defines "diligent efforts" as "using such efforts and employing such resources normally used by Persons in the pharmaceutical business . . . ." (Compl., Ex. A, at 5 ("Section 1.1").) Plaintiff further alleges that upon meeting each milestone, Defendant would pay the CVR holders a fixed amount for a total of approximately $3.8 billion over the course of the agreement. (*Id.*)

According to Plaintiff, Defendant breached the CVR Agreement because it purposely "embarked on a slow path to FDA approval and departed from its own drug commercialization patterns and those of others in the industry," causing Defendant to miss the approval milestone and PSM #1, for which CVR holders should have been paid at least $708 million. (*Id.* ¶¶ 5, 16.)

### A. **Defendant Misses the March 31, 2014 Approval Milestone**

With regard to the approval milestone, Plaintiff alleges that Defendant only obtained FDA approval of Lemtrada for MS treatment on November 14, 2014—almost eight months after the

---

Opp'n, at 10 n.9.) The last qualifying major market was Italy, and four quarters from the first commercial sale in Italy wass June 30, 2016. (*See id.*) Defendant concedes that the June 30, 2016 deadline has passed and it has not met PSM #1. (*See* Tr. at 7:6-8. ("[O]ur first argument was June 30 hasn't come and gone yet. Now it has. We don't have that argument anymore."))

approval milestone deadline. (*Id.* ¶ 79.) Plaintiff further alleges that this delay resulted from Defendant's failure to use diligent efforts to seek FDA approval. (Id. ¶¶ 34-80.) First, Plaintiff asserts that Defendant knew of various issues the FDA had with Genzyme's Phase III clinical trial protocols, with the neutrality of the evidence of the drug's efficacy derived from those trials, and with the drug's safety. (*Id.* ¶¶ 38, 43, 64-66, 81.) For example, Genzyme proceeded with an open-label, rater-blind Phase III trial, instead of the FDA-preferred double-blind methodology, and the FDA communicated concerns about that choice to Genzyme between 2006 and 2011. (*Id.* ¶¶ 39, 56, 59-60.) In that regard, Plaintiff alleges that the FDA expressed concerns with the "uneven dropout rates in the Phase III trials," which could indicate that "patients who knew they would be receiving [Lemtrada] may have felt more positive about the results of the treatment while patients receiving [an older MS drug] may have felt less positive about the treatment results." (*Id.* ¶ 61.)

Defendant allegedly failed to address the FDA's concerns in a timely fashion, and with resources comparable to those normally used by other pharmaceutical companies, to achieve the milestone. (*Id.* ¶¶ 50-51.) When the FDA denied a revised licensing application for Lemtrada on December 27, 2013, (*id.* ¶ 77), Plaintiff alleges that Defendant did not submit any supplemental paperwork addressing the FDA's concerns until after the approval milestone deadline of March 31, 2014. (*Id.* ¶ 78.) Rather, Defendant allegedly submitted at least thirty-two responses to the FDA's concerns between April 15, 2014 and November 14, 2014 (the date the FDA approved Lemtrada) containing an analysis of data from the same Phase III trials previously at issue with the FDA. (*Id.* ¶¶ 78-79.)

## B. **Defendant Misses the June 30, 2016 Sales Milestone**

Plaintiff alleges that Defendant also failed to use diligent efforts to meet PSM #1. (*Id.* ¶¶ 85-113. The bulk of Plaintiff's allegations outline two ways in which Defendant failed to use

diligent efforts with regard to achieving PSM #1.   First, Plaintiff alleges that Defendant's inadequate response to the FDA's concerns about the drug's safety (about which Genzyme knew as early as September 2005) led to Lemtrada's approval as merely a third-line therapy for MS. (*Id.* ¶¶ 81-84.)   That is, according to Plaintiff, Lemtrada was associated with increased risk of thyroid disorders or cancers, as well as autoimmune diseases, which Defendant should have sought to mitigate prior to approval of the application via a Risk Evaluation and Mitigation Strategy (REMS) of screening and monitoring of patients' side effects.   (*Id.* ¶¶ 81, 84.)   Because of those safety concerns, the FDA allegedly conditioned approval on the marketing of Lemtrada only for patients that experienced inadequate responses to two or more MS drugs, thereby limiting Defendant's ability to sell more Lemtrada to achieve PSM #1.   (*Id.* ¶¶ 83, 85.)

