```
                    UNITED STATES DISTRICT COURT
                   SOUTHERN DISTRICT OF NEW YORK

In re:                                 :
                                              Docket #15cv8725
UMB BANK N.A.,                         :

                     Plaintiff,        :

          - against -                  :

SANOFI,                                :
                                           New York, New York
                     Defendant.        : March 28, 2018

------------------------------------ :

                      PROCEEDINGS BEFORE
             THE HONORABLE ROBERT W. LEHRBURGER,
         UNITED STATES DISTRICT COURT MAGISTRATE JUDGE

APPEARANCES:

For Plaintiff:          CAHILL GORDON & REINDEL LLP
                        BY:  CHARLES GILMAN, ESQ.
                             BRENT ANDRUS, ESQ.
                        80 Pine Street
                        New York, New York 10005


For Defendant:          WEIL, GOTSHAL & MANGES LLP
                        BY:  JOHN A. NEUWIRTH, ESQ.
                             STEFANIA VENEZIA, ESQ.
                             JOSH AMSEL, ESQ.
                             JESSICA DJILANI, ESQ.
                        767 Fifth Avenue, 25th Floor
                        New York, New York 10153




Transcription Service: Carole Ludwig, *Transcription Services*
                       141 East Third Street #3E
                       New York, New York 10009
                       Phone:  (212) 420-0771
                       Fax:  (212) 420-6007


Proceedings recorded by electronic sound recording;
Transcript produced by transcription service.
```

**INDEX**

**E X A M I N A T I O N S**

| Witness | Direct | Cross | Re-Direct | Re-Cross | Court |
|---|---|---|---|---|---|
| None | | | | | |

**E X H I B I T S**

| Exhibit Number | Description | ID | In | Voir Dire |
|---|---|---|---|---|
| None | | | | |

1

```
 1                                                    3
 2              THE CLERK:   We're here in the matter for a
 3    status conference, UMB Bank N.A. v. Sanofi, 15cv8725.
 4    Parties, please state your name for the record.
 5              MR. CHARLES GILMAN:   For plaintiff UMB Bank as
 6    Trustee Charles Gilman from Cahill Gordon & Reindel.
 7              THE COURT:   Good afternoon.
 8              MR. BRENT ANDRUS:   Also for plaintiff, Brent
 9    Andrus from Cahill.
10              MR. JOHN NEUWIRTH:   Your Honor, good afternoon,
11    John Neuwirth from Weil Gotshal for defendant Sanofi.  With
12    me is Stefania Venezia, Josh Amsel, and Jessica Djilani.
13              THE COURT:   Good afternoon.  Please be seated.
14    So I have quite a bit in front of me on a long agenda, but
15    I don't actually think it necessarily comes down to this
16    long agenda because, as I see it, many of the discovery
17    disputes that were laid out in the letter sent on March 23
18    from Mr. Gilman, many of those seem to come within the
19    purview of the motion to compel in regards to the
20    supposedly privileged material.
21              So I'm happy to try to get to as much of this as
22    we can, maybe everything, unless somebody tells me that
23    it's premature or we shouldn't be addressing a particular
24    issue.  And in that group, by the way, you know the summary
25    judgment motion is on here?  This was not designated to be
```

                                                        4

1

2   an oral argument on that, but I'm happy to hear from the

3   parties if both parties want to discuss that.  I'm prepared

4   to do that.  So is there anything that either thinks should

5   not be addressed here among what was set forth in the so-

6   called agenda?  Okay, so let's give it a shot.  Not

7   promising we'll deal with it all, but we'll try.

8          I'd actually like to keep the summary judgment

9   motion last though and start with the other stuff and see

10  if we can get that resolved.  So on the motion to compel,

11  I'm happy to proceed in any order, but I think I'll just

12  sort of follow the agenda and list of items.  So this is

13  about privilege documents and various categories of

14  asserted privilege, and I asked the parties to provide some

15  examples to me, which I've reviewed.  Thank you for

16  providing those.  And I just want to give you my initial

17  view on the general dispute.  This is a case with a lot of

18  documents, as we've discussed.  Privilege should not be a

19  tail that wags the dog obviously.

20          I am not going to review 599 documents or

21  whatever number there are.  I will try to give you

22  guidance.  But I want to say one thing based on my review

23  of those ten documents, which is, yeah, there may be some

24  portions in there that may not be privileged but I want to

25  hear argument on that or just get some insight, but I'll

1

2    tell you, I don't think any of those documents make a hill

3    of beans of difference to this action. I think this is

4    probably a lot of fighting about something that in the end

5    isn't going to make a difference. That's not to say there

6    can't be a document withheld as privilege that would prove

7    important, but I have to say, based on what I've seen, and

8    granted, I'm not tied into the facts like you are, I

9    wouldn't, I try not to make such a big deal of this.

10          Anyway, that's my initial thought.  So there are,

11   the two overall topics that I guess we need to address are

12   whether items are privileged, and then providing logs. And

13   I'm happy to address those in either order.  So I believe

14   plaintiff was contesting Sanofi's retention of the

15   documents, or denoting them as privilege, so why don't you

16   let me know what you want me to hear, but keep it short. I

17   mean I understand the position generally.

18          MR. GILMAN:  Sanofi's letter to Your Honor of

19   March 7 forwarding cases, the cases rely on you can share

20   documents with a third party agent. I have here and will be

21   pleased to hand up the engagement letters of a number of

22   these third parties. Every single engagement letter

23   disclaims any agency relationship, disclaims any fiduciary

24   relationship. These are financial advisors, these are

25   communications consultants, these are not parties, expert,

```
 1                                                          6
 2   that are being hired to interpret or translate
 3   communications between client and lawyer. They have their
 4   own job separate and apart from the lawyer to do and their
 5   own opinions to render in connection with the transaction.
 6   I have the Credit Suisse engagement letter, the Evercore
 7   engagement letter, and I'd be pleased to, if you'd like
 8   them.
 9             THE COURT:  I don't need to right now but I may.
10             MR. GILMAN:  I represent to you that every one of
11   them that we have expressly disclaims agency --
12             THE COURT:  Okay.
13             MR. GILMAN:  You know, for example, Credit Suisse
14   has been retained solely to act as financial advisor with
15   respect to the services described and no fiduciary or
16   agency relationship between the company and Credit Suisse
17   has been created, blah, blah, blah.
18             THE COURT:  Okay, well --
19             MR. GILMAN:  It's the same for the others.
20             THE COURT:  But presumably, my understanding is,
21   aside from the agency rubric there is another basis under
22   which or other bases under which such shared communications
23   could be protected.
24             MR. GILMAN:  Yes, and that's the Kovel decision
25   of Judge Friendly back in 1961. The Circuit has discussed
```

7

1
2   that, we submitted the *Ackert* decision more recently
3   discussing the limitations in the cabining of *Kovel*.  It
4   applies traditionally where the lawyer needs a translator
5   to communicate with the client and to obtain information on
6   which then to provide legal advice. The translator is an
7   intermediary that does not waive privilege. That has been
8   expanded in certain circumstances to accountants where some
9   of the accounting jargon is hieroglyphic and you need a
10  translator to facilitate.  That's not what we're talking
11  about here, we're talking about financial advisors giving
12  opinions in connection with M and A transactions.  They're
13  not being hired by Weil Gotshal. In *Kovel*, the third
14  parties are being hired by the lawyers to assist in giving
15  legal advice.  None of these engagement letters are with
16  Weil Gotshal, they're with the client. The client is hiring
17  expert financial advisors to do what financial advisors do
18  directly with the client.

19          THE COURT:  But are there situations though where
20  still there's an inquiry by one of the employees or
21  officers and they want legal advice, they're saying,
22  counsel, I need advice on how to structure this or how this
23  particular document should be worded and I'm seeking that
24  advice by sending this to you as well as our outside firm
25  in this particular matter. And when I say firm, I mean

```
 1                                                      8
 2   either the financial firm or whoever else is advising them
 3   and then various other employees.  Why isn't that protected
 4   if it's seeking actually a legal input?
 5            MR. GILMAN:  Well, if, in fact, the client is
 6   seeking legal advice, and if, in fact, in order for the
 7   lawyer to render that advice the lawyer needs to
 8   communicate with an information from JP Morgan, or Credit
 9   Suisse, or Evercore, or one of the other institutions
10   involved here, I suppose you could make it up. But I don't
11   believe that's what occurred here because these financial
12   advisors weren't being retained to assist the lawyers in
13   giving legal advice, they were being retained separate and
14   apart from Weil Gotshal, separate and apart from any
15   lawyers, and there is no work product claim here.
16            THE COURT:  Right.
17            MR. GILMAN:  There's just no shielding based on
18   litigation and worry in that regard. So we start from the
19   premise that privileges are to be narrowly construed,
20   they're not to be wildly invoked. We received privilege
21   logs that have myriad third parties on them. We asked why.
22   We are left to make motions to compel. We don't know what
23   those documents say. They've been either withheld
24   completely or they have been redacted to the point where we
25   see the addressees, but it is hard to image that a client
```

9

1
2  would send a document to 20 recipients, a handful of whom
3  are not lawyers, in a disparate group, one communications
4  guy, one investment banking guy, et cetera, et cetera, this
5  is a communication going out to a working group, this is
6  not a communication seeking legal advice, and if it is,
7  it's been waived because you don't send them to working
8  groups.

9          THE COURT:  Okay.

10          MR. GILMAN:  And if you want, we can kind of wrap
11  most of it up, we have received privilege logs for only
12  documents that have been received redacted for privilege.
13  We know that there are documents withheld in full, we know
14  there are documents that are withheld in part, we know that
15  there are documents withheld by third parties, the Weil
16  Gotshal firm hasn't given us a privilege log, they say they
17  will, we don't have one.  The Evercores say they will, we
18  don't have one.  We have no privilege logs from any
19  nonparty, they just produce whatever they produced and we
20  have no idea what they haven't produced.

21          THE COURT:  Are any of the nonparties represented
22  by counsel other than for Sanofi?

23          MR. GILMAN:  I don't believe, they are all
24  represented by counsel, but not here today.

25          THE COURT:  But not represented by counsel for

10

1   Sanofi?

2           MR. GILMAN:  Some may be, but most I would think

3   are not. Evercore has I think Simpson Thacher --

4           MR. NEUWIRTH:  We're not, other than the Weil

5   Gotshal production, Your Honor, we're not representing any

6   of the third parties to which Mr. Gilman referred.

7           MR. GILMAN:  I can't dispute that.

8           THE COURT:  So as for that, you need to take that

9   up with those counsel, if you've got a dispute on here --

10          MR. GILMAN:  Okay.

11          THE COURT:  But not need to get into that today.

12          MR. GILMAN:  We don't have privilege for

13  redactions, we're anticipating getting it, we're entitled

14  to it, but we don't have it. And what seems to have

15  occurred here, Your Honor, and this is the problem, we're

16  not asking for any adjournments under the amended

17  scheduling order. Discovery is supposed to be done the end

18  of the month. Depositions are supposed to be done by the

19  end of June.  It is difficult to take an executive's

20  deposition and receive the privilege log afterwards. It's

21  difficult to get a full production in time when they're not

22  even talking about giving us privilege logs for another

23  month or two or more. We have no idea what they're

24  withholding and the volume of what's being withheld under

11

1

2  claims of privilege and the breadth of the claims of

3  privilege. Counsel for Sanofi has stepped up to the plate

4  and they have re-reviewed privilege logs. We have asked

5  them to, pointing out things that we don't think should

6  have come out of the firm in the first place. And to their

7  credit, they have gone back and they've done it again, and

8  they've done it again, but they haven't done it right.

9          And what we have here is a situation where the

10  breadth of privilege is an umbrella, and that's not what it

11  is. They are cloaking in privilege a transaction where

12  there were multiple participants performing multiple roles,

13  only one of which was as a legal advisor. And the rest of

14  them, it is beyond imagination that you can have this many

15  people copied and some of them are the authors, some of

16  them are the recipients, some of them are ccs, but there is

17  no indication that this is limited to what one would

18  normally think of as the necessary confidential

19  communication for the purposes of requesting or receiving

20  legal advice.

