```
 1                    UNITED STATES DISTRICT COURT
                     SOUTHERN DISTRICT OF NEW YORK
 2

 3     --------------------------------X
                                       :
 4     UMB BANK, N.A.,                 :
                                       :
 5                    Plaintiff,       : 15-CV-08725 (GBD)
                                       :
 6             v.                      : June 19, 2018
                                       :
 7     SANOFI,                         : 500 Pearl Street
                                       : New York, New York
 8                    Defendant.       :
       --------------------------------X
 9
          TRANSCRIPT OF CIVIL CAUSE FOR TELEPHONE CONFERENCE
10            BEFORE THE HONORABLE ROBERT W. LEHBURGER
                  UNITED STATES MAGISTRATE JUDGE
11
       APPEARANCES:
12

13     For the Plaintiff:      NONE STATED ON RECORD

14

15

16     For the Defendant:      JOHN A. NEUWIRTH, ESQ.
                               Weil, Gotshal & Manges, LLP
17                             767 Fifth Avenue, 25th Floor
                               New York, New York 10153
18

19

20

21     Court Transcriber:      SHARI RIEMER, CET-805
                               TypeWrite Word Processing Service
22                             211 N. Milton Road
                               Saratoga Springs, New York 12866
23

24

25


       Proceedings recorded by electronic sound recording,
       transcript produced by transcription service
```

2

1          THE PLAINTIFF:  . . . . Sanofi-Genzyme used diligent

2   efforts to achieve something known as the approval milestone,

3   that is the approval of Lemtrada by a date certain for the

4   treatment of multiple sclerosis.

5          The second issue in the case, at least as it relates

6   to Lemtrada, relates to whether or not certain sales

7   milestones of 400 million were met within a defined sales

8   measuring period.  At issue in this motion are documents

9   recently discovered, recently created, and recently confirmed

10  to exist.  The last date of confirmation occurred in a

11  deposition of May 2018 with a individual who had direct

12  substantive knowledge.  Our understanding and the existence of

13  these documents were not known to us until after Your Honor's

14  order of November in which you ruled that certain documents

15  post July 2016 were relevant to the matters to be litigated in

16  the case because they gave insight as to things which could

17  have or should have been done during the relevant period in

18  the litigation.

19         Here, there is what we would characterize as a

20  specific and relatively narrow category of documents.  They

21  relate to a decision recently to initiate a trial, a Phase 3

22  trial, which is an approval trial in something known as

23  primary progressive multiple sclerosis.  As the documents we

24  submitted as part of our letter motion show unequivocally,

25  this trial or trials of this nature were considered in 2011

1  all the way through 2015 but were rejected for budgetary

2  reasons.  We've also included evidence that, at least with

3  respect to an analogous antibody known as GLD52, it was the

4  considered view of Sanofi and Genzyme that such activity would

5  not only enhance the image of Lemtrada, but it would also

6  potentially generate revenue in excess of $2.3 billion a year.

7          In addition, we recently learned at a deposition in

8  May 2018 that in 2012 relevant executives were informed that a

9  PPMS study would meet the definition of unmet need and would

10  satisfy what's known as the requirements for fast track and

11  priority review.  We just literally this Thursday got

12  testimony from Marc Esteva, the CFO of Genzyme, that in his

13  view the loss of fast track and priority review cost Genzyme

14  eight months of review.  Therefore, the question of why a PPMS

15  study, as was recommended in 2011 and through 2015, was not

16  conducted in our view is highly relevant.

17          THE COURT:  Okay.  But that's what --

18          THE PLAINTIFF:  It's not --

19          THE COURT:  Let me -- let me stop you there.  That

20  -- but that's what my concern -- and you already know the

21  reason it wasn't done or at least that it was professed, I

22  should say, the alleged reason, i.e. budgetary reasons.  But

23  you already have documents, I assume, from a prior -- but tell

24  me if I'm wrong, from a prior period, 2011 to I guess 2015,

25  that addressed the question of why they did not pursue

4

1   Lemtrada in PPMS at that time.  I understand that documents

2   reflecting their current initiative may reflect reasons why

3   they are choosing to do it but that doesn't really -- now, but

4   that doesn't really answer the question of why they didn't

5   before.  Do -- does it?  That's what I'm trying to weigh in

6   the calculus here.

