# EXHIBIT A

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UMB BANK, N.A., as Trustee,<br><br>                             Plaintiff,<br><br>- against -<br><br>SANOFI,<br><br>                             Defendant. | Case No. 15 Civ. 08725 (GBD) |

### NOTICE OF 30(b)(6) DEPOSITION

PLEASE TAKE NOTICE that pursuant to Rule 30(b)(6) of the Federal Rules of Civil Procedure, Plaintiff in the above-caption matter, by and through its counsel, will take the deposition upon oral examination of Defendant Sanofi on June, 28, 2018 – or other mutually agreeable date consistent with the Court's scheduling orders – at the offices of Cahill Gordon & Reindel LLP in New York, New York regarding the topics set forth in Schedule A attached hereto.

Sanofi shall provide a written designation of the name(s) and position(s) of one or more officers, directors, managing agents, or other persons who shall be produced to testify concerning each of the topics listed in Schedule A. Plaintiff reserves the right to supplement or amend this notice and/or Schedule A.

NOTICE IS FURTHER GIVEN that the deposition will take place before a notary public or other officer authorized to administer the oaths and record testimony pursuant to Rule 28 of the Federal Rules of Civil Procedure. The deposition shall continue from day to day until completed, and will be recorded by stenographic and videographic means.

PLEASE TAKE FURTHER NOTICE that Plaintiff reserves the right to take further depositions of Plaintiff pursuant to Rule 30(b)(6).

Dated: May 23, 2018         CAHILL GORDON & REINDEL LLP
New York, NY

                                         By: /s/ Charles A. Gilman
                                                      Charles A. Gilman
                                                      Michael B. Weiss
                                                      Brent L. Andrus

                                                      Eighty Pine Street
                                                      New York, NY 10005-1702
                                                      (212)-701-3000
                                                      cgilman@cahill.com
                                                      mweiss@cahill.com
                                                      bandrus@cahill.com

                                                      *Attorneys for Plaintiff*
                                                      *UMB Bank, N.A., as Trustee*

**Schedule A**

**DEFINITIONS AND INSTRUCTIONS**

1. This Notice incorporates by reference the Uniform Definitions in Discovery Requests set forth in Local Civil Rule 26.3 for the United States District Courts for the Southern and Eastern Districts of New York.

2. All terms defined in the CVR Agreement shall have such meaning as ascribed to them in the CVR Agreement.

3. All other undefined terms shall have the meaning as used at Sanofi.

4. "Allston Landing" means the protein manufacturing plant in Allston Landing, Massachusetts.

5. "CVR" and "CVRs" means Contingent Value Rights under the CVR Agreement, as defined below.

6. "CVR Agreement" means the Contingent Value Rights Agreement by and between Sanofi-Aventis and American Stock Transfer & Trust Company, LLC, as Trustee, dated as of March 30, 2011.

7. "Genzyme" means Genzyme Corporation and any agents thereof acting as such.

8. "Merger" means the March 2011 merger between Sanofi and Genzyme.

9. "Production" and "Produce" have the same meaning the parties to the CVR Agreement intended the term "production" to have therein, particularly as that term is used in the definition of "Production Milestone."

10. "Sanofi" means Sanofi and any agents thereof acting as such or any Affiliate.

11. The time period relevant to the examination will be from January 1, 2010 to July 31, 2016 unless otherwise specified.

## SUBJECTS OF RULE 30(b)(6) EXAMINATION

1. Genzyme's rationale for entering into the CVR Agreement, the negotiations of the terms thereof and any Board of Director deliberations and materials relating thereto.

2. Sanofi's rationale for entering into the CVR Agreement, the negotiations of the terms thereof and any Board of Director deliberations and materials relating thereto.

3. Why Sanofi did not timely achieve the Production Milestone, including without limitation:

    a. All experts and consultants with whom Genzyme/Sanofi communicated concerning the production of Cerezyme or Fabrazyme subsequent to the Merger and prior to this litigation.

    b. Consideration of what Genzyme/Sanofi might have done differently to have increased the likelihood that the Production Milestone would have been achieved.

    c. Each way in which Sanofi did or did not exercise Diligent Efforts to achieve the Production Milestone.

4. Why Sanofi did not timely achieve the Approval Milestone, including without limitation:

    a. All experts and consultants with whom Genzyme/Sanofi communicated concerning the approval of Lemtrada subsequent to the Merger and prior to this litigation.

    b. Consideration of what Sanofi might have done differently to have increased the likelihood that the Approval Milestone would have been achieved.

    c. Each way in which Sanofi did or did not exercise Diligent Efforts to achieve the Approval Milestone.

5. Why Sanofi did not timely achieve Product Sales Milestone #1, including without limitation:

    a.    All experts and consultants with whom Genzyme/Sanofi communicated concerning the development, launch, marketing, promotion and commercialization of Lemtrada subsequent to the Merger and prior to this litigation.

    b.    Consideration of what Sanofi might have done differently to have increased the likelihood that Product Sales Milestone #1 would have been achieved.

    c.    Each way in which Sanofi did or did not exercise Diligent Efforts to achieve Product Sales Milestone #1.

