# Exhibit B

Page 1

```
 1
 2           IN THE UNITED STATES DISTRICT COURT
 3         FOR THE SOUTHERN DISTRICT OF NEW YORK
 4
 5   UMB BANK, N.A., as Trustee, )
                                 )
 6                 Plaintiff,    ) No. 1:15-cv-08725
                                 ) (GBD)(RWL)
 7           vs.                 )
                                 )
 8   SANOFI,                     )
                                 )
 9                 Defendant.    )
     ----------------------------)
10
11
12
13
14
15
16       VIDEOTAPED DEPOSITION OF S. ALBERT EDWARDS
17                  New York, New York
18                Friday, March 8, 2019
19
20
21
22
23   Reported by:
24   KRISTIN KOCH, RPR, RMR, CRR
25   JOB NO. 156490
```

1  S. A. Edwards

2 changing technologies, changes science,

3 changing medicine; correct?

4     A.    That's correct.

5     MR. MINTZ: Objection. Form.

6     Q.    That's correct.

7     THE COURT REPORTER: I'm sorry?

8     MR. MINTZ: Objection to form.

9     Q.    And you didn't actually have any

10 firsthand experience with the Lemtrada

11 application; correct?

12     A.    And by firsthand experience you

13 mean --

14     Q.    You were not involved personally

15 with respect to any aspect of the Lemtrada

16 application to the FDA; correct?

17     A.    No. No.

18     Q.    After the FDA you spent a few years

19 at a couple of other positions.

20     You were an assistant professor,

21 correct, at Howard?

22     A.    That's correct.

23     Q.    You were a senior staff

24 pharmacologist at the National Institute of

25 Health?

1               S. A. Edwards

2    "stated another way."

3              MR. MINTZ:  Sorry.  Which paragraph

4        are we on?

5              MS. VENEZIA:  End of 23, second to

6        last sentence.

7        A.    Okay.  I see that.  I'm with you.

8        Q.    Isn't the converse also true?

9        A.    In other words, let me clarify what

10   I think you are saying, and that is even a

11   product with negative clinical outcomes and

12   otherwise negative attributes, is that where

13   you are going?

14       Q.    No.

15       A.    Can fail to achieve approval?

16       Q.    Let me see if I can help.

17       A.    Okay.

18       Q.    If you have a product where the

19   regulatory strategy that's been employed is one

20   that you would say is consistent with a

21   diligent efforts obligation, but the product

22   safety profile is such that the FDA is not

23   willing to issue an approval, isn't that also

24   the case, in other words, isn't it the case

25   that you could have an impeccable regulatory

1  S. A. Edwards

2  strategy, yet the FDA still deems the product
3  not suitable for public use?
4  A. Yes, that can happen.
5  Q. If you go to pages -- I'm sorry --
6  paragraphs 28 to 29, there is a reference to
7  the division of neurology products; correct?
8  A. Yes.
9  Q. And this division was actually
10 formed after you left the FDA; correct?
11 A. Yes.
12 Q. Are you aware that a published
13 report from 2014, which examined all of the
14 existing FDA divisions, found that DNP was the
15 slowest division at FDA in terms of product
16 approval, were you aware of that?
17 A. I'm not aware of that, no.
18 Q. Would that have impacted your
19 opinion in any way?
20 A. I wouldn't be surprised by that sort
21 of outcome, because neurologic diseases are
22 among the most difficult to research and find
23 viable efficacy measures for.
24 Q. In paragraph 32, you talk about the
25 FDA, and I am now sort of three-quarters of the

S. A. Edwards

secrets, but I guess --

A. Well, let's say secrets from the point of view that one of those could surface and cause an RTF.

Q. And I guess what I was thinking is it seems possible to me that an -- FDA could think of an issue, notwithstanding all of its prior work in the six to seven, eight, nine years that you have talked about, that crystallizes in a way it had not crystallized before and, thus, raises additional or new concerns that it hadn't previously expressed. That's all I was trying to sort of get at.

A. Yes. And, you know, over a shorter period of time I have experienced that. We thought we had -- and you are just triggering a memory. We thought we had the ideal antibiotic answer to some of the most vexing infections that cancer patients get or that HIV patients get, suffering as sort of a side effect of their disease. We went through phase 1 planning, which was fairly complicated, because this drug had a five-day half-life. So it doesn't disappear from your body in a day. You

1                S. A. Edwards

2  would have yielded a -- assuming correctly

3  formatted data elements all in shape for

4  review, this would have yielded an approval

5  third or fourth quarter of 2013.

6      Q.   So based on all of those assumptions

7  that you just listed, that's how you reached

8  your third or fourth quarter of 2013?

9      A.   Right, that's my explanation.

10     Q.   In footnote 56 you have a reference

11 to the "timing assumes Sanofi used the correct

12 people and resources to achieve these

13 milestones."

