# Exhibit K

```
 1
 2           IN THE UNITED STATES DISTRICT COURT
 3         FOR THE SOUTHERN DISTRICT OF NEW YORK
 4
 5   UMB BANK, N.A., as Trustee, )
                                 )
 6                Plaintiff,     ) No. 1:15-CV-08725
                                 ) (GBD)(RWL)
 7             vs.               )
                                 )
 8   SANOFI,                     )
                                 )
 9                Defendant.     )
     ----------------------------)
10
11
12
13
14
15
16      VIDEOTAPED DEPOSITION OF DAVID E. SMOLIN
17                 New York, New York
18             Wednesday, March 20, 2019
19
20
21
22
23   Reported by:
24   KRISTIN KOCH, RPR, RMR, CRR
25   JOB NO. 156494
```

1         D. Smolin
2  diligence report, focused here on this -- on
3  the chemistry manufacturing and control
4  section.
5       Q.   And so, in your experience, this
6  work typically happens pre closing?
7       A.   Well, certainly the due diligence
8  does and -- and there is -- there is a risk
9  assessment in its broadest form that's
10 accompanying that overall due diligence report.
11 Risks and opportunities and the like for -- the
12 term that was always used was are there any
13 show-stoppers.
14      Q.   And is it your experience that in
15 due diligence typically there is sort of a full
16 awareness gained of all of the underlying
17 issues at the company?
18      A.   It's difficult to get a complete
19 awareness, but I -- I believe, having done this
20 a number of times on behalf of Bristol-Myers
21 Squibb, that we had quite a good understanding
22 of what the issues were with respect to any
23 given product.
24      Q.   And in connection with any of your
25 acquisitions or acquisition work while at

1                    D. Smolin

2        Q.    Would it depend on what that
3   information actually is?
4        A.    Yes.
5        Q.    Do you have any knowledge
6   independent from what's set forth in the
7   Phillips report about the specific micro --
8   microcarrier perfusion technology that was used
9   with respect to the manufacture of Cerezyme and
10  Fabrazyme?
11       A.    No, I have not practiced perfusion
12  technology, but I am knowledgeable about its
13  purpose, but I am not an expert in perfusion
14  technology.
15       Q.    Have you ever had occasion to --
16  this may not be the right way to phrase it --
17  work with perfusion technology?
18       A.    Yes.
19       Q.    Okay.  Can you describe that for me?
20       A.    I previously referenced perfusion
21  technology being applied for the inoculum
22  expansion steps for the production of Enbrel.
23       Q.    And anything other than that process
24  in Enbrel?
25       A.    No.  Perfusion technology ordinarily

1                     D. Smolin

2    perspective, could provide an additional hurdle

3    to over -- overcome with -- but I emphasize

4    could provide an additional hurdle to overcome.

5    The Consent Decree is meant to help assure the

6    sponsor remains compliant in all respects with

7    good manufacturing processes, otherwise the

8    Consent Decree wouldn't have been issued in

9    the -- in the first place.

10              So I would say it should be taken

11   into account as to what the nature of the

12   change is, the regulatory classification, and,

13   if you will, offer a potential second check on

14   that submission, but I don't see the Consent

15   Decree as causing an undue delay in any

16   submission of that type.

17       Q.    But you have not yourself had

18   personal experience submitting either a CBE-30

19   or CBE-0 in the context of a company operating

20   under a Consent Decree; correct?

21       A.    No, I have not.

22       Q.    I think we briefly spoke about minor

23   changes or at least you referenced the annual

24   report changes and those are for minor changes;

25   correct?

1  D. Smolin

2  A. I don't recall specific discussions
3  of these. They may have come up during the one
4  meeting that we had here.
5  Q. But no specific recollection of
6  discussing them otherwise?
7  A. No. I don't -- there is certainly
8  no specific recollection regarding the
9  technical information that supports them or the
10  regulatory classifications that they might have
11  been placed under.
12  Q. And with respect to the proposed
13  process improvements that she references in her
14  report, have you performed any analyses on your
15  own to determine whether each would have been
16  feasible to implement at the relevant time?
17  A. No, not -- not an analysis like
18  that.
19  Q. Did you undertake any analysis with
20  respect to the proposed process improvements
21  that she references?
22  A. I only gave them consideration as to
23  what they are proposed to be and how they may
24  be implemented, what regulatory classification
25  they may be given, based on what I knew about

1               D. Smolin

2    too long, these improvements would not have

3    made any difference, and I don't assume that to

4    be correct, the regulatory classification.

5         Q.   Right.  But you can't affirmatively

6    say that they are not accurate; correct?

7              MR. MINTZ:  Objection to form.

8         A.   To my knowledge, there was never a

9    determination of what regulatory classification

10   these process improvements would require.

11        Q.   And you can't affirmatively state

12   one way or the other today whether they would

13   have been qualified as a CBE-0, a CBE-30 or

14   some other classification; correct?

15             MR. MINTZ:  Objection to form.

16        Misstates the record.

17        A.   What I wrote in 69 stands, and in

18   respect to that it can't be assumed that the

19   Sanofi position was correct.

20        Q.   I understand that's what you have

21   said.  My question is slightly different.

22             Are you able to say with certainty

23   that any of the process improvements that

24   Ms. Phillips talks about in her report would

25   have been accepted as a CBE-0 or a CBE-30?

1                    D. Smolin

2       A.    I can't say that with certainty, but
3   I think there is an appropriate probability
4   that they would have been accepted under a
5   lower regulatory classification that should
6   have been pursued by direct discussion with
7   FDA, because, in my opinion, these don't
8   constitute major changes.
9       Q.    But you have not yourself submitted
10  any CBE-0s or CBE-30s that you can recollect;
11  correct?
12            MR. MINTZ:  Objection to form.
13      Q.    For post-approval changes.
14      A.    We have discussed that.  I don't --
15            MR. MINTZ:  Same objection.
16      A.    -- recall.
17      Q.    You go on in 71 to talk about
18  "deciding what regulatory approach to take with
19  respect to implementing a change to the
20  approved process for making a biologic is a
21  matter of judgment and discretion."  Do you see
22  that?
23      A.    Yes.
24      Q.    And you go on to say it's "a balance
25  of regulatory risk and benefit."