Page 1

E. Zerhouni

UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF NEW YORK

No. 15 Civ. 08725 (GBD)

_____
UMB BANK, N.A., as Trustee,                )
             Plaintiff,                    )
      v.                                   )
SANOFI,                                    )
             Defendant.                    )
_____)


DEPOSITION OF DR. ELIAS ZERHOUNI

Baltimore, Maryland

November 7, 2018




Reported by:  M. Payonk

Job No. 150664

1                E. Zerhouni

2    to the CEO of Sanofi for R&D issues that he

3    wanted me to advise him on in March or April of

4    2009.

5        Q.   And then when did you formally join

6    Sanofi?

7        A.   I formally joined Sanofi as an

8    employee of Sanofi on January 1, 2011.

9        Q.   And in what position did you join --

10       A.   I was the --

11       Q.   -- Sanofi?

12       A.   -- president of global R&D.

13       Q.   And could you briefly describe what

14   your job responsibilities were at that time?

15       A.   Essentially, to be the corporate

16   officer for research and development for the

17   company.

18            Under research and development,

19   medical affairs also reported to research and

20   development as well as regulatory affairs.

21       Q.   And at the time you joined, did you

22   become a member of what was known as the COMEX?

23       A.   Yes.  The COMEX is the French acronym

24   for executive committee.

25       Q.   Correct.  And that's a committee

1                E. Zerhouni

2       A.   Then in -- in September-October,
3  there is a reconciliation of all of these
4  budgeted proposals that come then to the CEO.
5  And at the end of the year in December the
6  final budget is approved by the CEO and the
7  board.
8            So I -- I'm sorry to go through these
9  details because if you are external to that you
10 will tend to think that the June proposal is
11 the real budget.  The June proposal is a
12 wished-for budget which is then -- then
13 arbitrated according to the requirements of the
14 company, which is also in line with your
15 long-range plan, which is modified that year
16 for an extra year.
17           So when you looked at the long-range
18 strategic plan for R&D as you mentioned, the
19 goal was to keep the total envelope flat or
20 slightly declining, not just R&D.  R&D, medical
21 affairs, regulatory, all of it.
22           And then when you came to the -- the
23 plan for that year, you make proposals and you
24 prioritize and you say it's really important
25 for me to do more of this, less of that, I want

1              E. Zerhouni
2  to cut this, I want to augment that.
3         And then the totality of that is then
4  reconciled by the CFO for the -- for the CEO as
5  to exactly what will be presented to the board
6  and finally acted upon by the board, which is
7  then the -- the official budget for the coming
8  year.
9         Sorry to go into a very long
10 presentation to you but I noted that, indeed,
11 it's arcane sometimes for outsiders, and it's
12 important to understand how it's done.
13    Q.   I -- I think understand the Sanofi
14 budgeting process pretty well.
15    A.   You probably do.
16    Q.   So, for example, the process that you
17 described includes something called a preread;
18 correct?
19    A.   Preread is a mechanism by which we
20 inform all members of a team with
21 predocument -- preread document so that they
22 can be ready for the conversation at the
23 meeting.
24    Q.   And in prereading, there's often
25 specific instructions given that are

1                E. Zerhouni

2        A.   I mean, to me, Chris told me the most
3   important thing was to maintain the viability
4   of Genzyme and its programs and do every effort
5   to make sure that that -- that that acquisition
6   turned into a success, not a failure.  And
7   Lemtrada was part of it so we had always --
8        Q.   Okay, okay.
9        A.   -- considered that.
10       Q.   Thank you for your answer.
11            Were you given any specific
12  instructions as to what the obligation of
13  Genzyme was with respect to using diligent
14  efforts to meet certain milestones as they
15  related to Lemtrada?
16       A.   Legally?  No.  Specifically?  No.
17  The only thing I was told was to make every
18  reasonable effort to make sure that the -- the
19  programs that were transferred were successful
20  and that the Genzyme enterprise was successful
21  in terms of its integration.  So do not disturb
22  anything that could be jeopardized, including
23  Lemtrada in particular.
24       Q.   Okay.  But no instructions were given
25  about how to treat allocation of resources to

1                E. Zerhouni

2   Lemtrada specifically?

3       A.   Basically, what -- what I knew was to

4   make absolutely clear that this was a priority

5   that will have to be looked at in the context

6   of a global R&D to the same extent of diligence

7   and effort that we would do for any molecule.

