1

2      IN THE UNITED STATES DISTRICT COURT

3     FOR THE SOUTHERN DISTRICT OF NEW YORK

4

5  ------------------------------------x

6  UMB BANK, N.A., as Trustees,

7              Plaintiff,          C.A. No.

8     V.                    15 Civ. 08725(GBD)

9  SANOFI,

10             Defendant.

11 ------------------------------------x

12

13           C O N F I D E N T I A L

14    VIDEOTAPED DEPOSITION OF CAROLE HUNTSMAN

15           Boston, Massachusetts

16             May 8, 2018

17

18

19

20

21

22  Reported by:

23  MARYJO O'CONNOR, RMR, CSR

24  JOB NO. 141699

25

1      C. Huntsman - Confidential

2  Aubagio, was approved in, I believe, either

3  October or November of 2014.

4      Q.  And in that case, it was part of

5  the normal practice of the company to assess

6  the commercial situation, determine whether

7  additional studies were warranted, and, if

8  so, conduct them and seek to expand the

9  label, correct?

10      MR. AMSEL:  Objection to the form.

11   You can answer.

12      A.  I think that it is typical to

13  assess whether you want to do a study to

14  expand the -- submit and expand the label,

15  yes.

16      Q.  When you say "typical," you would

17  say that it is a common practice in the

18  pharmaceutical industry?

19      A.  Yes.

20      Q.  And part of that, in your opinion,

21  does that fall into what might otherwise be

22  known as life cycle management?

23      A.  Yes.

24      Q.  So we'll talk about this a bit

25  later, but what do you understand "life cycle

1              C. Huntsman - Confidential

2    management" to be?

3         A.   It is a means by which you expand

4    what is known about a product, whether it is

5    analysis of studies -- additional analysis

6    from studies that have already been done or

7    initiating new studies.

8         Q.   And life cycle management, or LCM

9    is, again, a typical or common practice in

10   the pharmaceutical industry?

11        A.   Yes.

12        Q.   And, in fact, when you were at

13   Serono, you became aware that LCM did not

14   just include data but could also include

15   reformulation, for example?

16        A.   Yes.

17        Q.   So, for example, moving a drug

18   from IV to sub-Q, would be an example of LCM?

19        A.   Yes.

20        Q.   And in some instances, that can

21   actually have a profound implication on the

22   commercial success of the product, correct?

23             MR. AMSEL:  Objection to the form.

24        You can answer.

25        A.   I think it's on a case-by-case

Page 80

C. Huntsman - Confidential

1   media activity around Lemtrada also
2   continues, with Drs. Daniel Kantor and Barry
3   Singer tweeting live from today's oral
4   presentation with Dr. Eva Havrdová, as well
5   as Don Seiffert from Boston Business Journal,
6   who tweeted that 'Lemtrada is looking
7   increasingly like a cure for multiple
8   sclerosis.'"
9
10          Do you see that?  It's on the
11  first page.  It's the last sentence under the
12  section that begins "Lemtrada." Do you see
13  that?
14          A.  Yes.  Sorry.
15          Q.  Were you aware of that statement
16  at the time it was made?
17          A.  No.
18          Q.  And are you aware of any efforts
19  on the part of either Sanofi or Genzyme to
20  correct Don Seiffert?
21          MR. AMSEL:  Objection to the form.
22      You can answer.
23          A.  I'm not aware.
24          Q.  Now, previously we were talking
25  about Canada.  So when you joined Sanofi in

1          C. Huntsman - Confidential

2   2012, what was your primary job assignment?

3          A.   It was to build out the MS

4   organization and prepare for the launches of

5   both of our MS therapies in North America.

6          Q.   And at the time you joined,

7   essentially, you were given the task of

8   building the actual commercial and marketing

9   infrastructure for those two drugs, correct?

10         A.   Yes.

11         Q.   And, briefly, what does that

12  entail?

13         A.   It entails hiring and training

14  people, developing product strategy and

15  collateral, and taking care of all commercial

16  aspects of launch.

17         Q.   And so let's talk a little bit

18  about that in the context of MS, because it's

19  a little more complex in MS than it would be,

20  say, in other drug context, correct?

21         A.   I'm not sure what you mean by

22  that.

23         Q.   What is a REMS, R-E-M-S?

24         A.   That's a risk evaluation and

25  mitigation strategy.

1         C. Huntsman - Confidential

2          Do you see that?

3     A.   Yes.

4     Q.   And it identifies that one

5  potential unmet need is "durable disability

6  improvement."  Do you see that?

7     A.   Yes.

8     Q.   Do you agree that that was, in

9  fact, a new goal for an unmet need?

10        MR. AMSEL:  Objection to the form.

11    A.   Yes.

12    Q.   And "Freedom from clinical disease

13 activity."  Do you see that?

14    A.   Yes.

15    Q.   That also would be an unmet need?

16    A.   Yes.

17    Q.   And might we now call that NEDA?

18        MR. AMSEL:  Objection to the form.

19    A.   Technically, I don't think it's

20 the same definition.  It's changed over time.

21    Q.   But it's the same concept, right?

22    A.   The concept is similar.

23    Q.   And then it says below that,

24 "Durable disability improvement progression-

25 free survival."

Page 194

1            C. Huntsman - Confidential

2       Q.   Okay, fair point.

3



1           C. Huntsman - Confidential



Page 198

1          C. Huntsman - Confidential



Page 199

1           C. Huntsman - Confidential



Page 254

1                  C. Huntsman - Confidential



25              Q.  Do you know what the CVR Agreement

1              C. Huntsman - Confidential

2    is?

3         A.   The what?

4         Q.   CVR Agreement.

5         A.   I don't -- I don't know very much

6    about that at all.

7         Q.   Were you aware of the existence of

8    an agreement relating to the contingent value

9    right that had been issued as part of the

10   merger between Genzyme and Sanofi?

11        A.   I had heard of it.  I just heard

12   it existed.  I read some things that were in

13   the paper, et cetera, about it.  But I never

14   had any discussion about it.

15        Q.   So I don't need to show you the

16   CVR Agreement, because you've never read it.

17        A.   I've never read it.

18        Q.   And if I asked you what the term

19   "diligent efforts" meant, you couldn't tell

20   me?  In the CVR Agreement.  Withdraw the

21   question.

22             With respect to the "diligent

23   efforts" clause in the CVR Agreement, you

24   couldn't tell me what it is?

25             MR. AMSEL:  Objection to the form

```
 1              C. Huntsman - Confidential
 2        of the question.  Objection; calls for a
 3        legal conclusion.  But you can answer it.
 4             A.  I've never read the CVR Agreement.
 5             Q.  Has anyone ever given you a
 6        summary of the CVR Agreement?
 7             A.  No.
 8             Q.  Has anyone discussed the CVR
 9        Agreement with you?
10             A.  I'm aware that the CVR Agreement
11        exists, and I'm aware that it's relevant to
12        this ongoing case.
13             Q.  Did your counsel show you the CVR
14        Agreement?
15             MR. AMSEL:  You can answer that
16        question --
17             Q.  Yes or no.
18             MR. AMSEL:  -- "yes" or "no" only.
19        Don't get into any substance of anything
20        that --
21             Q.  And how long did you spend talking
22        to your counsel in preparation for the
23        deposition?
24             A.  Do I have any reason to --
25             MR. AMSEL:  You can answer that.
```