Second, Plaintiff alleges that Defendant did not use efforts or resources normally used in the pharmaceutical business to commercialize or promote the drug, especially in light of the 2017 expiration date of Lemtrada's patent, and when compared with Defendant's efforts to commercialize another MS drug, Aubagio. (*See id.* ¶¶ 87, 91.)   For example, in contravention of industry practice, Defendant allegedly (1) kept "Lemtrada consumer marketing materials from rolling out until six months after approval"; (2) delayed in assembling a Lemtrada salesforce until after the drug's first American commercial sale; (3) failed to provide doctors with sufficient drug information; (4) failed to develop infusion centers to ensure patient access to the drug; and (5) failed to operate patient resource campaigns.   (*Id.* ¶¶ 88-89.)    Defendant also did not sell any Lemtrada in France prior to December 31, 2015.   (*Id.* ¶ 105.)    Had Defendant done so, France would qualify as a major market under the CVR Agreement, which in turn, would have extended the measuring period for PSM #1 to December 31, 2016 (instead of June 30, 2016).   Finally, Plaintiff contends that "faced with the known expiration of the Lemtrada Patent [on September 19,

2017], a company using normal efforts and resources in the pharmaceutical business would have sought to obtain approval" more quickly in order to sell more Lemtrada at a higher, patent-protected price. (*See id.* ¶¶ 111-12.)

In contrast, Defendant allegedly assembled a sales team "really quickly before [Aubagio's] FDA approval," (*id.* ¶ 95 (internal quotation marks omitted)), conducted over 50% more consumer marketing events for Aubagio than Lemtrada, including patient ambassador forums, (*id.* ¶¶ 96-97), and provided more public information outlining treatment options as well as the steps a patient must take prior to treatment with Aubagio. (*Id.* ¶¶ 98-99.) Plaintiff further alleges that the FDA approval process for Aubagio was thirteen months, versus twenty-nine months for Lemtrada. (*Id.* ¶ 101.) According to Plaintiff, the first year net sales of Aubagio was € 166 million, whereas Lemtrada only had net sales of € 34 million after its first year on the market. (*Id.*) Therefore, Plaintiff contends that had Defendant used diligent efforts, "the Product Sales for Lemtrada would have been significantly higher, and [PSM #1] would have been met as early as the second quarter of 2015, and no later than the third quarter of 2015." (*Id.* ¶ 102.)

### C.  **Plaintiff's Additional Bad Faith Allegations**

Plaintiff alleges that Defendant engaged in additional "bad faith conduct designed to keep Lemtrada sales below a contractual threshold and depress the trading price of the CVRs so as to maximize its opportunity to exercise its option to purchase the CVRs at a discount" in breach of the implied covenant of good faith and fair dealing. (*Id.* ¶¶ 17, 117.)

### D.  **Provisions for Payment of Legal Fees in the CVR Agreement**

According to Plaintiff, the CVR Agreement provides that Defendant is "obligated to pay the Trustee's reasonable attorneys' fees, disbursements, and expenses incurred in investigating and prosecuting the claims brought in [this action] . . . and any other Trustee's Expenses" upon the

7

Trustee's request or demand.  (Suppl. Compl. ¶¶ 2-3.)[5]  Section 4.7(b) of the CVR Agreement also provides that Defendant agrees "to reimburse the Trustee upon its request for all reasonable expenses, disbursements and advances incurred or made by the Trustee in accordance with any provision of this CVR Agreement (including the reasonable compensation and the reasonable expenses and disbursements of its agents and counsel) . . . ."  (July 15, 2016 Decl. of Stacey Rappaport in Supp. of Partial Mot. for Summ. J. ("Rappaport Decl."), Ex. A, ECF No. 63-1, at 47.)  Section 4.7(c) is a guarantee that Defendant agrees "to indemnify the Trustee . . . for, and to hold them harmless against, any loss, liability or expense (including attorneys [sic] fees and expense) incurred without negligence or bad faith . . . ." (*Id.*)