21          THE COURT:  So there are, in acquisitions of this

22  type, they're big, they have working teams, it requires a

23  lot of input from different people and entities, and

24  lawyers are almost always a part of that working group.

25  And I imagine that Cahill has some of its own clients for

1                                                      12

2  which it's done these type of deals and has working groups,

3  are you saying that those communications that Cahill, would

4  have been to or from Cahill in part among those working

5  groups would not be privileged?

6          MR. GILMAN:  Your Honor, there is a big

7  difference between whether something is confidential and

8  whether something is privileged.  Working groups can pass

9  around information as they are trying to get from A to B,

10 the closing, and it may well be understood to be

11 confidential.  The attorney-client privilege doesn't apply

12 to confidential information, it applies to confidential

13 communications for the purpose of seeking or rendering

14 legal advice. It is no broader than that. And that's not

15 the claims that they're making. They're making, it's a

16 working group, in essence, they all had a common interest,

17 they're all working on the same transaction for the same

18 client, that has never been viewed by courts as attorney-

19 client privilege.

20         We don't doubt that this information was shared

21 among and between people who respected the confidence of a

22 common enterprise, but that has never been the definition

23 of attorney-client privilege.

24         THE COURT:  No, I agree with you on that, I

25 understand. Let me hear from Mr. Neuwirth about this

13

 1  generally.

 2      MR. NEUWIRTH:  Thank you, Your Honor, and I'll

 3  try to be brief. I think the issues are intertwined

 4  somewhat, both the motion to compel and the schedule issue,

 5  so to speak, so I'll try to address both.  Let me start

 6  with the motion to compel.  And I agree with Your Honor, I

 7  think there's a path forward here that's a reasonable one

 8  that will work within the schedule of the case.

 9      First of all, it's New York law, not federal law,

10  that governs the Court's determination here as to

11  privilege, because it's a diversity case.  There is no

12  dispute about that, I don't think. The cases that plaintiff

13  submitted were all federal law cases, we've submitted cases

14  that determine this issue under New York law.  That being

15  said, I don't think there's a lot of distance between the

16  two, if any.

17      THE COURT:  Right.

18      MR. NEUWIRTH:  What is clear from those cases is

19  that the standard is, is the advisor or the consultant

20  facilitating communications between the attorney and the

21  client. I think Your Honor has put your finger on a very

22  important and practical and real world issue. In the

23  context of sophisticated transactions, and this transaction

24  certainly was one, in which our firm was involved, in which

1

2  Cahill was involved, in which Your Honor was involved in

3  your prior life before he went onto the bench, certainly

4  there are groups that are working together and assisting

5  attorneys in providing legal advice, and this case is no

6  different, it happened in connection with the underlying

7  transaction, it happened with respect to consultants that

8  were working with lawyers in order to tackle pricing

9  issues, commercialization issues, and other issues. This

10  case is not unique in that regard and it would be quite a

11  ruling, in fact, if all of a sudden in a group like that,

12  where legal advice is being facilitated, there would be no

13  privilege.

14         But I think the ultimate issue here and this is

15  why I think there's a reasonable path forward, is that what

16  plaintiffs are asking for, at least in the motion, is for a

17  categorical ruling that none of the, call them 450

18  documents I think we're at now, can possibly be privileged

19  because there's been a per se waiver because there's been a

20  third party involved.  There is no case that I've seen that

21  stands for that proposition. In fact, both the cases that

22  plaintiff has submitted to the Court and the cases that

23  we've submitted to the Court, have made that determination

24  as the law requires on a fact document by document basis.

25  And, of course, there are in camera reviews and exemplar is

1

2 provided in order to try to make that determination and

3 provide guidance. But it's certainly not a categorical

4 determination and none of the cases stand for that.

5          THE COURT:  No, but the argument here is that

6 based on the list that you've provided, the people involved

7 are ones that, even if a privilege had attached somewhere

8 along the way, it's just too wide and broad and so it's

9 waived, if there even was a privilege.  And, therefore --

10          MR. NEUWIRTH:  I understand that's the argument

11 being made, but I think the only way to look at this is on

12 a document by document basis. Obviously, the Court has a

13 very small sample size of ten documents on an otherwise

14 very large log, and these are hard calls. And some

15 situations are going to be privileged and some situations

16 are not going to be privileged, but there can be no

17 categorical waiver and the notion that when you've got

18 investment bankers working with lawyers in connection with

19 trying to execute a transaction that there can't be in

20 privilege. And that's quite a notion and I don't think

21 that's what the law is.

22          THE COURT:  Yes, so what's your path forward that

23 you're suggesting?

24          MR. NEUWIRTH:  Well, look, I think the path

25 forward is, and this will get into the other parts of the

1
2   agenda, and, Your Honor, perhaps will give us guidance on
3   the ten documents that we've submitted, we are re-
4   reviewing, as a result of some of our other issues with the
5   plaintiff, every single document on every privilege log
6   that has been produced so far. We've told the Court this
7   morning in a letter that that re-review will be complete by
8   the end of May, which the schedule, by the way, and I think
9   this is a point that's been missed, actually permits, the
10  operative schedule in this case.
11          THE COURT:  And when are depositions taking place
12  and when are they supposed to be finished?
13          MR. NEUWIRTH:  Depositions have already started,
14  four depositions in the case have already happened, under
15  the current schedule they're supposed to be completed by
16  the end of June.
17          THE COURT:  So if you provide -- are you going to
18  provide final logs at the end of May or you've already
19  provided many of those and it's just a matter of the next
20  iteration?
21          MR. NEUWIRTH:  We're going to be done with our
22  privilege logs at the end of May.
23          THE COURT:  So if documents turn up that should
24  have been produced at that point, and depositions have
25  already been taken, I assume you would bring back a witness

1

2  to be deposed if the document was one that warranted it?

3         MR. NEUWIRTH:  When you say if documents turn up?

4         THE COURT:  Well let's see on the privilege log,

5  and let's say you were required to produce it because it

6  turned out not to actually be protected, and --

7         MR. NEUWIRTH:  I think we'd have to have, Your

8  Honor, that happens in cases all the time --

9         THE COURT:  Yes, it does.

10         MR. NEUWIRTH:  And we would have to have a

11  discussion as to whether we thought that was appropriate. I

12  understand the plaintiffs may take the position that that

13  is something they want to do and it depends on the

14  situation, we may say yes or we may say let's do a limited

15  deposition, or we may say, no, it's not appropriate.

16         THE COURT:  Right, but I'm just suggesting, based

17  on the time, I agree with plaintiffs that it's a little

18  tight to say all privilege logs are final at this time and

19  now we've only got a month left on depositions. So we just

20  have to leave it at that and you won't have time to get

21  through it and won't be able to ask about documents that

22  are produced. But again, this is not uncommon, none of this

23  is uncommon, it's not uncommon in litigations of this

24  magnitude for a privilege log to be generated by people

25  working very hard and under strenuous circumstances where

18

1
2  it's very hard to make these calls and more document than

3  might otherwise be privileged end up on there. And people

4  do need to go back and review, but it does need to come to

5  an end.

6          MR. NEUWIRTH:  It does --

7          THE COURT:  It does.  But on the issue of which

8  ones are or aren't and which parties involved make a

9  difference, when I was looking at the ten documents, there

10  were some documents and some portions of documents where it

11  seemed reasonable to say legal advice was being sought or

12  there were communications about legal advice that really

13  should remain privileged even though it's not a big deal.

14  But there were others where I'm like, come on, this is

15  about a press release, why is that privilege, you're

16  communicating with the PR folks, you're communicating with

17  lots of others, and, yes, we always include, litigators

18  always include lawyers on there, they want to be involved

19  for the reasons they want to be able to able to claim

20  privilege, and maybe if one of the lawyers writes something

21  back that says, well, you should change this, you should

22  change that, here are the legal implications, it might be a

23  different story. But some of these it doesn't look like

24  that's what's happening.

25          Again, I think it's irrelevant in terms of the

19

documents at issue, but in terms of privilege it certainly

seemed like some were questionable.

MR. NEUWIRTH:  Put the relevancy aside, I don't

disagree with you.

THE COURT:  Okay.

MR. NEUWIRTH:  Okay.  And that's why I think we

have a path forward.  I think there are documents for which

there are, certainly of the ten there are certainly

appropriate claims of privilege and I think there are

others which are not.  And the good news is, is that we

have already committed to once again go through the entire

log of everything that's been produced to date and with

whatever guidance Your Honor wishes to give us today, apply

it to the documents that we still have to log going

forward, and we are saying to the Court that we will be

done with that project by the end of May which is,

regardless of the fact that the schedule is tight and I

agree that it's tight, is within the scope of the current

operative schedule that the parties negotiated some time

ago.

I'm not here asking for an extension of that

schedule as well, if we want to let reason prevail, and if

Your Honor would be okay with it, I am happy to talk to

plaintiff's counsel at the appropriate time, if need be,

1

2  and we can move that deposition date out by a month or a

3  month and a half if the Court would be okay with that.  We

4  don't have to do it, we can do both on the track that we're

5  currently on. That would be the reasonable thing to do, and

6  the reason that it would be particularly reasonable in this

7  situation, and it can't get lost, is that the amount of

8  discovery, and I don't want to harp on this, but the amount

9  of discovery that's been sought and produced in this case

10 is really quite unprecedented. I mean we're going be at 20

11 million pages of documents by the end of March. If there's

12 another case in this courthouse that's got that volume of

13 discovery, I'd be somewhat surprised. There are going to be

14 a million documents produced here.

15          THE COURT:  How many are you going to use at

16 trial?

17          MR. NEUWIRTH:  Well how many are they going to

18 use at trial?  The issue is, and Your Honor remarked

19 exactly that when we were back here in November, there is

20 no way that anybody could possibly need or use that many

21 documents at trial.

22          THE COURT:  Right, but it can be hard to find the

23 ones that you want to use.

24          MR. NEUWIRTH:  Of course, but, Your Honor, the

25 issue is, they're the master of their case, they decided to

1                                                              21

2    prosecute it the way they wanted to prosecute it, they

3    asked for an enormous amount of discovery, and maybe I

4    should have objected more vigorously then.  We worked with

5    them to provide that discovery, we are now at the point

6    where we've produced 20 million or we're going to be at the

7    point where we've produced 20 million pages of documents.

8    Your Honor is right, that is not such an easy task. We all

9    know that in this room. But the good news is, we're

10   essentially still on schedule to complete it.

11          And with respect to the production of actual

12   documents, we're going to do that by March 30, that

13   deadline is going to be hit. With respect to the privilege

14   logs, that deadline is going to be hit as well.  That's why

15   I say there's a path forward.

16          THE COURT:  Okay, so on that big picture view and

17   schedule, I agree, it should remain as is for now. You're

18   grownup people, you'll be able to talk with each other,

19   work out date issues, if there really are documents that

20   come off the privilege log that then become subject to the

21   deposition of someone who is already deposed, there will be

22   good faith discussion about whether that person should be

23   brought back, if there's a good faith dispute I can help

24   get involved. Yes, accommodations can be made for things of

25   that nature.  So I actually think, that aside, it just

1
2   doesn't need to be, nothing new needs to be done in that

3   regard. And I know there was a request for all this

4   information on logs by April 13th, I think whatever the

5   dates are that currently apply, those are the dates that

6   should rule, subject to the rule of reason, as I just

7   explained about any disputes.

8           In terms of guidance, you know, part of it also

9   depends on who all these parties are and I only received

10  today, but thank you for providing it, the explanation and

11  identification of who these different entities are.  And

12  it's hard to give a general roadmap in general rules and I

13  don't even know that going through the ten documents

14  necessarily helps doing that.  In my mind, if a lawyer

15  happens to be on a communication as a cc and legal advice

16  is not being sought from them, and their legal input is not

17  being sought, then it's not privilege in these working

18  groups, I totally agree with that. If the lawyer's advice

19  is being given or asked for directly, then that is likely

20  to be privileged.

21          I'm less convinced about the waiver argument in

22  that it's a big working group, but again, it depends on the

23  type of communication. You can be having a direct

24  communication with a lawyer saying give me your advice and

25  there are many people cc'd on it because it's important for

23

them to know, so I'm less concerned about that. But it
seemed to me there was in here little of the actual direct
stuff, and there were documents where redactions were done
and that's fine, as long as it's only those portions with
the direct type of communications that are redacted. And I
did think there was a document or two where perhaps it
should have been redacted because it was wholly withheld
and only a small portion of it dealt with what appeared to
be a legal issue. But again, I don't know about the
relevance of a lot of this quite frankly.