7             THE PLAINTIFF:  Absolutely, Your Honor.  And if Your

8   Honor will look at the exhibit to Sanofi's response, and it

9   lays out the category of documents that we're seeking, and I

10  can explain in detail what each one of these categories are

11  particularly relevant and, hence, in the proportionality test,

12  as set out by Magistrate Pitman, should be produced.  What

13  happened --

14            THE COURT:  I -- wait, wait, wait.  I don't have

15  time to go through each category --

16            THE PLAINTIFF:  Okay.

17            THE COURT:  -- by detail.  I just want to understand

18  why is a decision to go forward made in 2017 relevant to a

19  decision in 2011 not to go forward?

20            THE PLAINTIFF:  The specific rationales for why they

21  decided today to spend the money to move forward on PPMS are

22  directly relevant because they show that PPMS, in their view,

23  has a high probability of success, that the decision to do

24  this study with Lemtrada as opposed to another anti-CD52

25  antibody was driven by desire, which was critical to our

1   theory of the case, to avoid paying the milestone.

2          In addition, the documents requested show the

3   communications with the FDA and set forth the parameters of

4   what that clinical trial would look like and are important to

5   our experts to be able to establish that that PPMS study would

6   have been a study that was acceptable to the FDA.  In

7   addition, we had asked for the context of those decisions,

8   particularly if any consideration was made that the reason to

9   delay the launch, which would occur now and would be developed

10  in documents now was driven by motivations such as the

11  termination or end of the CVR agreement.  I am --

12         THE COURT:  Wait, so again, so that still, in my

13  mind, doesn't directly get to the relevancy to the decision at

14  an earlier point in time.  I understand that at one of our

15  previous hearings I did agree that certain documents after the

16  fact are relevant because they may reflect decisions made

17  previously, but there I was talking about just one year later

18  or one-and-a-half years later.  Whereas this was talking about

19  something allegedly relevant to a decision made six years ago.

20  And the question of whether something is feasible in 2017

21  versus 2011, that, you know, is a factor, among others that

22  will make this potentially a very collateralized issue of

23  limited relevancy.

24         But let me -- let me just switch to the defendant on

25  this for a minute because I have -- I have some questions --

6

1   I'm sorry, but yeah, let me switch to UMB on this -- I'm

2   sorry, Sanofi, I'm going back and forth on the issues -- of

3   why they don't want to do this and why it's so burdensome.

4           MR. NEUWIRTH:  Sure, Your Honor, thank you.  It's

5   John Neuwirth.  A couple of preliminaries which the Court is

6   aware of and I'll be very brief.  First of all, the Court

7   knows full well how extensive, how expensive, and how

8   burdensome discovery in this matter has already been.

9   Document production has already been completed, and that was a

10  Herculean undertaking which was accomplished.  There's a July

11  29th, 2016, cut off or documents in this case.  Obviously, the

12  documents that UMB is seeking now extend beyond that

13  agreed-upon cutoff.

14          THE COURT:  Right, but isn't this information they

15  learned about recently?

16          MR. NEUWIRTH:  It is.  It is, Your Honor, and there

17  are a lot of things that potentially could be happening now.

18  And as Your Honor has correctly pointed out, we are divorced

19  by six, seven years from 2011, and the answer can't be that

20  plaintiff, especially considering what they already know --

21  and I think that's extremely important, they know the fact

22  that there's a study with respect to PPMS.  Now what else do

23  they need to know?  They know that.  They can make that point

24  if they want to.  It can't be that they can delve into, at

25  this point in the case, everything that is currently going on.