6. Genzyme's plans for the approval, development, launch, marketing, promotion and commercialization of Lemtrada prior to the Merger, including without limitation:

    a.    The annual budgets (including dedicated manpower and money) of Genzyme for the approval, development and commercialization of Lemtrada prior to the Merger.

    b.    All recommendations and plans for the approval, development, launch, marketing, promotion and commercialization of Lemtrada provided to Genzyme by consultants prior to the Merger.

    c.    All clinical trials and studies, concerning Lemtrada (whether or not conducted) considered by Genzyme prior to the Merger.

7. Sanofi's plans and the implementation and execution of those plans for the approval, development, launch, marketing, promotion and commercialization of Lemtrada subsequent to the Merger; including without limitation:

    a.    The annual budgets (including dedicated manpower and money) of Sanofi for the approval, development and commercialization of Lemtrada subsequent to the Merger.

    b.    All recommendations and plans for the approval, development, launch, marketing, promotion and commercialization of Lemtrada provided to Sanofi by consultants subsequent to the Merger.

    c.    All clinical trials and studies concerning Lemtrada (whether or not conducted) considered by Sanofi subsequent to the Merger and any reasons for not undertaking or delaying such studies, including, but not limited, to studies in primary progressive multiple sclerosis.

8. All lifecycle management or related activities undertaken or considered and not undertaken with respect to Lemtrada, including, without limitation, development of a subcutaneous formulation or a biomarker for secondary auto-immunity.

9. The current clinical evidence supporting the use of Lemtrada as a treatment for any form of multiple sclerosis, including without limitation Primary Progressive Multiple Sclerosis ("PPMS").

10. Consideration by Sanofi subsequent to the Merger of the terms of the CVR Agreement or payments to Bayer with respect to any aspect of the development, approval, pricing, reimbursement, launch, marketing, and/or commercialization of Lemtrada.

11. The process leading to regulatory approval of Lemtrada in the United States, including without limitation:

    a. Preparation, submission, resubmission and discussions with the Food and Drug Administration ("FDA") concerning the electronic common technical document ("eCTD").

    b. The Refusal to File letter, and all communications with the FDA concerning the Refusal to File letter and any analysis for the root cause of the Refusal to File letter.

    c. The Complete Response Letter and all communications with the FDA concerning the Complete Response Letter and any analysis for the root cause of the Refusal to File letter.

    d. The loss of Fast Track status for Lemtrada.

    f. The consideration of an accelerated approval and the planning for the disability verification study and the subsequent decision not to pursue such a study.

    e. The labeling and indication of Lemtrada.

12. Sanofi's purchases of the CVRs, including without limitation the dates and numbers of CVRs purchased by Sanofi and the prices thereof.

13. Sanofi's sales of Cerezyme and Fabrazyme that was manufactured prior to the date of the Production Milestone but not counted toward achievement of the Production Milestone.

14. The Product Sales Statements and the certifications thereof, including without limitation:

    a.    All documents and information reviewed and considered in connection with the certification of each certified Product Sales Statement.

    b.    All adjustments made to the gross revenues generated by sales of Lemtrada to produce the numbers reflected in the certified Product Sales Statements.

    c.    All policies and procedures relating to the application of accounting standards and the internal financial and accounting controls to sales of Lemtrada recorded in the Product Sales Statements.

15. Meetings subsequent to the Merger at which one or more Genzyme/Sanofi employees or executives were present concerning the CVR Agreement, including without limitation Sanofi's compliance or noncompliance with any terms of the CVR Agreement.

16. The efforts and plans to achieve resumption of supply of Fabrazyme and Cerezyme during the period January 1, 2011 through June 2012, including, without limitation:

    a.    Analysis of the regulatory status and interaction with regulatory authorities relating to Allston Landing, 74NYA and the regulatory status of products manufactured there, including, without limitation, consideration of accelerated regulatory processes.

    b.    Assessment and implementation of technical or other improvements intended or with the potential to increase the level of manufacture, processing and fill and finish of Fabrazyme or Cerezyme.

    c.    The role and timing of the direct involvement of Sanofi employees with respect to the supply of Fabrazyme or Cerezyme.

17. Project McLean.

18. The establishment of the pricing and reimbursement of Lemtrada.

19. The date of First Commercial Sale in Germany and the United States and Sanofi's basis for its determinations of the date thereof.

20. The date of Product Launch in Germany and the United States and Sanofi's basis for its determination of the date thereof.

21. The planning, timing, decision-making and execution around the filing for approval, pricing and reimbursement approval and launch of Lemtrada in each country of the world, including, without limitation, Japan.

22. The document and information retention polices of Genzyme/Sanofi with respect to documents and information concerning:

      a.      the production of Cerezyme or Fabrazyme.

      b.      the approval of Lemtrada.

      c.      the development, launch, marketing, promotion and commercialization of Lemtrada.

      d.      individuals leaving the employment of Genzyme/Sanofi whose work included reference to Cerezyme, Fabrazyme and/or Lemtrada.

      e.      all litigation holds or preservation directions put in place with respect to documents or information concerning topics 22a, 22b, 22c and 22d above.

23.    The collection and processing of documents in this litigation.