14          What do you mean by "correct people

15 and resources"?

16     A.   Previously we discussed the TAP 85

17 gigabyte application and I listed some people

18 and parameters that were present and, you know,

19 I believe those resources are available either

20 directly from Genzyme or they are available as

21 contract resources from the contract research

22 industry to fulfill those needs.

23     Q.   And I believe you earlier said you

24 did not know the number of people on the

25 Lemtrada application.  So are you saying here

1  S. A. Edwards

2 approximately 60-plus days.

3     Q.    And is it your view that Sanofi
4 should have anticipated each component that the
5 FDA requested at the pre-BLA meeting?

6     A.    They certainly should have had
7 access to pre-BLA meeting materials from at
8 least Aubagio to be predictive of what FDA was
9 going to ask them for. Moreover, just the
10 primary tenet that FDA is always going to be
11 concerned about safety, and so I would expect
12 going into that meeting FDA is going to have a
13 conversation with you about all the safety data
14 surrounding Campath. That shouldn't be a
15 surprise.

16     Q.    And, in your view, is it typical for
17 pharma companies to anticipate each request
18 that the FDA might pose at a pre-BLA meeting?

19     MR. MINTZ: Objection to form.

20     A.    It's typical for them to, let's say,
21 do their best and try and anticipate every
22 request that FDA has, yes.

23     Q.    But you can't always anticipate
24 every request; correct?

25     A.    Right, you can't be perfect.

1  S. A. Edwards

2  Q. Have you ever attended -- and I
3  think I may have asked you this before, but
4  apologies if I'm duplicating -- a pre-BLA
5  meeting?
6  A. I have not attended a specific
7  pre-BLA meeting, no.
8  Q. And you say "specific pre-BLA." I
9  don't know if you are trying to make a
10 distinction there.
11 A. Pre-NDA meeting, pre-IND meeting,
12 those sorts of things.
13 Q. In your experience, is it uncommon
14 for sponsors to receive follow-up from FDA at a
15 pre-BLA meeting?
16 A. I guess I would say it's certainly
17 not the norm to receive follow-up requests.
18 One -- one would hope that going into that sort
19 of a meeting you have an interaction with the
20 agency, you find out all their needs, and then
21 you kind of close things out when you leave --
22 leave the doorway.
23 Q. I know you said you hadn't attended
24 a pre-BLA meeting, so what experience are you
25 drawing that conclusion from?

1              S. A. Edwards

2       A.    The pre-IND meeting and NDA meetings
3  that I attended.
4       Q.    And so in the context of those
5  meetings, you, yourself, have not experienced a
6  situation in which the FDA requested follow-up
7  items arising out of that meeting?
8       A.    No.  I am usually pretty relentless
9  in terms of people doing -- do your homework,
10 get it done early and get the data in front of
11 the decision makers at FDA to get the yes.
12      Q.    And is your experience typical
13 of what other pharma companies with
14 similarly-situated products see when they are
15 at the pre-BLA meeting?
16      A.    I -- I believe it is, especially
17 when you have limited time to achieve a
18 particular review date hanging over your head.
19      Q.    And can you name any specific pharma
20 companies that you are aware went through a
21 pre-BLA meeting without receiving any follow-up
22 from the FDA?
23      A.    I'm not aware of any.
24      Q.    Is it your view, based on the
25 materials that you have reviewed, that Sanofi

1          S. A. Edwards

2   regulatory intelligence and actively

3   communicated with the FDA, it would have

4   addressed the FDA's concerns well in advance of

5   March 31, 2014, and FDA approval would have

6   been achieved during December of 2013";

7   correct?

8       A.   Yes.

9       Q.   And there is no source cite for

10  that; correct?

11      A.   There is no source for that, that's

12  correct.  I think I earlier today traced you

13  through my timing from the pre-BLA meeting in

14  2012 through a liberal sequence of activities

15  to get to the third or fourth quarter of 20 --

16  2013 for an approval.

17      Q.   Right, we did speak about that, but

18  you can't actually guarantee that approval

19  would have occurred; correct?

20          MR. MINTZ:  Objection to form.

21      A.   I can't guarantee that approval

22  would have occurred at that time.  All I can do

23  is reflect on the fact that approximately

24  eleven months later, no new data, FDA did

25  approve Lemtrada.

S. A. Edwards

A.   It would depend on the trial design and the specifics for that.

Q.   Do you have an approximate ballpark?

A.   I don't.

Q.   Could those trials have been completed from start to finish in twelve months, including the recruitment of patients?

A.   From start to finish, that would probably be difficult, but, you know, it would, I think, depend upon the level of recruitment that you could undertake once the -- once the study design was laid out.

Q.   And, in your view, would it have been possible to prior to March 31 of 2014 have had recruited the patients, completed the trials, completed a submission to FDA and actually had FDA approve that submission?