8       Q.   Okay.  But nothing specific to

9   Lemtrada?

10      A.   Only in the conversation with Chris

11  Viehbacher, and he sent me emails and -- that

12  he basically said I'm really, really, really

13  focused on making sure that the Genzyme

14  acquisition is done smoothly, that we don't

15  smother that company, it's a biotech company,

16  and Lemtrada was cited as part of the

17  priorities for --

18      Q.   Okay.

19      A.   -- that.

20      Q.   Okay.

21      A.   So we had a set of priorities for

22  making sure that Genzyme -- the Genzyme

23  acquisition would be successful and in

24  particular, amongst many other instructions,

25  Lemtrada was part of it.

1        E. Zerhouni
2    A.   Yeah.
3    Q.   -- you indicate to him ultimately, if
4 you really believe in this, you can appeal and
5 Chris Viehbacher can arbitrate; right?
6    A.   Yeah, that is correct.
7    Q.   And you go on to say that meantime,
8 we follow the rules he and Jerome outlined.
9         Do you see that?
10   A.   No, I don't.  Show me again.  What
11 line?
12   Q.   Same thing.  It's in the second
13 paragraph of your email of October 2012.
14        See that?
15   A.   After all the budget's done and you
16 want to appeal.  By Chris, I certainly will
17 understand.  In the meantime, we follow the
18 rules he and Jerome outlined, yes.
19   Q.   So basically, Jerome Contamine, CFO,
20 and Chris Viehbacher, CEO, had set some pretty
21 clear rules about what should happen with the
22 budget.  And the deal at the time was follow
23 the rules.  If you don't agree with it,
24 ultimately you can take it up personally with
25 Chris Viehbacher in a form known as an

1                E. Zerhouni

2    arbitration; correct?

3        A.   That's correct.  In other words, what
4    I'm saying is, you know, look, I'm -- my hands
5    are tied.  I don't have an infinite amount of
6    monies to give you.  They are defined by Jerome
7    and Chris, and each -- within each perimeter
8    you have to be following those rules which
9    again relate to the LRP, the budget request,
10   the guidance, and -- and so forth.

11       Q.   If you go to the fifth paragraph of
12   your email back of October 2012 --

13       A.   Uh-huh.

14       Q.   -- it says "In terms of medical
15   management."  You see where I am?

16       A.   Yeah.

17       Q.   And it says:  "Given the delay in
18   filing Lemtrada, I think you could easily
19   reduce that portion significantly and request
20   that you do so out of this RD budget."

21            Do you see that?

22       A.   Yeah.

23       Q.   What are you referring to here?

24       A.   Okay, so timing, right?  So start at
25   beginning.  In terms of medical management,

1             E. Zerhouni

2       Q.   So sorry.  I'll withdraw the
3  question.  Previously, you said one way you
4  might get a negative signal is that the
5  patients don't accumulate enough disability at
6  your point of measurement.
7       A.   That is correct.
8       Q.   Here what you're saying is even if
9  they actually did develop disability because
10 the Rebif arm did better than we thought, on a
11 hazard ratio basis you might get a lack of
12 statistical significance; correct?
13      A.   That is correct.  So just to make it
14 very straight so that everybody understands,
15 all right, when you do a trial -- do you mind?
16      Q.   No, please.
17      A.   Okay.  So when you do a trial, you're
18 comparing the slope of separation.  So theory
19 number 1 is that the slope is -- is not large;
20 and therefore, it takes time to see the
21 results.  Where the other is that the
22 comparative arm, instead of being here, it's
23 here.  And the slope is good, but you have a
24 difference between the starting points of the
25 two.

Page 304

1         E. Zerhouni
2         THE WITNESS:  November '17 no.
3         MR. WEISS:  But then I'm going to
4    go backwards.
5         THE WITNESS:  Okay.
6    BY MR. WEISS:
7         Q.   So I show you what's been marked for
8    identification as Plaintiff's Exhibit 659.
9         Do you recognize it?
10        A.   Uh-huh.
11        Q.   And what is it?
12        A.   These are minutes of an IDC, in
13   particular, the development council, which is
14   the decision-making body for --
15        Q.   And --
16        A.   -- for pushing forward programs.
17        Q.   And this is fairly recent; correct?
18        A.   November '17 is about eight months,
19   10 months.
20        Q.   When did you leave Sanofi?
21        A.   July 1, 2018.
22   ▮ ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬
▮ ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬
▮ ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬
▮ ▬▬▬▬▬▬▬▬▬▬