On July 29, 2015, Plaintiff's predecessor, AST, sent Defendant a "Notice of Breach" letter, contending, *inter alia*, that Defendant breached its duty to use diligent efforts with regard to the Approval Milestone and PSMs.  (*Id.*, Ex. E, ECF No. 63-5.)  On November 9, 2015, AST instituted this action against Defendant.  (*See* ECF No. 5.)  Defendant received three letters dated October 12, 2015; November 25, 2015; and April 14, 2016 requesting payment for Plaintiff's purported legal fees and expenses incurred on the Trustee's behalf related to its investigation of the purported breach and the legal action arising from the investigation's findings.  (*See* Rappaport Decl., Ex. D, ECF No. 63-4; Ex. F, ECF No. 63-6; Ex. K, ECF No. 63-11.)   In its correspondence with AST and later with Plaintiff, Defendant stated that it did not have an obligation to pay the invoices.  (*See* Rappaport Decl., Ex. G, ECF No. 63-7; Ex. J, ECF No. 63-10; Ex. L, ECF No. 63-12.)

---

[5] The following facts are taken from the parties' statements filed pursuant to Local Rule 56.1, (Pl.'s Rule 56.1 Statement ("Pl.'s 56.1 Stmt."), ECF No. 62; Def.'s Rule 56.1 Statement ("Def.'s 56.1 Stmt."), ECF No. 70; Pl.'s Response to Def.'s 56.1 Statement ("PR56.1 Stmt."), ECF No. 75.)  The facts are undisputed, unless otherwise noted, or taken in the light most favorable to Defendant.

## II.    MOTION TO DISMISS PURSUANT TO RULE 12(B)(6)

To survive a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A plaintiff must demonstrate "more than a sheer possibility that a defendant has acted unlawfully"; stating a facially plausible claim requires pleading facts that enable the court "to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. That is, the factual allegations pleaded "must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. "[A] pleading that does nothing more than recite bare legal conclusions is insufficient to 'unlock the doors of discovery.'" *Arena v. Delux Transp. Servs., Inc.*, No. 12 Civ. 1718, 2013 WL 654418, at *2 (E.D.N.Y. Feb. 15, 2013) (quoting *Iqbal*, 556 U.S. at 678).

A district court must first review a plaintiff's complaint to identify allegations that, "because they are no more than conclusions, are not entitled to the assumption of truth." *Iqbal*, 556 U.S. at 679. The court then considers whether Plaintiff's remaining well-pleaded factual allegations, assumed to be true, "plausibly give rise to an entitlement to relief." *Id.* In deciding the 12(b)(6) motion, the court accepts the complaint's well-pleaded factual allegations as true and draws all reasonable inferences in the non-moving party's favor. *See Ahmad v. Morgan Stanley & Co.*, 2 F. Supp. 3d 491, 495 (S.D.N.Y. 2014) (citing *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007)).

"In deciding a motion to dismiss under Rule 12(b)(6), the court may refer to documents attached to the complaint as an exhibit or incorporated in it by reference, to matters of which judicial notice may be taken, or to documents either in plaintiffs' possession or of which plaintiffs

9

had knowledge and relied on in bringing suit." *Fishbein v. Miranda,* 670 F. Supp. 2d 264, 271 (S.D.N.Y. 2009), *aff'd sub nom. Silverman v. Teamsters Local 210 Affiliated Health & Ins. Fund,* 761 F.3d 277 (2d Cir. 2014) (internal quotation marks omitted).

## A. **BREACH OF CONTRACT CLAIM**

Count II of the Complaint claims that Defendant breached the CVR Agreement because it improperly took the milestone payments into account when evaluating Lemtrada's profitability, purposely "embarked on a slow path to FDA approval and departed from its own drug commercialization patterns and those of others in the industry," causing Defendant to miss the product sales milestones and, in turn, miss payments to the Holders. (*Id.* ¶¶ 5, 16.)

Under New York law, "[t]o make out a viable claim for breach of contract a 'complaint need only allege (1) the existence of an agreement, (2) adequate performance of the contract by the plaintiff, (3) breach of contract by the defendant, and (4) damages.'" *Eternity Glob. Master Fund Ltd. v. Morgan Guar. Trust Co. of N.Y.,* 375 F.3d 168, 177 (2d Cir. 2004) (quoting *Harsco Corp. v. Segui,* 91 F.3d 337, 348 (2d Cir. 1996)). Indeed, "factual allegations showing damages are essential: 'In the absence of any allegations of fact showing damage, mere allegations of breach of contract are not sufficient to sustain a complaint.'" *Mariah Re Ltd. v. Am. Family Mut. Ins. Co.,* 52 F. Supp. 3d 601, 611 (S.D.N.Y. 2014) (quoting *Lexington 360 Assocs. v. First Union Nat'l Bank of N.C.,* 651 N.Y.S.2d 490, 492 (1996) (citations and internal quotation marks omitted)).