But just let me ask a question on that. I know
the biggest, the main dispute is about failure to hit the
milestone. To what degree is what happened during
development a part of that issue? My sense is it's a fairly
sizable part of it, but I'm not clear.  And I don't need a
long explanation, I just want to understand, is that part
of it?

MR. GILMAN:  It's fundamentally relevant because
the first milestone is the approval of the product.

THE COURT:  Right.

MR. GILMAN:  The second, third and fourth
milestones are sale based following approval. There's
another milestone that relates to two different drugs, it's
a production based milestone, and, Your Honor, we have

1

2  documents among the ones that have been produced that we

3  believe show that Sanofi, upon the closing of the

4  acquisition, which is a week after the CVR agreement is

5  signed up, shortly thereafter cut the budgets for this

6  pharmaceutical drug.

7          THE COURT:  Right.

8          MR. GILMAN:  Cut the budgets, the people that

9  were in charge of the development of this drug, that were

10 in charge of the marketing and sales of this drug, fired

11 off red flares that, you know, the world is over, wow,

12 exclamation point.

13         THE COURT:  Okay, you can stop there, I don't

14 want to get into a long discussion of the merits.

15         MR. GILMAN:  This is fundamentally --

16         THE COURT:  I understand the point, okay, the

17 answer to my question which is, yes, development is clearly

18 important, it's not just about the marketing efforts and

19 the sales efforts, okay.  In that case maybe some of the

20 documents are relevant, again, I don't think they make a

21 difference, but maybe they're relevant.

22         What additional guidance can I give? If you have

23 specific questions, let me know. I always have doubts when

24 marketing, when the communications are really about

25 marketing folks and business strategy and PR. And, look,

```
 1
 2   when I litigated I always wanted to assert that privilege
 3   because it was trying to protect my client but it wasn't
 4   always privilege and you've just got to live with that.
 5           MR. GILMAN:  The problem we have is Mr. Neuwirth,
 6   in his arguments, said that the privilege covers that which
 7   facilitates legal advice, it doesn't. The law is crystal
 8   clear that if a communication simply proves important to
 9   the lawyer, that's not good enough, if it substantially
10   assisted the lawyer, that's not good enough, and the cases
11   are legion.  What they have to show is that the third party
12   was necessary so that the lawyer's communications with the
13   client could meaningfully occur. And that's why it began
14   with the translator folks and that's why it's been extended
15   narrowly to professions that require, like accounting in
16   certain instances, although a number of the cases that were
17   submitted by both of us said there's no privilege for Ernst
18   & Young in this particular area, or there is no privilege
19   for Marsh --
20           THE COURT:  Well, right, but it depends on what's
21   happening, it depends on what is going on.
22           MR. GILMAN:  Exactly, but it's not just that it
23   makes it easier, it's not that it facilitates, that's not
24   the standard. You can withhold almost anything under that
25   standard. The standard, we believe, is that in order for
```

1

2  the lawyer effectively to give the advice the client is

3  seeking, the lawyer needs this information, needs it

4  translated, needs it explained, because it's not within the

5  lawyers cannon.  It's special.  And when you're talking

6  about crafting a press release, you're about as far from

7  special, in terms of legal advice, because they're not

8  claiming work product, they're not claiming that there's an

9  overarching lawsuit that we have to be worried about. We're

10 talking about traditional attorney-client privilege and I

11 think it's being given a pretty broad view.

12         THE COURT:  So if, let me just ask you a couple

13 of hypotheticals. So if a party, let's say Sanofi, has a

14 press release it wants to issue and it runs it by its

15 lawyers to get their input, privileged?

16         MR. GILMAN:  It could be, it could be, but that's

17 not this case.

18         THE COURT:  I understand.  So I'm going to build.

19         MR. GILMAN:  Okay. It could well be if the client

20 is asking the lawyer here's a draft that we think, you

21 know, what do you think, does this expose us to X or Y or,

22 sure, it could be.

23         THE COURT:  Okay, and that could have been an

24 internal communication just between the lawyer and someone

25 within the firm, but presumably there's a PR firm involved

1
2   or there may be, and so someone from the PR firm is
3   involved, does that remove it from the privilege?
4            MR. GILMAN:  If the PR professional is being
5   asked in his confidence and the lawyer is being asked, but
6   you wouldn't send that to all of your investment bankers
7   and all your PR guys, and all your scientists and all your
8   lawyers on the same email.
9            THE COURT:  No, you wouldn't, but if a deal is
10  big enough, presumably having 10-15 people doesn't mean
11  that's a particularly wide group, there may be 200 people
12  in total working on it, right?
13           MR. GILMAN:  We're not dealing, I don't mean to
14  suggest the number of recipients is the key, it's who they
15  are.
16           THE COURT:  Yep.
17           MR. GILMAN:  You would not send, if you're
18  seeking confidential legal advice on subject A, you might
19  include the lawyer, you might include an expert on subject
20  A, maybe, and you'd have the client, but you wouldn't have
21  four or five other third party professionals, none of whom
22  are agents, none of whom are experts in that, copied on the
23  same document.
24           THE COURT:  But what if each person's expertise
25  is integral to what's going on?

1                                                          28

2          MR. GILMAN:  Again, if you can hypothesize

3 something that narrow it would apply to the red-headed

4 stepchild document, it wouldn't apply to 8,000 documents.

5          THE COURT:  Okay.  Mr. Neuwirth.

6          MR. NEUWIRTH:  Briefly, Your Honor, first of all,

7 the test, which is the applicable test, is Ozario

8 (phonetic) and it uses the word facilitate directly in the

9 middle of it. It says, "similarly, communications made to

10 counsel through a hired interpreter, or one serving as an

11 agent of either attorney or client, to facilitate" --

12          MR. GILMAN:  Agent.

13          MR. NEUWIRTH:  "An agent of attorney or client"

14 --

15          THE COURT:  All right, one person.

16          MR. NEUWIRTH:  "To facilitate," we love the give

17 and take, "to facilitate communication generally will be

18 privileged," that's Ozario.

19          MR. GILMAN:  Made to an agent to facilitate --

20          THE COURT:  Hey, hey --

21          MR. NEUWIRTH:  These are disclaim agency of the

22 attorney or client, and, by the way, it goes on to say,

23 "the scope of the privilege is not defined by the third

24 party's employment or function," the issue that plaintiff's

25 counsel is raising; however, it depends on whether the

29

1

2  client had a reasonable expectation of confidentiality

3  under the circumstances. I don't want to spend a lot of

4  time --

5          THE COURT:  Well confidentiality when there's a

6  communication with a lawyer involved.

7          MR. NEUWIRTH:  Correct.

8          THE COURT:  Again, I agree with plaintiff's

9  counsel that it's not just if it's confidential.

10          MR. NEUWIRTH:  Correct, I agree with that, as

11  well.  I don't want to spend a lot of time, Your Honor,

12  arguing about that. I think we understand what the Court

13  has said.  I understand Mr. Gilman's view, I think Mr.

14  Gilman will be pleasantly surprised that a lot of documents

15  are going to come off of this log before May 31 or by May

16  31, but we certainly understand. I disagree fundamentally

17  with the notion that in sophisticated companies and

18  sophisticated transactions, working groups aren't large and

19  legal advice isn't sought and received in the context of

20  working groups, it happens every single day of my practice

21  and I can tell you, and I'm sure Your Honor knows this, and

22  I think Mr. Gilman knows it, as well, that clients expect

23  the privilege to attach in those situations and for those

24  documents to remain privileged. It has to be done on a case

25  by case basis and a document by document basis, it's not

1                                                          30
2   always going to be the case, but it certainly is going to
3   be the case sometimes, particularly with financial
4   advisors.

5           THE COURT:  Right, but again, I think it comes
6   back to the communication and what it is seeking or getting
7   response to. And in the documents that were here, the ones
8   that you submitted, again, there are some that just seem
9   fundamentally about a non, it's really not seeking legal
10  advice, it's just input on a business decision, be it a
11  press release, be it a particular part of the acquisition,
12  whatever it is. And lawyers certainly have to know about
13  certain things that are happening so they can go do what
14  they need to do, but I don't know that that makes the
15  communication privileged. And I think you've really got to
16  take a careful look at the documents on your logs about is
17  this really about a legal matter or is it really just this
18  is a business decision that's going forward and the
19  lawyer's participation here, it's really about a business
20  function that's going on. And you should consider also
21  whether the group is so wide that you really can't claim
22  its privileged. There are times when that happens and
23  sometimes a lawyer is just cc'd to make it look like it's
24  privileged when we all know it's really not. So those are
25  words of wisdom I can give to you.

```
 1                                                      31
 2              MR. NEUWIRTH:  Understood.

 3              THE COURT:  Okay, all right, anything else on the

 4  privilege issues that we should discuss? It seemed to me

 5  there were a couple of issues and let me just see if I can

 6  hit them. So besides privilege log, so is there an issue

 7  about French in house counsel and whether documents,

 8  whether documents involving French in house counsel not

 9  admitted to any American bar are privileged or not?

10              MR. GILMAN:  May I have Mr. Andrus --

11              THE COURT:  Absolutely.

12              MR. GILMAN:  He's earned the right to speak --

13              THE COURT:  I would think so.

14              MR. GILMAN:  And we're pleased that you are going

15  to have the opportunity.

16              THE COURT:  I am pleased, as well.

17              MR. ANDRUS:  There is an issue, Your Honor.

18              THE COURT:  Okay.

19              MR. ANDRUS:  With French in house counsel. As

20  defendant has said, they have agreed to re-review all of

21  these privilege assertions, so now on that issue we're just

22  at a date.

23              THE COURT:  Okay, so you're just waiting then --

24  but why does it make a difference, why does it make a

25  difference if someone is not admitted in the US?  If
```

32

1
2  someone is seeking counsel from a lawyer, I don't care
3  where they are, do I?
4          MR. NEUWIRTH:  Hey, Your Honor, we're with you,
5  but the case law is not as clear as you and I would think
6  it should be.
7          THE COURT:  Okay.
8          MR. NEUWIRTH:  And that's the issue.  What we've
9  committed to do, Mr. Andrus is absolutely right, is we are,
10 in the context of completing our logs by the end of May,
11 going back, and to the extent we think that law is wrong,
12 respectfully --
13         THE COURT:  Okay.
14         MR. NEUWIRTH:  But to the extent that we've got
15 solely French in house folks on documents, we are going to
16 take those off the log. To the extent there's another basis
17 for privilege, for instance, there's a US barred lawyer
18 there and there's an appropriate claim of privilege, we
19 will not be taking them off the log. But to the extent
20 we've got solely French folks who are not barred, as a
21 result of that case law, which I think is subject to
22 debate, by the way, we have determined that we're going to
23 give them those documents.
24         THE COURT:  Okay. Does France have a privilege
25 that would apply, and, if so, could it be invoked?

1

2          MR. ANDRUS:  That's the issue is that France does

3  not and so if they do not have an American admitted

4  attorney, then New York law is that those are not properly

5  withheld documents.

6          THE COURT:  Okay, all right, but I hear agreement

7  on going forward to try to resolve this so that's terrific.

8  Yeah, was there?

9          MR. NEUWIRTH:  We'll move on to the next one.

10          THE COURT:  Okay.  Proof of contemporaneous bar

11  membership for all individuals designated as attorneys.

12  Well I understand that, are they lawyers or are they not,

13  how far does this go?

14          MR. ANDRUS:  That's our request, we just want a

15  list of the attorneys and their, because this is an issue,

16  looking at the French in house counsel, as an example, the

17  US bar membership is necessary for privilege assertion.

18          THE COURT:  Okay.

19          MR. ANDRUS:  So we're just asking for a list of

20  the attorneys that they are seeking their documents to be

21  --

22          THE COURT:  And you're asking for when they were

23  admitted to the bar it looks like?

24          MR. ANDRUS:  Just the contemporaneous with the

25  communication --

1

2          THE COURT:  Oh, okay.

3          MR. ANDRUS:  Oh, what bar they were admitted to.

4          THE COURT:  Is that something you are going to

5   provide, any objection?