1  That is burdensome.  Obviously, an additional document

2  production, from our perspective after everything that we have

3  already done, is a burdensome, costly exercise and certainly

4  not proportional, as Rule 26 requires, to the needs of the

5  case.

6          THE COURT:  Okay.  So let me -- let me ask you this.

7  What -- you have agreed to produce the items set forth in a

8  letter to me of June 7th; is that correct?

9          MR. NEUWIRTH:  We have.

10          THE COURT:  Okay.  So -- and then there are the set

11  of categories of documents that UMB seeks that are set forth,

12  as I have it, in an email dated May 22nd.  And there never

13  bullets, and I want to ask you about three of them.  So

14  starting from the bottom, there's the most recent -- on the

15  second bullet from the bottom, the most recent draft or final

16  version.  That's a single document.  Why can't -- can that be

17  -- do you have that and can that be reduced relatively easily?

18          MR. NEUWIRTH:  Your Honor --

19          THE COURT:  And why shouldn't it be, if you think it

20  shouldn't be?

21          MR. NEUWIRTH:  Your Honor, we have the brand plan as

22  well as the strategic plan, and we could produce that with

23  relatively minimal burden.  The issue is it has a lot of other

24  information in it that is wholly unrelated to PPMS with

25  respect to forecasting and budgeting which we think would be

8

1  inappropriate given what plaintiff is seeking.  So if what the

2  Court is saying is can you produce that document, the answer

3  is yes.  But we would want to redact a lot of information that

4  we think has nothing to do with this issue.

5           THE PLAINTIFF:  [Inaudible]

6           THE COURT:  Wait, hold on.  And let me -- let me ask

7  you about the one above it, the integrated development plan.

8  What about that?

9           MR. NEUWIRTH:  We understand, Your Honor, that that

10 does not exist for Lemtrada currently.

11          THE COURT:  Okay.  Okay.  And lastly, the bullet

12 that's the forth from the top, documents sufficient to show

13 the internal deliberative process resulting in the decision to

14 abandon development of GLD52 in favor of Lemtrada.  I -- you

15 know, one could imagine documents that address the issue of

16 whether to proceed and there being discussion in contrast to

17 previous years and perhaps addressing why is it being now when

18 it wasn't done previously.  I'm not saying there is.

19 Obviously, I don't know.  But I could see that as a

20 possibility.  Why can't you or could -- what would be involved

21 in getting documents sufficient to show the internal

22 deliberation?  And I -- this has deliberative process.  But

23 really what I -- well, that is the deliberative process in the

24 decision to abandon development.

25          MR. NEUWIRTH:  Your Honor, we think that the

9

1   documents that we've offered to produce will shed light on

2   that issue.  We think anything beyond that which necessarily

3   will require a search of correspondence and emails is the same

4   type of burdensome process that we have now completed in the

5   case and will require a reopening and a real burden to us.  So

6   we think that the documents -- and we have them and we could

7   produce those relatively promptly.  We think that the

8   documents that we've already identified and offered to produce

9   will shed light on that issue.

10          We think going beyond that into more deliberative

11  information which is -- which could perhaps, I don't even

12  know, perhaps could reside in emails and other types of

13  informal communications like that is an expedition which

14  certainly is going to be burdensome, time-consuming, and I

15  know we're going to get to the schedule next, and costly.  And

16  completely out of proportion to where we are right now.

17          THE COURT:  I'm not going to order any electronic

18  search on this.  I am just trying to figure out if there are

19  documents beyond what's in the bulleted list that make sense

20  and is proportional.  In the various committee documents that

21  you are producing, I see reference to final minutes and

22  meeting minutes, are those all committees that would have been

23  assessing whether or not to proceed with this -- with Lemtrada

24  in PPMS?

25          MR. NEUWIRTH:  Yes.

1          THE COURT:  Okay.  So -- okay.  Well, that's helpful

2     to know.  All right.

3          is there anything else plaintiff wishes to say on

4     this issue?  I'm sorry.