MR. MINTZ:  Objection to form. It's -- objection to form.

A.   Certainly for a promising drug like Lemtrada one would hope that that would all be doable within that time frame.

Q.   Other than hoping that it would be doable, do you have any basis --

1           S. A. Edwards

2      A.   I don't have any -- I -- I have not
3 delved into the specific step-by-step process
4 to tease that out.
5      Q.   And is it your opinion that putting
6 aside whether the studies would have been
7 completed by that time, that just initiating
8 the study would have been sufficient for the
9 FDA to get comfortable with approval?
10     A.   I think it would have signaled --
11 sent a very strong signal to FDA to the
12 neurology review division that Lemtrada had
13 additional indications to offer and would
14 change the regulatory landscape for the further
15 review of it.
16     Q.   Would that have guaranteed approval?
17     A.   One would certainly hope so, but
18 there is -- if you use the word "guarantee," I
19 would have to say no.
20     Q.   Can you point to any specific
21 experience that you have had in which
22 initiating such a study has led the FDA to
23 reverse course or avoid a CRL, as you put it?
24     A.   Not avoid a CRL, but I can tell you
25 that TAP's consistent presence in the Lupron

1                     S. A. Edwards

2 the compounds that I work with had either

3 backup compounds or additional indications that

4 they wanted to pursue, and so the trending down

5 of a single application would not end the

6 drug's life at TAP, it would merely switch to

7 another indication.

8       Q.    But the drug life at Sanofi also did

9 not end at the disability miss; correct?

10      A.    Right.

11      Q.    In 134, at the end of that you say:

12 "Had Sanofi initiated a DVS study immediately

13 after the CARE-MS-I results were reported,

14 Sanofi would have avoided the CRL." And,

15 again, what's your basis for that?

16      A.    Again, it's the switching of

17 development paths to something that is an unmet

18 medical need which has a higher attention span

19 at FDA and a higher possibility of succeeding.

20      Q.    Sitting here today, you don't know

21 whether the FDA would have approved Lemtrada

22 without a CRL simply by virtue of a DVS study;

23 correct?

24           MR. MINTZ: Objection to form.

25      A.    I can't guarantee that approval, but

1  S. A. Edwards
2  it would have given another avenue to approval.
3  Q. Similarly in 135 you talk about the
4  revokal of the Lemtrada Fast Track designation.
5  Is it your opinion that initiating a
6  DVS or PPMS study would have gotten Fast Track
7  reinstated?
8  A. I think it would, yes.
9  Q. And does that opinion assume that at
10 the time there was actually data to support
11 reversal of disability?
12 A. I think there was at that time, yes.
13 Q. In 2012?
14 A. Yes.
15 Q. Is there any reason, in your view,
16 why a pharmaceutical company would not want to
17 initiate a study while an application was
18 currently pending?
19 A. Would not want to initiate a study?
20 There are probably reasons. I am not aware of
21 any as I sit here right now why that wouldn't
22 be the case.
23 Q. How about the risk of obtaining
24 negative data from the ongoing study while you
25 have a pending application with the FDA, is

1                S. A. Edwards
2    only drug after drug, but they see patient
3    experience after patient experience, and so for
4    them to see someone or a sponsor who is willing
5    to work on an unmet medical need like
6    disability, for instance, knowing all the
7    patients they have seen and all the trials that
8    experience disability, just from a human point
9    of view it's a very strong incentive for them
10   to view your product in a positive way.
11        Q.   The reviewers themselves don't
12   actually have the final say; correct?
13        A.   They don't have the final say, but
14   they are the main basis for decision-making
15   authority in the agency.
16        Q.   I think you said that from a human
17   point of view this would be a strong incentive,
18   a very strong incentive for the reviewers to
19   review -- to view your product in a positive
20   way; correct?
21        A.   Yes.
22        Q.   But does that mean necessarily that
23   the FDA would have had a different outcome?
24             MR. MINTZ:  Objection to form.  We
25        have been down this road a while.  Asked

1                S. A. Edwards

2       and answered.

3       A.    I -- I think I previously said I
4  can't guarantee a positive outcome from this.

5       Q.    In paragraphs 138 and 139 you cite a
6  number of documents.  These documents are all
7  from the 2010 and early 2011 period.

8             Does that -- do you recall that?  I
9  know you don't have dates for all of these
10 documents, but you do have some discussion in
11 the text about some of the timing.

12      A.    Right, yes.

13      Q.    And so this would have been -- these
14 documents would have been generated before the
15 disability endpoint in the CAMMS 232 study was
16 missed; correct?

17      A.    Yes, that's correct.  But bear in
18 mind there is a difference between when, let's
19 say, data and documents become final and turned
20 over for sort of public consumption or
21 announcement, and internal discussions in the
22 company months or so back in terms of what the
23 results are.

24      Q.    But the fact that individuals were
25 talking about the reversal of disability prior