Defendant's contention that Plaintiff has not sufficiently alleged that the Count II breach of contract caused damage in the form of monetary loss to Plaintiff is unavailing as to PSM #1. (*See* Mem. at 14-15; Tr., at 7:9-18.)   Plaintiff has alleged sufficient facts that Defendant breached the CVR Agreement when it failed to use diligent efforts—efforts or resources normally used in the pharmaceutical business to commercialize or promote the drug—to meet both the approval

10

milestone and PSM #1. (*Id.* ¶¶ 50-51.) Plaintiff alleges that such failure to use diligent efforts to promptly obtain approval, as well as, to promote the drug resulted in missing PSM #1. (*Id.* ¶ 80. ("Sanofi's delay in achieving FDA approval adversely affected sales of Lemtrada all over the globe.")) For example, Plaintiff alleges that Defendant's inadequate response to the FDA's concerns about the drug's safety (about which Genzyme knew as early as September 2005) led to Lemtrada's approval as merely a third-line therapy for MS, thereby limiting sales of Lemtrada. (*Id.* ¶¶ 81-84.)

Plaintiff further alleges that in contravention of industry practice, Defendant (1) kept "Lemtrada consumer marketing materials from rolling out until six months after approval"; (2) delayed in assembling a Lemtrada salesforce until after the drug's first American commercial sale; (3) failed to provide doctors with sufficient drug information; (4) failed to develop infusion centers to ensure patient access to the drug; and (5) failed to operate patient resource campaigns. (*Id.* ¶¶ 88-89.) According to Plaintiff, Defendant also failed to sell any Lemtrada in France prior to December 31, 2015 in order to make France a "Qualifying Major Market" so as to extend the measuring period for PSM #1 to December 31, 2016 (instead of June 30, 2016). (*Id.* ¶ 105.) Plaintiff also contends that "faced with the known expiration of the Lemtrada Patent [on September 19, 2017], a company using normal efforts and resources in the pharmaceutical business would have sought to obtain approval" more quickly in order to sell more Lemtrada at a higher, patent-protected price to meet PSM #1. (*See id.* ¶¶ 111-12.)

As a point of contrast, Plaintiff alleges that Defendant used diligent efforts in its marketing and promotion efforts for its other MS drug, Aubagio, (*id.* ¶¶ 95-101), which, according to Plaintiff, led to Aubagio's first year net sales of € 166 million, whereas Lemtrada only had first net sales of € 34 million. (*Id.*) Therefore, Plaintiff contends that had Defendant used diligent

efforts for marketing Lemtrada, "the Product Sales for Lemtrada would have been significantly higher, and [PSM #1] would have been met as early as the second quarter of 2015, and no later than the third quarter of 2015." (*Id.* ¶ 102.) And, as Plaintiff alleges, had Defendant met PSM #1, it would have been obligated to pay Plaintiff $2 per CVR within twenty business days of the date PSM #1 was achieved. (Compl. ¶ 23b.)

Plaintiff has therefore sufficiently alleged a breach of contract claim based on Defendant's failure to use diligent efforts to meet PSM #1, and that failure resulted in missing PSM #1. Defendant's motion to dismiss Count II is hereby DENIED as to PSM #1.[6]

## B. BREACH OF COVENANT OF GOOD FAITH AND FAIR DEALING

Defendant correctly argues that under New York law, Count III, a separate cause of action for breach of the implied covenant of good faith and fair dealing, cannot lie when a breach of contract claim based on the same facts is already pleaded. (Mem. at 17.)