6          MR. NEUWIRTH:  We do have an objection, Your

7   Honor, but I'm not sure it's a big issue. It's based on a

8   flawed premise and I think the argument that we received

9   was 11 of 16 attorneys were misidentified as non-attorneys,

10  I mean as attorneys when, in fact, they weren't.  They are,

11  in fact, attorneys, they just happen to be French

12  attorneys.  So 14 of the 16 are, in fact, attorneys, I

13  think the issue comes back to the one we were just

14  discussing which is to the extent that we've got documents

15  that only involve French in house counsel, to which the

16  privilege arguably does not attach, we're going to produce

17  those documents. But we think it's completely unnecessary

18  for us --

19         THE COURT:  But you said 14 of 16, what were the

20  other 2?

21         MR. NEUWIRTH:  Well, one was mistaken --

22         THE COURT:  Okay, that happens.

23         MR. NEUWIRTH:  Of the 16, and the other was an

24  attorney. So 15 of 16 we had right, the issue comes back to

25  this issue of are they French in house counsel without an

35

American bar license or not. And that issue I think has

been resolved because we've committed to go back and

actually produce documents that involve French --

THE COURT:  All right, so Mr. Andrus, why is

anything else necessary.

MR. NEUWIRTH:  But that we have to produce

another piece of paper to list peoples' bar licenses and

dates, given what we are doing already --

THE COURT:  I got it.

MR. NEUWIRTH:  Strikes us as a bit much.

THE COURT:  Okay.

MR. ANDRUS:  We're not asking for a lot. It's a

list of names of the attorneys.  They've already identified

that they're withholding their documents based on

privilege, we're just looking for the state that they're

admitted, because it's already been an issue and because we

are entitled to the information that is necessary to

evaluate their privilege claims.

THE COURT:  Okay.  Here's what you should do, if

there is anyone who is not an attorney that you've

previously identified as an attorney, take them off the

list, right, and it looks like you've already done a lot of

that. And you are going to be producing the French lawyer

stuff, it looks like, so that's going to go away. I don't

1

2   think you need to put together a whole list of

3   contemporaneous bar membership, I think that goes a little

4   far. So I'm not going to require that.

5          Non-Sanofi employer email accounts, what's that

6   issue?

7          MR. ANDRUS:  So there are board members who had

8   communications with attorneys and they're being withheld

9   for privilege. But the email account that those board

10  members used was their employer account, employer email for

11  their full time employer. So we give the example, United

12  Healthcare, someone who worked for United Healthcare is on

13  the board of Genzyme. They communicate with Genzyme people,

14  they're attorneys, those communications are withheld for

15  privilege, but that email account, that United Healthcare

16  email account, they don't have an expectation of privacy on

17  that account --

18         THE COURT:  Why not?

19         MR. ANDRUS:  As it relates to the Sanofi or

20  Genzyme privilege assertion.

21         THE COURT:  Why not?

22         MR. ANDRUS:  Because United Healthcare has the

23  right to look at that email account any time United

24  Healthcare wants to.  And we've cited two cases that have

25  addressed this exact issue.

1                                                              37

2              THE COURT:  Do the directors have an email for

3   the company for which they are director?

4              MR. ANDRUS:  I wouldn't know that.

5              THE COURT:  Do they?

6              MR. NEUWIRTH:  Well I think it's case specific,

7   this is a general issue that plaintiff has raised that in

8   situations where you've got a board member of Genzyme or

9   Sanofi board member that is employed by another

10  corporation, Your Honor, and United Healthcare is the

11  example that's been given, to the extent something was sent

12  to the United Healthcare email address, that there can be

13  no claim of privilege over that because there can be no

14  expectation of privacy. Your question, I believe, was do

15  board members in that situation have a Genzyme or a Sanofi

16  email account --

17             THE COURT:  Do they have an alternative email

18  they could use where there would be an expectation of

19  privacy? They have personal email, presumably, but do they

20  have a separate email as director that's for the company

21  for which they are director?

22             MR. NEUWIRTH:  I think it's case specific, I

23  don't know if I can answer it in detail, Ms. Venezia, I

24  don't know if you can, but I think we'd have to look into

25  it on a person by person basis. I'm not prepared to concede

38

in any way, shape or form that there wasn't an expectation
of privacy in this example when the person was using their
United Healthcare email address.

THE COURT:  Well I would agree with you to the
extent that I'm sure everyone who sent an email believed it
would be kept private. Whether that is allowed as a matter
of law is a different question.

MR. NEUWIRTH:  Well that's the issue, it's not as
simple as Your Honor saying there is no expectation of
privacy, and, therefore, none of these documents can be
privileged. There is actually a test that applies, it's a
four part test, the case is *Asia Global Crossing*, and it's
four parts: Does the corporation maintain a policy banning
personal or other objectionable use; does the company
monitor the use of the employee's computer or email; do
third parties have a right of access to the computer or
emails; and, four, did the corporation notify the employee
or was the employee aware of the use and monitoring
policies.

THE COURT:  Right, and whose burden to prove
those points?

MR. NEUWIRTH:  Well I think that's the issue,
Your Honor, is whose burden it is. It's our burden to
establish that a privilege applies, I think that's pretty

39

clear in the privilege law. And so where does that leave

us, you know, I'm not sure exactly what the request is.

Again, this was something that was raised on Friday. I will

tell you this, again, I'm not sure how big of an issue this

is at the end of the day, we are obviously going through

all the privilege logs, certain things are going to come

off, I don't know how much, if any, of this stuff is going

to remain. I guess the question is what's the path forward.

With respect to those that do remain, do we need provide

evidence as to why there was an expectation of privacy and

confidentiality with respect to those, perhaps we do.

        THE COURT:  I think it's an unnecessary

expenditure of time and effort, and I would just say given

what we're dealing with here, the extent of which there are

such emails compared to everything else that there is and

the amount of work that's been required, is neither

proportional nor appropriate to -- to say that those are

waived in this context or to make, have you go through the

trouble of having to prove whether or not those four

elements are met for any corporation that someone was an

employee of but was using it to send an email in their

capacity as director.  So I am not going to require that, I

would deny a motion to compel on that basically. If there

is some other basis or you come across some evidence that

1  really suggests that there was a reason to not expect

2  privacy and the plaintiff can show what the policy is of

3  the corporation and whether the other elements are met, I

4  might reconsider, but otherwise I think it's a waste of

5  time.

6

7         Okay, let's see.  Now attorney on the

8  communication, that's self evident. Withholding of

9  attachments, and, yeah, so I did have a question for Mr.

10  Neuwirth on that because it wasn't clear to what extent

11  that was happening. And were attachments withheld in

12  situations where the cover email was privileged or

13  something on the cover was privileged but the attachment by

14  itself was not?

15         MR. NEUWIRTH:  Not intentionally, Your Honor. And

16  what we're doing, again, not to beat a dead horse as part

17  of the re-review, is insuring that any attachments that

18  were withheld were, in fact appropriately privileged and if

19  they're not they will be produced. But there is certainly

20  no intent to simply withhold attachments. We understand

21  that if an attachment doesn't have an independent basis for

22  privilege it's got to be produced.

23         THE COURT:  I would encourage you to produce any

24  attachments of this nature with a, if the front document is

25  to be redacted, with that document in redacted form. So

1
2      there's a date, there's a re line, et cetera, so there's a
3      context for the attachment.  And you should also identify
4      which Bates number it goes with or maybe the front document
5      will have the Bates number and you can just attach it to
6      that.
7              Okay, 3,000 improper redactions, but you've
8      agreed to re-review so I think that's a nonissue for the
9      moment, correct?  Yes?
10             MR. ANDRUS:  Agreed.
11             THE COURT:  Okay.
12             MR. ANDRUS:  Just to raise one point on the
13     timing?
14             THE COURT:  Yes.
15             MR. ANDRUS:  They have asked for a May 31
16     deadline for everything.
17             THE COURT:  Right.
18             MR. ANDRUS:  All we're asking for here is an
19     interim deadline for the re-review for the things that
20     should have been done right already, that are already
21     logged, already produced, so that we don't have a backlog
22     at the very end where we have to review everything at once,
23     including the stuff that hasn't been logged, hasn't been
24     produced, hasn't been redacted yet.
25             THE COURT:  Seems like a reasonable request when

```
 1                                                    42

 2   he puts it that way, what do you say?

 3           MR. NEUWIRTH:  Very nice.  Your Honor, what it

 4   is, is a request to revise the schedule. We've got a

 5   schedule and I think, while it sounds nice, we can never

 6   forget in this case just what the job has been and the job

 7   is really at some level unprecedented, the amount of

 8   documents that we've had to produce. And so while I

 9   appreciate that plaintiffs initially wanted millions and

10   millions of pages of documents but now would like things to

11   be done a little bit quicker, I don't think that's a

12   reasonable ask.

13           THE COURT:  Well it's slightly different than

14   that, it's material you have already provided and it wasn't

15   correct. So they're just saying can you take care of this

16   so that we don't further put off things that should have

17   been done right previously.  And I think, so the question

18   is really, you know, can this be done. What an be done.

19           MR. NEUWIRTH:  I'm thinking maybe, Ms. Venezia,

20   you should speak to it, but I think the way that we are

21   doing this re-review requires us to go through this and

22   part of the way to get it right is obviously to shrink the

23   size of the team that's doing it so there's consistency

24   across the re-review, and do it in an across the board

25   order. And so when we say May 31, it's because we want it
```

```
 1                                                      43
 2  to be done and be done correctly. And I think everybody
 3  will be pleased to see a lot of documents come off the log
 4  as a result of that, but I don't believe it's doable by
 5  April 13, and you can speak to it in more detail.
 6          THE COURT:  Wait, what can you do in terms of a
 7  rolling basis, like providing periodic productions of
 8  anything that comes off the list?
 9          MS. VENEZIA:  I think, Your Honor, providing a
10  rolling production of the privilege documents as de-
11  designate them, I don't think will resolve the issue and
12  may perpetuate some of the issues that have been ongoing,
13  as Mr. Neuwirth said, we want to make sure we're doing this
14  one last time and we do it right, and we do it
15  consistently. And I do think that taking the time to make
16  sure we get to that place so that we don't have to, you
17  know, have these conversations with plaintiff when we
18  produce logs on May 31 is the most efficient way to get
19  this done and be done with it and get it done right.
20          THE COURT:  I mean I can see the issue of you say
21  a document has gone off on a rolling production and then
22  you come across something later that gives more context
23  that might lead -- might lead to a different conclusion.
24  But at the same time, I don't know that waiting to the end
25  really makes sense.
```

1                                                                    44

2            How about if, well when are you starting the re-

3    review, is it underway right now?

4            MR. NEUWIRTH:  Yes.

5            MS. VENEZIA:  Yes.

6            THE COURT:  Okay.  So how about we just say,

7    well, it presents the same problem.  How about we say any

8    time you come across a document that you're sure is not

9    privileged, because I'm sure for some of them it's just

10   going to be obvious, and there's some categories you've

11   already said, oh, you know, French counsel, we'll look at

12   the document, but it can go, whatever it is that you might

13   be able to do categorically, just produce what you have at

14   the end of the week. If there are documents you have a

15   close call on and you need to see others down the line,

16   that's fine, but if there are some that are just, you know,

17   it's pretty straightforward, I would just say produce it.

18   And if you, just don't hold them all until the end is sort

19   of my concern.

20           MS. VENEZIA:  Well we will try to find a way to

21   make that work. What I will say, Your Honor, is that there

22   will not be, we will not be able to produce revised logs,

23   revised final logs at the time that time that we produce

24   those documents --

25           THE COURT:  No, I understand, you're just

1

2 producing the documents. Anything else, Mr. Andrus, on

3 that?

4        MR. ANDRUS:  Just a couple of points, and you've

5 been very reasonable.

6        THE COURT:  Sure.

7        MR. ANDRUS:  The first point is that one of the

8 counts, all of those documents should have already been

9 produced in the fall.  That deadline is over, those should

10 be done.

11        THE COURT:  Right, but this is a privilege log

12 issue, but I understand the concern.