5          THE PLAINTIFF:  Yeah, I would only say two things,

6     Your Honor.  One, we do think that this -- and again, this is

7     not burdensome because they maintained these in a separate

8     database.  The material communications with the FDA about the

9     clinical design of the trial are relevant.  In the

10    alternative, we would ask that there be some way in which we

11    have an understanding of whether or not there's any

12    distinction between the clinical trial as proposed to the FDA

13    today and the clinical trials as proposed by internal clinical

14    development people at Genzyme as late as 2015.

15         The second thing I would point out is there is a

16    protective order in this case, and the redactions, other than

17    the redaction as was previously agreed for forecasts past

18    2019, is not necessary as there is a protective order because

19    it's not just the PPMS study itself but the PPMS study in

20    context.

21         And the last point I would make, Your Honor, is I do

22    think there should be some effort, maybe not electronic

23    discovery, but I do think the plaintiff is absolutely entitled

24    to know whether or not the decision to move from GLD52 to

25    Lemtrada was in any way influenced by the Bayer royalties, the

1    probability of not having to pay the CVR payments because

2    that's absolutely 100 percent the core and relevant in claims

3    being made by the plaintiffs in the count and in this case.

4    If, as we know when we send these documents to the court if

5    necessary, a decision was made to delay all of these PPMS

6    studies past 2020 when the CVR agreement terminates -- I'm not

7    asking for an electronic search, but some good faith effort to

8    make a determination as to whether there has been a chart

9    termination outside of the final versions of these documents

10   had any consideration of things which under the CVR agreement

11   under the definition of diligent efforts, they are prohibited

12   from considering.

13          THE COURT:  Right, so -- and -- but as I understand

14   it, again the relative time period is somewhere in I think it

15   was 2016 or so up until then, maybe '17.  But the --

16          THE PLAINTIFF:  '16.

17          THE COURT:  '16.  Okay.  But again, documents going

18   precisely to the issue, which I agree is a core issue, should

19   have been produced in connection with whatever production has

20   already occurred.  But again, these are documents that are

21   going to a decision made later about whether to drop another

22   drug and pursue Lemtrada.  And at this point, it's just --

23   it's just going to be too burdensome in my view and not

24   proportional given the relevancy of this category of documents

25   to do anything more fulsome than the following, which is I am

1    going to order that Sanofi produce all of the materials it

2    listed in its letter of June 7.  They also shall produce the

3    brand plan and strategic plan, both 2017 and 2018 if there is

4    one, and you can redact but only as to other products.  Why

5    would you need to redact anything beyond that?

6           MR. NEUWIRTH:  Your Honor, thank you for asking.

7    There are, as we understand it, projections and financial

8    forecasts in those documents which go out into the future and

9    relate to, among other things, product sales, milestones, 244

10   [Ph.], which as the Court knows, are claims which are not in

11   this case.  That's the law of the case.  And so it's not that

12   were worried necessarily, and obviously it's irrelevant, and

13   we will redact materials respect other products.  There's that

14   issue, but there's also the issue about what this plaintiff is

15   entitled to see given where we are in this case.  And with

16   respect to some of the forecasts and budgeting with respect to

17   issues that the Court has ruled are not in this case, that is

18   material that we want to redact as well.

19          THE COURT:  Have you -- have you previously produced

20   documents about forecasting of what sales were going to be

21   like in the future?  Doesn't that in some way address the

22   damages here potentially?

23          MR. NEUWIRTH:  We produced, Your Honor, pursuant to

24   one of your orders in a -- in a previous hearing, documents

25   such as that through last year.  So that material has been

13

1   produced.

2           THE COURT:  All right.  And when you say through the

3   last year, you mean as created through last year and -- but

4   projecting out into the future beyond that, correct?

5           MR. NEUWIRTH:  Yeah.

6           THE PLAINTIFF:  Yes, Your Honor, pursuant to prior

7   discussions, we had -- the projections were truncated as of

8   2019.  And just on the projection point, Your Honor, that's

9   precisely the point of these documents is that to the extent

10  they show productions into the future, those projections

11  include parts of the sales that would be garnered both as a

12  halo effect on the relapsing-remitting MS and as well as PPMS

13  sales themselves.