The implied covenant of good faith and fair dealing is incorporated into every contract. *Mariah Re Ltd. v. Am. Family Mut. Ins. Co.*, 52 F. Supp. 3d 601, 611 (S.D.N.Y. 2014) (citing *Oscar de la Renta, Ltd. v. Mulberry Thai Silks, Inc.*, No. 08–cv–4341, 2009 WL 1054830, at *5 (S.D.N.Y. Apr. 17, 2009)). "The covenant 'precludes each party from engaging in conduct that will deprive the other party of the benefits of their agreement.'" *Id.* (citing *Leberman v. John Blair & Co.*, 880 F.2d 1555, 1560 (2d Cir. 1989) (citation and internal quotation marks omitted)). However, the covenant "does not create obligations that go beyond those intended and stated in the language of the contract." *See Mariah Re Ltd.*, 52 F. Supp. 3d at 611 (quoting *Wolff v. Rare Medium, Inc.*, 210 F. Supp. 2d 490, 497 (S.D.N.Y. 2002)). Furthermore, "New York law . . . does

---

[6] To the extent that Plaintiff argues that the Complaint sufficiently alleges a breach of contract based on PSM #2-4, (Compl. ¶ 130), this Court disagrees, as the deadline to meet those milestones is not until December 31, 2020. (*See* Mem. at 16.)

12

not recognize a separate cause of action for breach of the implied covenant of good faith and fair dealing when a breach of contract claim, based upon the same facts, is also pled." *ARI & Co. v. Regent Int'l Corp.*, 273 F. Supp. 2d 518, 522 (S.D.N.Y. 2003) (quoting *Harris v. Provident Life & Accident Ins. Co.,* 310 F.3d 73, 81 (2d Cir. 2002) (internal quotation marks omitted)).

While Plaintiff attempts to distinguish Count II from Count III by basing Count III on a different provision of the CVR Agreement—Article 10 instead of Section 7.10—neither the Complaint nor Plaintiff's counsel at oral argument could articulate separate conduct or damages arising out of Count III that were not already caused by the conduct in Count II. (*See* Opp'n, at 20-21; Tr., at 85:20-93:11.) Moreover, both are based on contract provisions. Under New York case law, a cause of action for breach of the implied covenant of good faith and fair dealing is redundant where "the conduct allegedly violating the implied covenant is also the predicate of the breach" of the same contract. *See ARI*, 273 F. Supp. 2d at 522 (quoting *TVT Records and TVT Music, Inc. v. The Island Def Jam Music Grp.*, 244 F. Supp. 2d 263, 277 (S.D.N.Y. 2003)). The CVR Agreement controls. *See Mariah Re Ltd.*, 52 F. Supp. 3d at 611 (quoting *Wolff v. Rare Medium, Inc.,* 210 F. Supp. 2d 490, 497 (S.D.N.Y. 2002)) (holding that the covenant of good faith and fair dealing cannot create obligations in addition to those expressed in a contract).

Therefore, Defendant's motion to dismiss Count III is GRANTED. Plaintiff's claim for breach of the covenant of good faith and fair dealing is dismissed as duplicative of its breach of contract claim.

### III.     SUMMARY JUDGMENT PURSUANT TO RULE 56

Summary judgment is appropriate where the record establishes that there is no "genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

13

The court "is not to weigh the evidence but is instead required to view the evidence in the light most favorable to the party opposing summary judgment, to draw all reasonable inferences in favor of that party, and to eschew credibility assessments." *Weyant v. Okst*, 101 F.3d 845, 854 (2d Cir. 1996); *see also Williams v. McAllister Bros., Inc.*, 534 F.2d 19, 21 (2d Cir. 1976).

To defeat a motion for summary judgment, the nonmoving party must provide "hard evidence," *D'Amico v. City of N.Y.*, 132 F.3d 145, 149 (2d Cir. 1998), "from which a reasonable inference in [its] favor may be drawn," *Binder & Binder PC v. Barnhart*, 481 F.3d 141, 148 (2d Cir. 2007) (internal quotation marks omitted). "To satisfy Rule 56(e), affidavits must be based upon 'concrete particulars,' not conclusory allegations. To the extent that these affidavits contain bald assertions and legal conclusions . . . the district court [can] properly refuse[ ] to rely on them." *Schwapp v. Town of Avon*, 118 F.3d 106, 111 (2d Cir. 1997) (citations omitted); *Fletcher v. Atex, Inc.*, 68 F.3d 1451, 1456 (2d Cir. 1995); *Moises Mendoza Padilla v. Empressa Hondurena De Vapores, S.A., Balboa Shipping Co., & United Brands Co.*, 1981 A.M.C. 671, 673 (S.D.N.Y. Dec. 2, 1980) ("[Nonmovant] at that time may not avoid summary judgment except by affidavits or other submissions setting forth "specific facts showing that there is a genuine issue for trial.") (citing Fed. R. Civ. P. 56(e)).