13        MR. ANDRUS:  So there is no need to wait around

14 and see what other documents come out of it because that's

15 a set. In the scheduling order, we already asked for a

16 rolling privilege log for this very purpose, so that we

17 would not get back loaded.

18        THE COURT:  Well we're back loaded here because

19 it wasn't done correctly.

20        MR. ANDRUS:  It wasn't done right.  And it should

21 not be our burden to force the other side to do it right.

22        THE COURT:  That's true.

23        MR. ANDRUS:  Right.  To go through the expense of

24 reviewing all these, finding the errors, going through the

25 meet and confer, coming to court, and so that is our

1

2  request, that we push a little bit.

3          THE COURT:  Your points are well taken, I'm going

4  to leave it as is, but your points are well taken.

5          All right, the next thing on here is spoliation,

6  and there certainly isn't enough information to act here if

7  there really is a claim of spoliation.  But just tell me

8  what's going on.

9          MR. ANDRUS:  The request is for information.  We

10  have asking for information behind the deletion of the

11  documents, they have resisted, they have denied those

12  requests, that's the request.

13          THE COURT:  Right, okay.

14          MR. NEUWIRTH:  Well, we've resisted for a good

15  reason, Your Honor, the gentlemen who left, left in 2011,

16  which was five, six years before this claim was filed. And

17  so the notion that there's a spoliation issue that we need

18  to explain in that circumstance, we just think doesn't hold

19  up.  A) there was no requirement, obviously, to protect

20  documents five years before a litigation was even on the

21  horizon, and even if you had other ongoing litigations or

22  investigations going on, they weren't substantially related

23  and this plaintiff has no standing to raise that issue now.

24  So that's why we haven't provided the information.

25          On top of that, Your Honor, many of these

47

1
2   documents are being provided by virtue of hard drives, and
3   servers and other things, so we just don't think there's an
4   issue there. Certainly not one that required us to preserve
5   somebody's documents six years before a litigation was even
6   on the horizon, and it doesn't give this plaintiff the
7   right to walk into court with any standing and complain
8   about that issue.

9           THE COURT:  And just before we go there, you said
10  that he left five or six years before, before what?

11          MR. NEUWIRTH:  He left in 2011.

12          MS. VENEZIA:  Mr. Knute (phonetic) left in the
13  middle of 2011 and the three other individuals that
14  plaintiff has referenced, not by name, but just by number,
15  left in 2010 and 2012.

16          THE COURT:  Okay, and you're saying that was five
17  or six years before the litigation was initiated?

18          MS. VENEZIA:  Plaintiff has indicated that these
19  individuals are relevant for purposes of the production
20  milestone claim which was not filed until 2017, Your Honor.

21          THE COURT:  Okay, but when was the agreement
22  entered for the CVRs and everything that went along with
23  it?

24          MR. NEUWIRTH:  2011.

25          MR. ANDRUS:  April 2011.

1

2          THE COURT:  Okay, so there's contemporaneous

3   things going on around the time, I, hold on, I'm just

4   saying in terms of the potential relevancy, but I do want

5   to hear from Mr. Andurs on why there was possibly an

6   anticipation of litigation at this time that would have

7   imposed a duty to preserve any time around that?

8          MR. ANDRUS:  Our contention is there was other

9   litigations around this exact subject matter, starting then

10  and going on until the present.

11         THE COURT:  What other litigations?

12         MR. ANDRUS:  There was a securities litigation

13  about CVR disclosures.  There was ongoing FDA disputes

14  about the two drugs at issue in the production milestone

15  claim.  We have more of them that I don't have right in

16  front of me, but that is our belief is that there were

17  continuous litigations that would have dictated these

18  documents be preserved.  And all we're, we're not even

19  saying that there was spoliation at this point, we're

20  asking for information about the deletion of materials.

21         THE COURT:  And what is it about these other

22  litigations that make you believe those documents should

23  have been kept, do you have access to document requests,

24  other materials that would suggest that they should have

25  been?

 1

 2          MR. ANDRUS:  Complaints and subject matters, that

 3   they covered the same subject matter is at issue here.

 4          THE COURT:  What is the subject matter, when you

 5   say the subject matter, what would that be?

 6          MR. ANDRUS:  Both the CVR agreement, itself, and

 7   the milestones, and the drugs, there's two drugs at issue

 8   in the production milestone claim, there were ongoing

 9   disputes with the FDA about the quality, the facility that

10   made those drugs.  And so there was litigation about that.

11          THE COURT:  Were there any allegations in any of

12   this litigations that there had been spoliation of Mr., is

13   it Kaput?

14          MR. NEUWIRTH:  Knute.

15          THE COURT:  Knute's email?

16          MR. ANDRUS:  We don't have access to that level

17   of discovery detail --

18          THE COURT:  Okay. All right, Mr. Neuwirth.

19          MR. NEUWIRTH:  First of all, Your Honor, the

20   securities litigation wasn't filed until well after Mr.

21   Knute and the three other individuals left the company. I

22   defended that litigation, it was a couple of years ago.

23   That's the first part.

24          The other litigations to which Mr. Andrus refers

25   were not about the CVR agreement. Maybe more importantly,

```
 1                                                          50
 2   in addition to the matters that I raised before I sat down,
 3   this is certainly not properly presented to this Court.
 4   This was an issue that was added to the agenda on March 23,
 5   Friday, if they want to make a motion for spoliation, I've
 6   previewed our position it, they're free to do it --
 7            THE COURT:  Well, they want discovery on
 8   spoliation.
 9            MR. NEUWIRTH:  Well, again, the reasons why we
10   don't think that they're entitled to discovery on
11   spoliation are the ones that I've given you.
12            THE COURT:  Yes --
13            MR. NEUWIRTH:  This litigation was nowhere on the
14   horizon, nowhere reasonably anticipated, and had nothing to
15   do with the litigations that were the other litigations to
16   which they referred.
17            THE COURT:  And it's just a sideshow for what is
18   an endless amount, as you have noted, of documents and
19   litigation. I don't see any reason to grant this. If there
20   comes further evidence that you have where you believe
21   there's been spoliation, you can present it, but going into
22   discovery on that issue for this is just not merited.  Mr.,
23   I'm going to hear some disagreement I think.
24            MR. GILMAN:  Only that spoliation, perhaps that's
25   a word that causes people to think of willfulness --
```

```
 1                                              51
 2              THE COURT:  It can be negligent.
 3              MR. GILMAN:  Of intentional destruction. It can
 4    be negligent, it can be whatever.  What we're talking about
 5    here is the gentlemen and his team who were hired to fix
 6    the production problems in the plant, there were two drugs
 7    that were already approved that were hundreds of millions
 8    of dollars a year in sales and they were stopped because of
 9    contamination in the facility in Massachusetts.  The
10    production milestone dealt with we have to fix the
11    facility, get it back online, get it approved, QC, back
12    online, and as soon as we produce certain levels, not sell
13    them, but as soon as we produce certain levels of these two
14    existing drugs, the CVR gets triggered, $400 million at
15    issue.
16              THE COURT:  Right.
17              MR. GILMAN:  The people we're talking about are
18    the people that were hired to fix the problem and months,
19    just months after Sanofi becomes their boss, Mr. Knute is
20    gone. The other one leaves a little bit later. All we're
21    asking is when were their files deleted, their electronic
22    files, when were they purged, who purged them, and on what
23    basis. Now we can serve a 30(B)(6) notice and be back here
24    in two weeks because he refuses to produce a witness, but
25    that's all we're asking for. We're not asking for rulings
```

52

from the Court about inferences at trial, that's down the road.

THE COURT:  In general, have 30(B)(6) depositions occurred at all at this point, I assume not?

MR. GILMAN:  There's been one. One on a limited subject, but --

THE COURT:  Anything about documents and retention policies or anything like that?

MR. NEUWIRTH:  It was a negotiated subject and did not cover this at all, if I may, Your Honor --

THE COURT:  Yes, sure.

MR. NEUWIRTH:  It was on the production milestone and it certainly could have been a topic, it was, the plaintiffs gave us a list of topics and we produced the witnesses.

THE COURT:  I'm sorry, I meant specifically about retention and document systems and things like that.

MR. NEUWIRTH:  That was not covered during the deposition, it presumably could have, this was not a new issue.

MR. GILMAN:  It wasn't part of the negotiation. The 30(B)(6) was a carefully negotiated, very odd deposition. It dealt with what are your scientific capabilities in a certain area and it was hopefully limited

1

2   to that.

3          THE COURT:  Is there a limit in place on the

4   number of depositions, there must be.

5          MR. GILMAN:  Twenty-five, and we don't think, if

6   we're going to have to be running around the barn on this

7   one and we can't get a straight answer as to when were they

8   deleted, and who deleted them, and by what reason were they

9   deleted, this is key guys, we don't want these depositions

10  to count against the number.

11         THE COURT:  Well here's what I'll do, two hours,

12  30(B)(6), if there's something there you get your two hours

13  back, if there's not, you've sacrificed two hours of one

14  seven-hour deposition, that's what I'm going to do. Okay,

15  there we are.

16         I see on here dates for Sanofi fact witnesses but

17  I assume that's something you guys can work out.  Am I

18  wrong?

19         MR. ANDRUS:  That's not in our court.

20         THE COURT:  Okay.  I had seen here something

21  about dates for Sanofi fact witnesses, but I was assuming

22  that that's something that you guys are going to work out.

23  But is there a dispute there?

24         MR. NEUWIRTH:  I don't think so, Your Honor, I

25  think, obviously, there were some timing issues that were

```
 1                                                    54
 2   at issue today on privilege issues and otherwise, they've
 3   asked for depositions dates, we've begun to provide them,
 4   there have been four depositions already.  We will continue
 5   to provide them shortly.
 6            MR. GILMAN:  Your Honor, February 23 we noticed,
 7   I don't know, a dozen depositions and we proposed dates,
 8   and we said talk to us about, you know, availabilities and
 9   whatnot. It has now been a month and five days, we have
10   dates for two people. It's not that easy to get
11   information. This is basic stuff.
12            THE COURT:  When are the depositions being set
13   for, the two that you've already got?
14            MR. GILMAN:  Well we set them for March 13
15   through May 17.  Now the early dates have already come and
16   gone without witnesses.
17            THE COURT:  Well, right, and there is still some
18   document production taking place, obviously.
19            MR. ANDRUS:  The two that we have scheduled are
20   May 3 and May 9.
21            THE COURT:  Okay.
22            MR. NEUWIRTH:  And by the way, we haven't spoken
23   to plaintiff's counsel about this, but I don't want it to
24   go unremarked upon, one of those dates may need to move
25   slightly, but within May.
```

```
 1                                                    55
 2              THE COURT:  Okay.  So what about the rest?
 3              MR. NEUWIRTH:  We obviously have recognized that
 4   there's more document work to do. We're happy to proceed
 5   with depositions and we'll provide them with dates very
 6   shortly after this conference for some people, not all yet.
 7   But if they want to proceed in the near term with
 8   depositions, we're perfectly happy to do that, and they
 9   will get the dates, I don't think there's an issue there.
10              THE COURT:  How long will it take you to get the
11   dates to give them?
12              MR. NEUWIRTH:  Well we don't have dates for all
13   but I think we've got dates for some that we'd be prepared
14   to give them as early as tomorrow.
15              THE COURT:  Okay, how many?
16              MR. NEUWIRTH:  Two, I believe.
17              THE COURT:  That's not very many. That's a start
18   --
19              MR. NEUWIRTH:  It's a start.
20              THE COURT:  So when are you going to get the
21   rest?
22              MR. NEUWIRTH:  We've given them two, that's four
23   off of the list, we're not intentionally trying to delay
24   it, Your Honor, I think we will be able to do it in
25   relatively short order.
```

56

1

2          THE COURT:  So when can, let's get something

3    somewhat structured in there so that it's not just left

4    hanging.

5          MR. NEUWIRTH:  I mean, again, I don't have my

6    client in the room, and so it's a little tricky, it's a big

7    corporation, there are some very senior people on this

8    list.

9          THE COURT:  I'm sure.

10          MR. NEUWIRTH:  With busy schedules. And so to

11    commit to a date is hard. We will endeavor to get them as

12    many dates as possible within the next two weeks.