14          So by allowing rejection of forecast and sales

15  projections and discussions of how PPMS can help you sell an

16  RRMS drug and how it encourages people to have a greater

17  belief in your product even if you don't do the trial

18  ultimately, that neuters the very purpose for why these

19  documents are so significant because, as Your Honor rightly

20  pointed out, that which is today to the extent it's relevant

21  and it is, can be projected backwards during the relative time

22  period.

23          And I would make one point which is that the

24  endpoint of July 2016, obviously, is a discovery cut off.  But

25  the initiation of a PPMS study even as early as 2016, simply

14

1    because it's what's known as a halo effect, could have, in our

2    view, made the achievement of the $400 million milestone much

3    more likely.  And in fact, I will also point out to Your Honor

4    that in December of 2016, the trustee actually sent a letter

5    to Sanofi asking them to do this very study.  So there is a --

6    there is a -- it's not 2011 that we're focused on per se.  It

7    is obviously relevant, but it is the entire arc from 2011 all

8    the way through to July 2016 -- because their own internal

9    documents, and we believe this is exactly what the strategic

10   plan documents will show, just initiating the trial itself

11   showing commitment to the MS patients, which is what the Terry

12   Murdock document we attached to the motion says, creates value

13   for the product that can increase sales regardless of whether

14   the PPMS study comes out positive or not.

15             THE COURT:  All right.  You -- okay.  All right.

16             MR. NEUWIRTH:  Your Honor, just to be clear, one last

17   word on that.

18             THE COURT:  Yeah.

19             MR. NEUWIRTH:  Yes, just to be clear, in your prior

20   ruling, we faced a similar issue as to how long these

21   projections should go out, what are the plaintiffs entitled to

22   see, and Your Honor ruled 2019.  That's what we have

23   previously produced to them.  We think anything more is

24   unnecessary.  That's all.

25             THE COURT:  Well, I send no reason to redact it,

15

1    though, which is different than whether you need to go find

2    and collect other materials.  So I think that they should be

3    produced but it does not need to be redacted.

4          All right.  Next item is the question of extending

5    discovery, and I understand you have agreement on that.  But

6    you haven't given me any rationale as to why it's necessary,

7    so someone explain that to me.

8          MR. NEUWIRTH:  Your Honor, why don't I -- it's John

9    Neuwirth -- why don't I start?  We do have agreement on this

10   issue except for one issue with respect to depositions which

11   we can discuss.  The rationale largely has to do with I think

12   two things.  One, obviously, the time to complete document

13   production was significant.  That's now complete, which is

14   terrific.  Depositions are already underway.  There have been

15   seven depositions to date.

16         But the main reason for the need for the extension

17   is to accommodate the remaining depositions.  The parties have

18   already agreed on a couple of extensions of the limit on the

19   number of depositions.  The Federal Rules, obviously, as that

20   Court knows, provide for 10 depositions of seven hours each

21   for each party.  We earlier agreed to extend that number -- to

22   increase that number from 10 to 20.  And then when plaintiff's

23   amended the complaint to add the production of milestone

24   claim, we agreed to increase that number from 20 to 25, still,

25   obviously, with the seven-hour time limit.

16

1          Seven of those depositions, as I've said, have

2    already taken place.  We've provided dates for 16 others to

3    the plaintiffs.  Only three of those dates have been confirmed

4    by the plaintiffs at this point.  Perhaps that's because

5    plaintiff wants to hear the Court's position with respect to

6    its most recent proposal with respect to how many depositions

7    should be permitted per side.  But again, seven have taken

8    place, 16 more we provided dates for, but they have not yet

9    been scheduled --

10          THE COURT:  Right.  Okay.

11          THE PLAINTIFF:  Other than three of them.  But the

12    main reason, Your Honor, that we need the extension is there's

13    a lot of depositions that still need to take place.  Many of

14    them are overseas where we have already been and will be going

15    back.  Those take multiple days, obviously, to accomplish.