## A. CLAIM FOR DECLARATORY RELIEF REGARDING IMMEDIATE PAYMENT OF ATTORNEY'S FEES

Plaintiff contends that Section 4.7(b-c) of the CVR Agreement obligates Defendants to pay Plaintiff for legal fees and other expenses relating to this action "promptly after each request for payment," even prior to the resolution of this action, and even if Plaintiff does not ultimately prevail. (*See* MSJ Mem., at 14; Compl., Ex. A., at 31; Tr., at 95:23-96:1.) Plaintiff, to date, has made three demands for payment to Defendant, purportedly pursuant to the CVR Agreement. (*See* Rappaport Decl., Exs. D, F, K.) Defendant, in turn, has reiterated its position that it does not have

14

a current obligation to pay the invoices, particularly solely upon Plaintiff's request. (*See id.*, Ex. G, ECF No. 63-7; Ex. J, ECF No. 63-10; Ex. L, ECF No. 63-12; MSJ Opp'n, at 15-16.)

Assuming, without deciding, that the CVR Agreement authorizes reimbursement for attorney's fees and other expenses, Defendant correctly argues, Sections 4.7(b) and (c) do not obligate payment of expenses prior to the resolution of this action because the language of the CVR Agreement does not waive the benefit of the American Rule. (*See* Opp'n, at 15 (citing *Hooper Assoc. v. AGS Computers*, 74 N.Y.2d 487, 491 (1989) ("[A]ttorney's fees are incidents of litigation and a *prevailing* party may not collect them from the loser unless an award is authorized by agreement between the parties, statute, or court rule.") (emphasis added)).) It is axiomatic that any such waiver of the American Rule must be "unmistakably clear." *Hooper*, 74 N.Y.2d at 492. Furthermore, indemnification clauses such as 4.7(c) are usually understood to apply to third-party claims. *See Gotham Partners, L.P. v. High River Ltd. P'ship*, 76 A.D.3d 203, 206 (1st Dep't 2010) (holding that language must be unequivocal for an indemnification clause to cover litigation between the contracting parties).

Plaintiff, in its briefing and at oral argument, could not identify any binding or persuasive authority compelling payment of litigation cost in a dispute between contracting parties automatically upon early demand. (*See* MSJ Mem., at 14 (citing cases purportedly defining "upon" as "requiring 'an immediate reaction'"); Tr., at 100: 2-6.) The cases on which Plaintiff relies are distinguishable for several reasons. (*See* MSJ Opp'n at 16-17; Tr., at 96:18-20 (indicating concession by Plaintiff that "[t]hose cases don't include that language or litigate "upon request").) Most saliently, *Aristocrat Leisure Limited v. Deutche Bank Trust Company Americas*, 631 F. Supp. 2d 308 (S.D.N.Y. 2009), dealt with a trustee defendant who was authorized to request payment at the end of the case. *Id.*, at 309. Neither could Plaintiff indicate any unambiguous language of

waiver of "the well-understood rule that parties are responsible for their own attorney's fees," *Hooper*, 74 N.Y.2d at 492, in Section 4.7(b) or (c).  (*See* Tr., at 94:13.)

Plaintiff's motion for summary judgment seeking immediate payment of attorney's fees and other expenses at this stage of the litigation is therefore DENIED.   However, Plaintiff may renew its motion for summary judgment at an appropriate future time in this litigation.

## IV.   **CONCLUSION**

Defendant's motion to dismiss Count II, the breach of contract claim based upon missing PSM #1, is DENIED.

Defendant's motion to dismiss Count III is GRANTED.  Plaintiff's claim for breach of the covenant of good faith and fair dealing is dismissed as duplicative of its breach of contract claims.

Plaintiff's motion for summary judgment seeking immediate payment of attorney's fees and other expenses is DENIED with prejudice.

The Clerk of Court is directed to close the motions at ECF Nos. 19 and 60.

Dated: New York, New York
      September 8, 2016

SO ORDERED.

*George B. Daniels*

GEORGE B. DANIELS
United States District Judge