13          MR. ANDRUS:  The other issue --

14          MR. NEUWIRTH:  Your Honor, they asked for these

15    dates on February 23 --

16          THE COURT:  I understand.

17          MR. NEUWIRTH:  A month is not a terrible amount

18    of time in the context of this case.

19          THE COURT:  I agree.

20          MR. ANDRUS:  The other issue is that we noticed

21    dates starting in March, two of those dates have already

22    passed. We noticed dates in April, I don't think we're

23    going to get any depositions in April. Our first date is

24    May 3, we have one May 9, we're running up against our June

25    30 deadline.

1

2          THE COURT:  Yes, you are.

3          MR. ANDRUS:  We have 14 that we've noticed, we

4  have 6 more that we have still yet to notice, we need to

5  examine documents. We've got to fit all of these people

6  before June 30, we don't want to delay this case. That's

7  the issue.

8          MR. NEUWIRTH:  That's an interesting statement

9  when they've received 20 million documents. And we just

10 cannot lose it because this is a unique situation.  And so

11 while I appreciate that now you don't want to delay the

12 case, unfortunately, the volume here is basically

13 unprecedented and, you know what, if we want to let reason

14 prevail, perhaps we might have to slip past June 29 a

15 little bit.

16         THE COURT:  Yes, so Mr. Neuwirth, calm down a

17 little, no need to address your adversary.  Yeah, it's a

18 lot of documents and that happens in many cases actually.

19 And whether it's unprecedented or not in terms of the

20 actual number, I don't know. It does seem to me that there

21 is an unrealistic timeframe here at the moment, and I never

22 want to see dates slip if they don't have to.  But it does

23 seem there might need, we might need a little grease in the

24 wheels.

25         Did I set the last schedule or did the DJ?

1

2          MR. NEUWIRTH:  You did, Your Honor.

3          THE COURT:  I did, okay.

4          MR. ANDRUS:  And we're not asking for it to be

5   moved right now, we will work with them to schedule as many

6   depositions as we can, and if they want to double track

7   depositions, we can try to do that.  Alternatively, we'll

8   work on something that's reasonable, but we're not trying

9   to delay. We're trying to finish our document production,

10  finish the privilege log, and move into the bulk of the

11  depositions.

12         THE COURT:  All right, so get them the two you

13  know of, get those dates to them tomorrow, work hard and in

14  good faith, diligently, to get dates for the rest of your

15  people, and let your client know that the judge wants that

16  to happen promptly.

17         MR. NEUWIRTH:  Will do.

18         THE COURT:  Okay.  All right, is there anything

19  else other than the summary judgment issue that we need to

20  address?  Going once, going twice, gone, okay.  So I

21  haven't read it recently, I read it a couple of weeks ago,

22  but it seems to me that this is a very narrow issue, that

23  the plaintiff wants to enforce a contractual right, and

24  what is, and I understand that in the context, if you want

25  to seek TRO or PI there are other issues that may prevent

59

1  such relief from getting granted, but right now we're

2  seeking a declaratory judgment and a grant of summary

3  judgment on that.  That they have the right to inspect the

4  books, get certain information, et cetera.  Why shouldn't

5  that happen, Mr. Neuwirth?

6

7            MR. NEUWIRTH:  Sure, Your Honor, two reasons, and

8  it requires a little bit of history, but let me give you

9  the two reasons. One, there is a genuine issue of fact that

10  precludes the grant of summary judgment that plaintiff,

11  itself, has injected into this claim.

12            THE COURT:  Counterclaim of bad faith?

13            MR. NEUWIRTH:  No, I'm going to get to that.

14            THE COURT:  Okay.

15            MR. NEUWIRTH:  The genuine issue of fact is this,

16  7.6(A) of the CVR agreement does contain an audit right,

17  but all that audit right allows is for the auditor, the

18  independent auditor to check the numbers. Plaintiffs

19  concede that in their papers.  Plaintiffs have asked for,

20  the CVR agreement 7.6(A) also allows for the auditor to

21  declare a CVR shortfall in the event a milestone should

22  have been paid but wasn't paid.

23            THE COURT:  Right.

24            MR. NEUWIRTH:  There is a dispute among the

25  parties, there wasn't always, but there is now because

60

1    plaintiff has turned it into one, about what the

2    appropriate measuring period is for product sales milestone

3    number one.  There was initially, at an earlier stage of

4    this case, agreement that that measuring period ended on

5    June 30, 2016.

6           THE COURT:  Right.  No, I recall that that's

7    become an issue and there could be a six month slippage

8    period.

9           MR. NEUWIRTH:  Plaintiffs think now that it could

10   be as late as December, Your Honor is absolutely correct,

11   December of 2016.  That's an issue of fact.

12          THE COURT:  Okay, but that goes to the issue of

13   whether the auditor declares a shortfall as opposed to

14   whether the auditor just checks the numbers. And why can't

15   that happen?

16          MR. NEUWIRTH:  Well, because they're asking for

17   both.

18          THE COURT:  Well I know.

19          MR. NEUWIRTH:  They're asking for the auditor to

20   not only check the numbers, but for the auditor to check

21   the shortfall.

22          THE COURT:  Right.  Can those be separated?

23          MR. NEUWIRTH:  They could be separated, but the

24   question is, does it make any sense to separate them?

61

1

2          THE COURT:  Why doesn't it?

3          MR. NEUWIRTH:  It doesn't, because plaintiffs say

4   it would be more efficient, we don't think it would be more

5   efficient at all. They're seeking to audit a larger period,

6   from 2013 all the way to the end of 2016, and they're

7   seeking to audit the exact same issues and underlying

8   information that's at issue in this litigation.  And so

9   under those circumstances, we just don't think it makes any

10  sense to enable that audit to occur. Certainly -- go ahead.

11         THE COURT:  If he calculates the numbers though,

12  and does it for an extra six month or year period, A) why

13  is that a big deal, and B) how much work does it require

14  after compiling the numbers to actually determine whether

15  there's a shortfall?

16         MR. NEUWIRTH:  Well, assuming you've got

17  agreement on a measuring period, which we don't, that's an

18  issue that is going to be litigated in this case.  The

19  auditor cannot do that.

20         THE COURT:  So what's the beginning, what's the,

21  give me the extremes, what are we looking at, the earliest

22  and the latest, the measuring period?

23         MR. NEUWIRTH:  Well I think the latest, well, the

24  earliest is the period that we're saying it is, which is

25  June 30, 2016.

1

2          THE COURT:  Okay.

3          MR. NEUWIRTH:  And the latest is end of December,

4  2016, and the beginning period that I believe they want to

5  audit is January 1, 2013?

6          MS. VENEZIA:  End of '13.

7          MR. NEUWIRTH:  End of '13.  End of '13 through

8  the end of '16, so a three year period.

9          THE COURT:  But, wait, wait, wait, I'm sorry,

10 where is, what's the disputed period, not in terms of

11 auditing, just in terms of where the dispute in the, you

12 know, there's a six month or one year slippage. I'm trying

13 to figure out what's the earlier of those between you two,

14 and what's the latest? So one of you is going to have the

15 earliest, and the other is going to have the latest.

16         MR. NEUWIRTH:  Let me see if I'm understanding

17 that and can answer it.

18         THE COURT:  Just two dates is what I'm looking

19 for.

20         MR. NEUWIRTH:  Well are you asking --

21         THE COURT:  Who among you says the period starts

22 earlier?

23         MR. NEUWIRTH:  They do.

24         THE COURT:  They do. What's the beginning of your

25 period that you contend should be the starting period?

```
 1                                                      63
 2              MS. VENEZIA:  So, Your Honor, our measuring
 3   period is triggered off of the product launch date and the
 4   CVR agreement which under our view was in April of 2014.
 5              THE COURT:  Okay.
 6              MS. VENEZIA:  Which runs our measuring period
 7   through June 30, 2016.
 8              THE COURT:  I'm sorry, it begins on June 30,
 9   2016?
10              MS. VENEZIA:  Ends, Your Honor.
11              THE COURT:  Ends, when does it begin? It begins
12   in April of 2014?
13              MS. VENEZIA:  2014, I'm going to confirm that,
14   yes.
15              THE COURT:  Okay, and Mr. Andurs, what's your
16   period?  What's the period that you contend is an
17   alternative period?
18              MR. ANDRUS:  That is still an issue that we're in
19   discovery on.
20              THE COURT:  What is the --
21              MR. ANDRUS:  It could be as late as a year later.
22              THE COURT:  Could it be any more than that?
23              MR. ANDRUS:  No, that's open but we don't think
24   so. If I might clarify but go ahead if you want to keep
25   going.
```

1

2          THE COURT:  No, no, go ahead.

3          MR. ANDRUS:  The audit is meant to cover product

4    sales statements. The product sales statements give the

5    sales --

6          THE COURT:  You know what, Mr. Neuwirth was in

7    the middle, I don't want to take away --

8          MR. ANDRUS:  Yep, let him go.

9          THE COURT:  Keep that thought, let me know, but

10   let me let Mr. Neuwirth finish.

11         MR. NEUWIRTH:  So I think that's really the first

12   issue, Your Honor, there's a disagreement about the

13   appropriate measuring period, the CVR agreement under 7.6

14   does not entitle the auditor to make the determination as

15   to who's right about what that appropriate measuring period

16   is. That's an issue that is going to be decided in this

17   litigation.

18         THE COURT:  But we don't have to have the

19   accountant decide that, do we though, if we just take the

20   --

21         MR. NEUWIRTH:  We don't, the answer is we don't,

22   Your Honor, if we think it would be efficient to audit the

23   larger period.

24         THE COURT:  How much work is involved in auditing

25   an extra year's worth of data versus what would otherwise

1

2  be done?

3      MR. NEUWIRTH:  Again, I think it's hard to guess

4  about that, I'm not the auditor, it will depend upon the

5  information sought.  If this litigation is any guide, it

6  could be an enormous amount of work for the auditor to do

7  that. And we just think that makes no sense when the same

8  issues are at issue in this underlying litigation.

9      THE COURT:  What burden is placed upon your

10 client if the audit is done?

11     MR. NEUWIRTH:  Same kind of burden that's placed

12 upon my client in this litigation, producing documents

13 requested by an independent auditor, presumably, and cost.

14 Obviously we're spending an enormous amount of money in

15 connection with discovery in this litigation and we'll be

16 spending more in connection with this audit if it were to

17 happen.

18     THE COURT:  Isn't the audit going to have to be

19 done at some point, even for the litigation?

20     MR. NEUWIRTH:  Well, an audit, per se, no, the

21 issue in this litigation is whether we utilize diligent

22 efforts towards the approval milestone, and towards the

23 sales milestones, and towards the production milestone.

24     THE COURT:  But isn't plaintiff going to compile

25 something that's going to be damages claimed that is partly

66

1  going to depend on what those numbers were or should have

2  been?

3  

4          MR. NEUWIRTH:  Oh, I don't think plaintiff has a

5  claim in this litigation right now, that suggests that the

6  milestones were, in fact, met. So that's not a claim in

7  this litigation.

8          THE COURT:  Well no, but it's the shortfall

9  issue, right, it's, again, the idea that it wasn't met.

10         MR. NEUWIRTH:  There's a second issue, Your

11 Honor, on top of the inefficiency and the fact that we are

12 essentially doing that in this litigation at the same time

13 that they want this audit.  The second issue is, it's

14 premature under Federal Rule of Civil Procedure 56(D).  We

15 do have affirmative defenses, Your Honor, to this claim,

16 and to the other claims in general. The affirmative defense

17 that's directly relevant here is the defense that this

18 particular request for the audit is being exercised in

19 violation of plaintiff's duty of acting in good faith.

20         The reason why we made that claim is not to

21 impugn the Cahill firm, by any stretch of the imagination,

22 but because of the reality that the way that this request

23 arose. And that requires a little bit of history in

24 connection with this litigation which predates Your Honor,

25 and let me just spend one minute on it.

1

2              THE COURT:  Sure.

3              MR. NEUWIRTH:  This litigation existed and the

4   plaintiff was, beginning at the end of 2015/beginning or

5   2016, plaintiff was a different trustee, not UMB but a

6   trustee called American Stock Transfer and Trust Company.