16    That's the main reason, Your Honor.

17          THE COURT:  Okay.  And just remind me, to what

18    extent -- how -- to what extent have there been extensions

19    previous to this?  I just -- I don't have that in mind -- of

20    the discovery schedule?

21          MR. NEUWIRTH:  This would be the fourth extension,

22    Your Honor, of the schedule in the case.  The case has

23    obviously over time changed in both scope, [inaudible] with

24    respect to the claims, but this would be -- this would be the

25    fourth extension.

1        THE COURT:  Okay.  All right.  And -- all right.  So

2   on the -- before we decide the extension because I know that

3   could be affected by the number of depositions, although in

4   some respects it shouldn't.

5        But nevertheless, let's discuss number of

6   depositions.  So as I understand it, Sanofi is taking the

7   position there should be 25 depositions, meaning 25 persons or

8   I guess one of those would also be a 30(b)(6).  And secondly,

9   UMB takes the position that it should be done by hours and

10  that it would be 210 hours if I'm not mistaken.  And that

11  number of hours is greater than, certainly, the number of

12  hours that would be and Sanofi's proposal, but what concerns

13  me most about UMB's proposal is the following.  It --

14  theoretically, you could take that and depose 60 or more

15  people because you could do and a half-day deposition.  Are

16  you proposing the 210 hours for more no more than 25 people or

17  are you -- is it for an unlimited number of persons?

18        THE PLAINTIFF:  Your Honor, we would have no

19  intention of taking 210 one-hour depositions or anything along

20  those lines.  What we had suggested initially to Mr. Neuwirth

21  and his team was changing the -- changing the 25 230, but not

22  counting bodies, because some of those 30 can be short

23  depositions, and putting a per hour cap on the total fact

24  discovery.  So if you thought of it, we would -- we would want

25  to 210 hours.  We would anticipate no more than 30

18

1  depositions.

2       But the problem, Your Honor, arose at the beginning

3  when in response to the mandatory Rule 26 disclosures, Sanofi

4  identified hundreds of knowledgeable individuals, and then in

5  response to the addition of the protection milestone, they

6  identified 2,500 knowledgeable individuals on that one count

7  alone.  So they've given us 2,700 names, and we're trying to

8  take a very reasonable number of depositions.

9       THE COURT:  Well, the number of names is sort of --

10  I'm not sure what the right word is to describe it, but of

11  course, depending how one -- liberal one wants to be in

12  responding and providing people with knowledge, that can be

13  either interpreted very broadly or very narrowly.  And

14  certainly, they -- Sanofi or both parties should be letting

15  each side know what part -- what the parties played and you

16  can discern that partly from the documents so you can work

17  with each other in determining who should be deposed.  But I

18  don't think that Sanofi would have intended that 2,300 people

19  be deposed.

20       THE PLAINTIFF:  No, no, of course not.  But it's

21  just -- it just makes it difficult to figure out who the key

22  ones are, you end up spending a little time that perhaps is

23  unnecessary.  We anticipate the depositions for a number of

24  people will be shorter than seven hours, and it's entirely

25  possible that a deposition of some individuals may be a little

19

1   longer than seven hours.  And if we had a reasonable hour

2   clock on the entire thing we think that it would be most

3   appropriate.

4           MR. NEUWIRTH:  Your Honor, you know, at some point

5   in a case enough is enough.  In the rules of proportionality,

6   the amendments to the Federal Rules of  Civil Procedure, have

7   to mean something.  We agreed consensually to move the

8   deposition limit hear from 10 to 20 to 25.  That is more than

9   enough, Your Honor.  There are very few cases, if any, that

10  I'm aware of that have a deposition amount that reaches that

11  level.  Magistrate Judge Parker in the Almaty, Kazakhstan case

12  which she decided in May, talked about 14 or 15 depositions as

13  being extensive.  We are already at 25.