7   AST, I'll refer to that plaintiff as.

8              THE COURT:  Okay.

9              MR. NEUWIRTH:  AST resigned as trustee, Your

10  Honor, in May of 2016. AST, prior to its resignation, was

11  represented by different counsel, Milbank Tweed.  After AST

12  resigned, UMB became the successor trustee and Cahill

13  became counsel to UMB or was counsel to UMB.  Right after

14  Cahill came into case, Your Honor, there were three

15  extrajudicial requests made of Sanofi by letter demand. One

16  was in the beginning of December, 2016, outside of the

17  formal discovery process of the litigation for documents

18  from Sanofi for the purpose of investigating the production

19  milestone issues.  That was at the beginning of 2016.

20              Then in the middle of 2016, Your Honor, again,

21  outside of the formal discovery process of the litigation

22  which was underway, plaintiff requested additional

23  documents from Sanofi regarding Sanofi's commercial and

24  developmental activities with respect to the drug at issue,

25  with respect to Lemtrada.  Then a third request came in,

2  Your Honor, on December 19th of 2016, and that was the

3  audit request. All of these issues were duplicative of the

4  underlying discovery that was already underway and

5  duplicative of the claims that had already been asserted in

6  the case, but for the production milestone claim.

7           We took the position in response to those three

8  letters, Your Honor, that those requests were not proper

9  and were not in good faith, and were designed to harass.

10 We already had a litigation about these same issues --

11          THE COURT:  But they might be able to find out in

12 a different time period through asserting their direct

13 contractual right what may take longer in litigation,

14 right?

15          MR. NEUWIRTH:  Right, but you can't assert a

16 direct contractual right if you are not doing it in good

17 faith. And that was the basis for the denial of the

18 request.  Plaintiffs then amended their complaint to add a

19 claim for breach because of our denial of the request,

20 that's where we asserted our affirmative defenses of bad

21 faith.  Plaintiff then added the production milestone claim

22 into the case, it wasn't previously. On that second amended

23 complaint we renewed those defenses and so that's where the

24 affirmative defense comes from.

25          Yes, Your Honor, you could exercise contractual

69

1   rights, but you can't do so if you are not doing it in good

2   faith. And we think the circumstances under which all of

3   these extrajudicial requests were made when we were in the

4   middle of litigating the very same issues, violated that

5   contractual --

6            THE COURT:  But why, why is it bad faith?

7            MR. NEUWIRTH:  Well, Your Honor, I think it was

8   harassment. I think it was harassing. We were already --

9            THE COURT:  What was harassing about it?  What,

10  how does that manifest?

11           MR. NEUWIRTH:  Well it manifests itself by

12  repeated requests, you know, in the middle of a litigation

13  that's already commenced where the underlying issues are

14  already being litigated, and this is, in fact, duplicative

15  of what's already happening.

16           THE COURT:  So if that's it, then all that means

17  is you're reading letters and responding to them perhaps.

18  I'm trying to understand what else, you know, does it

19  require more work, is there a certain burden that it

20  imposes that otherwise isn't there, a certain cost?

21           MR. NEUWIRTH:  You mean the actual audit, itself?

22           THE COURT:  Yes.  So making, these requests, if

23  you honored them, what, or to put it differently, what

24  could plaintiff be doing in bad faith to penalize you or

69

rights, but you can't do so if you are not doing it in good

faith. And we think the circumstances under which all of

these extrajudicial requests were made when we were in the

middle of litigating the very same issues, violated that

contractual --

            THE COURT:  But why, why is it bad faith?

            MR. NEUWIRTH:  Well, Your Honor, I think it was

harassment. I think it was harassing. We were already --

            THE COURT:  What was harassing about it?  What,

how does that manifest?

            MR. NEUWIRTH:  Well it manifests itself by

repeated requests, you know, in the middle of a litigation

that's already commenced where the underlying issues are

already being litigated, and this is, in fact, duplicative

of what's already happening.

            THE COURT:  So if that's it, then all that means

is you're reading letters and responding to them perhaps.

I'm trying to understand what else, you know, does it

require more work, is there a certain burden that it

imposes that otherwise isn't there, a certain cost?

            MR. NEUWIRTH:  You mean the actual audit, itself?

            THE COURT:  Yes.  So making, these requests, if

you honored them, what, or to put it differently, what

could plaintiff be doing in bad faith to penalize you or

70

impose a burden on you?  What is it that's bad faith?  I
mean it can't be bad faith just to assert a right and have
to read a letter.

MR. NEUWIRTH:  No, but it can be bad faith, and
again, we would like take discovery into this issue, and
I'll get to that point because that gets to the 56(D)
point, but it can be bad faith if the purpose of exercising
that right is to impose undue burden and cost.

THE COURT:  So that's what I'm trying to figure
out, what undue burden or cost is there from asserting
their contractual right that's not already going to be
dealt with in the litigation?

MR. NEUWIRTH:  Well, because we're going to have
to pay for an auditor. There's going to be internal time
spent by internal Sanofi people to respond to what I'm sure
will be significant demands from the auditor for
information, and it may not be completely coextensive with
the way the documents have already been produced. So that's
certainly going to be cost.  We are going to potentially
have to manage that process, which is also going to be
cost. So there's certainly time, expense and interruption
of dealing with an audit, just like you would in any
situation where you were dealing with an audit.  That's the
time and expense. I can't calculate it without having the

                                                          71

benefit of it actually happening but there's no question

it's going to take time and it's going to take money.

          THE COURT:  If that auditor did his or her job

and did all this, would that obviate the need for experts

on either side regarding what would otherwise have to be

done by an expert in the litigation?

          MR. NEUWIRTH:  I don't think so.

          THE COURT:  Why not?

          MR. NEUWIRTH:  Well I think there are going to be

a lot of experts in this litigation but it's my sense that

nothing that the auditor does will obviate the need for any

of the various types of experts.  But let me add one other,

and plaintiff can speak to that, as well, I don't they are

going to disagree, but let me move on on the 56(D) point.

          Your Honor, as you will recall, we sought

discovery from the CVR holders on a more general basis, not

just relating to this particular audit request.  Plaintiffs

moved to quash those subpoenas, Your Honor granted that

motion. We respectfully disagree with it, but that's what

happened.  So we are not getting discovery from the CVR

holders, and the reason this is important is because under

Section 7.6, which is the audit provision of the CVR

agreement, the only way an audit can happen is if the CVR

holders, called the acting holders, first request the

```
1                                                72
2   trustee to make that audit request.
3            Your Honor made that ruling, it was in a slightly
4   different context in that our subpoenas were broader than
5   just the summary judgment issue, but we have not been able
6   to get discovery from the CVR holders which could provide
7   us with evidence in support of our affirmative defenses. In
8   other words, why did the holders decide to instruct the
9   trustee to request this audit in the middle of an ongoing
10  litigation that was essentially about the same stuff?
11           THE COURT:  Are you going to get any other answer
12  than to assert our contractual rights if you ask those
13  questions?  Really?
14           MR. NEUWIRTH:  I don't know what the documents
15  would have shown.  Who knows what they would have shown?  I
16  have a document in my possession that says it's time to
17  unleash Cahill.  Now maybe that should be read in the best
18  light and that just means we've got a new law firm and
19  we're excited and let's go, but maybe there are other
20  documents like that that mean something else.  I don't
21  know. I am not going to see the CVR holders' documents, at
22  least right now. Your Honor has invited us to come back if
23  we think it's appropriate and perhaps we will if we think
24  it's appropriate. We also don't have discovery, at least of
25  a deposition nature yet, because of the stage we're in in
```

depositions, of the plaintiff. And we're certainly going to

take discovery of the plaintiff from a deposition

perspective on a broad variety of issues including this

one.

So for that reason, Your Honor, we think there

are two bases upon which to deny this motion. One is a

genuine issue of material fact that precludes it, and, two,

it's too early.  We need discovery still, it's not done.

THE COURT:  Okay.  For the plaintiff.

MR. GILMAN:  Taking Mr. Neuwirth's argument in

order, he is incorrect, the concept of shortfall does not

appear anywhere in Section 7.6(A) of the CVR agreement.

THE COURT:  I think there were other provisions,

though, that were at issue.

MR. GILMAN:  No, our motion is to enforce the

right to have a nationally recognized firm examine books

and records as necessary to verify the product sales

statements and the numbers underlying therein.  That's the

words of the agreement. Our motion is restricted to 7.6(A),

we're not seeking a 7.6(B) adjudication of a shortfall. The

parties mentioned the existence of a possible shortfall, if

an auditor, using all of there proffer were to say, even

taking Sanofi at 100 percent of their words, there's a

shortfall, well, we'd like to know that. But that's not why

1                                                            74

2    they're going in there and that's not what they're being

3    asked to do. This is a 7.6(A) and our brief to the Court

4    says the instant motion is made with respect only to count

5    four of the second amended complaint and the audit right

6    under 7.6(A), period. So conflating 7.6(A) and 7.6(B) and

7    saying there's a confusing issue and a factual dispute,

8    that's a nonstarter. What we're talking about is exercising

9    a mandatory right of inspection of books and records.

10          Second, the fact that there's litigation is truly

11   not relevant because the parties bargained in section 8.8

12   of the CVR agreement, that all of the mandatory rights

13   under that agreement exist whether or not a party is

14   electing any remedies there under, whether or not there's a

15   lawsuit, there's still an inspection right.

16          Your Honor's point about will this facilitate the

17   case, perhaps obviate experts or otherwise, the answer is

18   we believe so.  Because what we're looking for here is the

19   examination and the verification of the product sales

20   numbers.  What months are counted is a later determination.

21   Picture a grid where you have quarters for timeframes and

22   within quarters you have boxes for geographies, countries,

23   major markets, other countries, whatnot.  That grid is

24   populated with numbers.  We're asking to exercise a

25   mandatory right to have an independent auditor verify the

1

2    numbers. How you move the template because of when was

3    product launch or not, what countries count or not, how you

4    move an Isinglass cover over that grid to figure out

5    product sales, that's not what we're talking about.  All

6    we're talking about is verifying the numbers, that's the

7    exercise. There's a contractual right to do it.  If we do

8    it, it's not going to have to be litigated at trial.

9    People aren't going to have to put somebody on and say that

10   conversion from that foreign currency to this currency was

11   done in a way to manipulate the numbers, or was done truly

12   and accurately.

13          We're not getting agreements on, we can't even

14   get agreements that documents produced by them, by their

15   client, with their Bates numbers, can be deemed to be

16   authentic, leaving each counsel to have an exception to

17   complain about business records if there is truly one that

18   got in there by surprise.  We can't get basic stipulations,

19   so don't count on this trial being easy.

20          THE COURT:  Oh, I'm not.

21          MR. GILMAN:  And the bottom line is, if we have

22   the auditors true up the numbers, verify the numbers, and

23   again, these are their numbers, the contract is they offer

24   money to buy Genzyme, the Genzyme board rejects it. They

25   come back with a sweeter cash offer and this thing called a

1
2   CVR. Okay, there's now a contract. They have to every

3   quarter produce a certified number, a grid with numbers

4   certified by their CFO.  All we're asking is to exercise

5   the right to have an independent person say those numbers

6   are right.  Otherwise, the CVR agreement means nothing,

7   it's illusory.

8           THE COURT:  Let me stop you, I understand the

9   argument.  How, let me ask you about burden, what do you

10  think will be required and what burden would this place on

11  Sanofi?

12          MR. GILMAN:  Well, whatever the burden is, it's

13  one that was contractually agreed and one that they

14  undertook, and that's the deal that was cut.

15          THE COURT:  Okay, so assuming that for the moment

16  --

17          MR. GILMAN:  So whatever it is.  It will only be

18  what is necessary, this is not an audit in the sense of

19  auditing Sanofi's financial statements, this is a

20  verification of a sheet of paper, each quarter, the numbers

21  on that sheet of paper.

22          THE COURT:  Well there could be a lot behind

23  those numbers.

24          MR. GILMAN:  The numbers were -- well, assuming

25  that they weren't divine, those numbers are built up.  So

1

2   they have a pile of documents.  So they give those, those

3   documents are already assembled, they're whatever the

4   affiant reviewed to verify what he produced or his

5   underlings. So pulling the documents together for the

6   independent auditor should not be an issue, they should

7   already have --

8          THE COURT:  But how deep does it go?  What if the

9   auditor says, you know what, there's something about these

10  numbers from, let's go back to France, and say something

11  isn't measuring up here, I actually want to go to the

12  French arm of Sanofi and talk to them, and now I need to go

13  talk to their accountants.  How, is there a limit?