14          Yes, of course, we identified a large number of

15  individuals in response to initial disclosures but plaintiffs

16  know full well who is relevant, and they've been taking those

17  depositions.  They just want more, just like they want more

18  document discovery.  Enough is enough, Your Honor.  This is an

19  entirely one-way discovery burden.  We are taking to date

20  right now one, maybe two, depositions of plaintiff.  They

21  already had 25 of us.  Now they want to go up to at least 30.

22          And the burden attendant to having just an hours cap

23  is significant, Your Honor.  Is the deposition to be three

24  hours?  Is it going to be nine hours?  What are we going to

25  know?  Where is that deposition going to be?  Are we going to

1   have to go to Europe for four days to do a three-hour

2   deposition?  Twenty-five depositions with a definitive hours

3   limit of seven hours, that rule -- that seven-hour rule is in

4   the Federal Rules for reason, so parties can plan and not be

5   unduly burdened.  Anything beyond 25 depositions, Your Honor,

6   which is a significant, significant number, is -- should not

7   be permitted at this point.  It's just not proportional.

8           THE COURT:  Well, look, on you -- I typically am a

9   fan of time limits for trial, and I have used it to -- when I

10  was litigating to some extent for depositions but never for

11  the full set.  But I have to say when I saw these numbers of

12  25 and then what equates to 30, I said to myself, you know, I

13  understand this is a sizable case.  I understand what drug

14  development cases are about.  But why am I seeing more than 20

15  per side?  So I thought 20 would be sort of the outside

16  number.

17          And what I'm going to say is it's going to be 25

18  limited, as they're supposed to be, to whatever hours they are

19  pursuant to the rules, seven hours.  However, A, if UMB thinks

20  there is good reason why a person should be deposed for more

21  than seven hours, such as if they are a key player and there's

22  a lot to ask them about, they can -- I -- they should ask you

23  if they can go longer.  But if another day is done with them

24  then that means one less witness.  But if it's a half-day, you

25  know, that's the type of thing where you could cooperate and

21

1    say, okay, well, let's just take the rest of your half-day

2    with somebody ask.  But 25 seems an appropriate limit.

3            I also assume you're going to have 30(b)(6)

4    depositions, and given the wide ranging information, I

5    wouldn't be surprised if, certainly for Sanofi, more than one

6    person were required to answer the various categories.  And on

7    the one hand that -- so that 30(b)(6) deposition is one

8    deposition.  However, to the extent people who are testifying

9    and designated for the 30(b)(6), if they are being deposed in

10   their individual capacity in addition to 30(b)(6) testimony,

11   then that counts as an additional deposition per person.  If

12   it's solely 30(b)(6) and not individual capacity then it's

13   just part of their 30(b)(6).

14           All right.  And look, again, also if for any reason

15   UMB feels they in good faith haven't been able to get what

16   they need and you guys can't work it out, UMB will come to me

17   and say, look, we need another deposition or two, 25 was

18   enough for X reasons, and if there's good reason then I'll

19   consider that.  So that's what we're going to do.

20           And then in terms of the extension, I'll grant a

21   three-month extension, but I do not want to see more

22   extensions.  So no more extensions absent compelling

23   circumstances.

24           Anything else?  Plaintiff?

25           THE PLAINTIFF:  Not from the plaintiff, Your Honor.

22

1    Thank you very much for your time this morning.

2              THE COURT:  Sure.  Defendant?

3              MR. NEUWIRTH:  Not from Sanofi, Your Honor.

4              THE PLAINTIFF:   Thank you, as well.

5              THE COURT:  All right.  Thank you all, and good luck

6    with the depositions.

7                         *  *  *  *  *

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

23

1          I certify that the foregoing is a court transcript from

2    an electronic sound recording of the proceedings in the above-

3    entitled matter.

4

5    _____

6                              Shari Riemer, CET-805

7

8    Dated:   June 19, 2018