14         MR. GILMAN:  Well under the contract, no.

15  Because the contract says that the fees charged by such

16  accounting firm shall be paid by Sanofi. That's the

17  contract, that's the deal. We're not talking here about

18  litigation expense being imposed.  We're talking about the

19  exercise of a contractual right of inspection.

20         THE COURT:  Well we are talking about potential

21  additional expense if it's something that's going to be

22  done in the litigation anyway.

23         MR. GILMAN:  And that could obviate a great deal

24  of litigation expense. And what I'm suggesting, Your Honor,

25  is if we could rely on the numbers, there would be less

1

2    discovery, there would be less depositions of their CFO, a

3    shorter one. There would be less documents and --

4              THE COURT:  Well there are documents already out

5    there.

6              MR. GILMAN:  Well, and that's another thing.

7    He's talking pages, not documents.

8              THE COURT:  I know, 900-and-something-thousand

9    documents.

10             MR. GILMAN:  And half of it is the filing with

11   the FDA that wasn't done right.

12             THE COURT:  They are, those are voluminous.

13             MR. GILMAN:  Okay, so the first 10 million pages

14   you can chalk off to we didn't do it right, and now we're

15   producing whatever we're producing.  But we're not looking

16   for batch records, we're not looking for tonnage, the fact

17   that they may produce tonnage, you know, we're suffering

18   having to read a lot of irrelevant stuff.

19             THE COURT:  Who directs and controls the auditor?

20   Sanofi is paying for --

21             MR. GILMAN:  By themselves, no, they're not

22   controlled. It's an independent auditor.

23             THE COURT:  Right.

24             MR. GILMAN:  A month ago I proposed to Mr.

25   Neuwirth, let's not talk about the two auditors that Sanofi

1

2  uses, Pricewaterhouse and Ernst & Young, let's not talk

3  about the one auditor that the trustee uses, KPMG, BDO

4  International, a firm of national reputation, international

5  reputation, I said how's that, a month ago, and we don't

6  have an answer because he won't talk about who the auditor

7  could be until Your Honor rules, and presumably then he'll

8  appeal. And he won't talk about it until after Judge

9  Daniels rules. And what we're doing here is self helping

10  ourselves out of a contractual obligation. Instead of

11  stepping up and saying these are our numbers, we're

12  perfectly comfortable with them, if you want to have an

13  auditor come in, we've got all the stuff from which they

14  were built, they can look at them, and if it goes sideways,

15  if somebody says I want to go to France for the holidays,

16  we can go back to you, they can come back to you.

17          THE COURT:  Well can I set limits on the auditor?

18  I guess I can.

19          MR. GILMAN:  Or you can visit with the auditor in

20  France, you know. But, Judge, the bottom line is, if we can

21  get the numbers nailed down and we're entitled to nail them

22  down, nothing has to be proven at trial.

23          THE COURT:  Nothing?

24          MR. GILMAN:  Of those numbers.  Of those numbers.

25          THE COURT:  Okay, so why not just, since there's

1
2   -- well --

3          MR. GILMAN:  But if you try to prove those

4   numbers at trial it's going to take a long time.

5          THE COURT:  But so why not just do it in

6   connection with the litigation?  What benefit, what right

7   is being, I don't know, addressed, other than that you have

8   the right to do it? What is it doing for you that wouldn't

9   otherwise get addressed in the course of the litigation?

10         MR. GILMAN:  Well, for one, it doesn't get us an

11  independent. Right now, the numbers, if an independent firm

12  is selected and agreed between the two of us, fine, if not,

13  we propose one, they propose one, and the two of them pick

14  the middle, and the middle guy goes out and does it.  If

15  the numbers are verified by an independent party, they're

16  taken as conclusive on the contractual parties --

17         THE COURT:  Right, and that's why I asked before

18  does it obviate experts who would otherwise have to do

19  that?

20         MR. GILMAN:  I think it might.

21         THE COURT:  Well, that might, why wouldn't it?

22  Why wouldn't it?

23         MR. GILMAN:  Why wouldn't it?

24         THE COURT:  Yeah, are either of you going to

25  contest the independent auditor?

1
2          MR. GILMAN:  It very well might, but the point is
3     that --
4          THE COURT:  Would you stipulate that if the
5     independent auditor, whatever his or her findings are
6     you're not going to challenge them?
7          MR. GILMAN:  Won't challenge the numbers?
8          THE COURT:  So why wouldn't that obviate
9     something from litigation?
10          MR. GILMAN:  I think it will, it will, number
11     one, it will expedite things.  Number two, it's a right.
12     Number three, the parties agreed they would pay for the
13     auditor.  That's the contract. They can't keep taking back
14     all the sections that say I will pay, it changes the deal.
15          THE COURT:  Right.  Well, they have their bad
16     faith argument.
17          MR. GILMAN:  Your Honor has already ruled that
18     bad faith is not an element of contracts --
19          THE COURT:  Well as I said that as a general
20     principle.
21          MR. GILMAN:  And, Your Honor, we've submitted the
22     affidavit of Mr. Wilkinson from the trustee that he was
23     acting at the direction of acting holders in exercising
24     this contract right.  What we've heard from Mr. Neuwirth
25     today is he wants to know why. The exercise of a contract

1

2  right, is the exercise of a contract right.  And if it will

3  facilitate the litigation, if it will obviate additional

4  litigation expenses, if it's mandatory and it's relevant,

5  we're entitled to it.

6          THE COURT:  Okay, actually you just prompted a

7  question that I have for Mr. Neuwirth, which is

8  traditionally, or at least in many situations, a bad faith

9  claim to a contract claim, to a contract issue, is one

10  where someone is impeding getting it done. Are you aware of

11  any cases or case law that says that enforcement of a right

12  under a contract can be bad faith?

13          MR. NEUWIRTH:  Yes.

14          THE COURT:  Okay.

15          MR. NEUWIRTH:  And I believe we've cited them in

16  our brief, Your Honor.

17          THE COURT:  My apologies for not remembering.

18          MR. NEUWIRTH:  You cannot enforce a contractual

19  right if you are doing so in bad faith.  We cited two cases

20  in our brief, the *Richbell* case, 309 A.D. 2d 288 (1st Dept.

21  2003) and the *Dalton* case, 87 N.Y. 2d 384, that looks like

22  it's New York -- it's the Court of Appeals.

23          THE COURT:  What was the name of the first one?

24          MR. NEUWIRTH:  *Richbell*, R-I-C-H-B-E-L-L, 309

25  A.D. 2d 288, 302 (1st Dept. 2003).  The *Dalton* case is 87

1

2    N.Y. 2d 384, 389 (1995). That's the Court of Appeals, Your

3    Honor, we cited both of those cases.

4            THE COURT:  Okay.

5            MR. NEUWIRTH:  Your Honor, let me just say one or

6    two brief things, I think Your Honor probably has heard a

7    lot.

8            THE COURT:  Yes, and actually we do need to wrap

9    up because I have another proceeding at four that I need to

10   prepare for.  So let's take five minutes.

11           MR. NEUWIRTH:  Let me be done in even less.  Back

12   to the first point, plaintiff's counsel said that all

13   they're asking for is to check the numbers. I refer the

14   Court, respectfully, to plaintiff's actual motion which is

15   document number 134.

16           THE COURT:  I have that.

17           MR. NEUWIRTH:  This is their notice of motion,

18   page 2, prayer for relief, number 5, they want, the Court,

19   an order --

20           THE COURT:  You don't have to read it, there's --

21           MR. NEUWIRTH:  I won't read it, but it's asking

22   for the independent auditor to declare a CVR shortfall.

23           THE COURT:  It is, and they have requested that,

24   but it is a legitimate issue to address, see if they can be

25   addressed separately.  In other words, relief could be

1
2   granted in part, I'm denying it.

3          MR. NEUWIRTH:  But the comment was made that that

4   piece of relief was not being sought from this Court, it's

5   being sought on page 2 of the actual motion.

6          THE COURT:  Yes, I guess I will ask, given what

7   was said here at argument, is that part of the relief being

8   ceded and given up at this point?

9          MR. GILMAN:  Your Honor, we'll restrict the

10  motion to 7.6(A) which is the right of inspection and

11  verification. Shortfall does not appear in 7.6(A), it

12  appears in 7.6(B), we will not be seeking relief under

13  7.6(B) on this motion.

14         THE COURT:  Right.

15         MR. NEUWIRTH:  And, Your Honor, just to wrap up,

16  if I could, again, the burden is real. We've talked about

17  France, how about 70 other countries that are involved in

18  this product and that's information that rolls up in the

19  product sales statement. So again, the notion that this is

20  some type of easy exercise is just not true. We know that

21  from experience, we've been litigating this case, we know

22  how much information there is.

23         THE COURT:  Right, and I agree with plaintiff

24  that burden doesn't get you out of a contractual

25  obligation, but we have a context where there is a massive

85

1   litigation going on concerning similar or the same issues.

2         MR. NEUWIRTH:  We have a context where there's a

3   massive litigation going on and we have an affirmative

4   defense which questions why this right is being invoked in

5   that context for which we have not received discovery yet.

6   Or certainly we're not complete.

7         THE COURT:  In the cases that you cited, are

8   those situations where the claims didn't have merit and

9   they were asserting them?

10        MR. NEUWIRTH:  No.

11        THE COURT:  No.

12        MR. NEUWIRTH:  In fact, we cited the Siemag NYMEX

13  case, Your Honor, Southern District of New York 2012,

14  that's Judge Daniels, he denied a summary judgment motion

15  on these exact same grounds and held, and I quote, "fact

16  discovery was necessary to determine whether any of the

17  numerous affirmative defenses proffered by defendants

18  precluded liability."  They were at a very similar stage in

19  the case as we are here, and that's our situation.

20        THE COURT:  Did they include a bad faith defense?

21        MR. NEUWIRTH:  I believe it did.

22        THE COURT:  Okay.  I think we're done unless I

23  hear any more comment?

24        MR. GILMAN:  Your Honor, unless this discovery is

1

2  provided in the lawsuit, it's not duplicative. You can't

3  play this Three-card Monte where we're going to get it in

4  the lawsuit so, therefore, you don't get it under an

5  inspection right, and then not get it in the lawsuit.

6      THE COURT:  Well data is being exchanged, I think

7  it's just a question of who does it and who foots the

8  expense and when it's done.

9      MR. GILMAN:  Well a contract right that says that

10  the CVR, acting CVR holders may request and inspection to

11  verify the most important sheet in the case, these are the

12  numbers that add up, if taken as true, to the sales which

13  either do or do not meet milestones. It cannot be that

14  Sanofi can say whatever numbers they want and no one is

15  allowed to go behind them.  The contract was prepared to

16  give the CVR holders and absolutely mandatory right and one

17  that Sanofi was going to pay for and they knew that going

18  in, and if you knew that going in, every time you'd produce

19  the sheet you'd have a pile of supporting documents and

20  it's not going to cost you much to show it to an auditor.

21      THE COURT:  Okay.

22      MR. GILMAN:  And if that's not what they did, all

23  the more reason that we should have an independent party

24  verify these numbers.

25      THE COURT:  Okay, I've heard enough, no one needs

1

2  the last word. I thank you very much for the issues we

3  discussed today, anything else down the line, let me know.

4  I think you have your instructions on the privilege and

5  discovery issues and the Court will reserve judgment on the

6  summary judgment motion.

7            MR. GILMAN:  Thank you, Your Honor.

8            MR. NEUWIRTH:  Thank you, Your Honor.

9            THE COURT:  Thank you.

10            (Whereupon the matter is adjourned.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

88

# C E R T I F I C A T E

        I, Carole Ludwig, certify that the foregoing

transcript of proceedings in the United States District

Court, Southern District of New York, UMB BANK v. SANOFI,

Docket #15cv8725, was prepared using PC-based transcription

software and is a true and accurate record of the

proceedings.


Signature_____*Carole Ludwig*_____

Date:  April 4, 2018